# Exhibit D

**Jeff Rambin**

| | |
|---|---|
| **From:** | Jeff Rambin |
| **Sent:** | Wednesday, January 20, 2010 2:42 PM |
| **To:** | 'Dan_Herp@playstation.sony.com' |
| **Subject:** | CSIRO Subpoena |
| **Attachments:** | Order Denying AMD motion to Quash.pdf; 10-06-05 Kamatani Benq TJW Order.pdf |

Dan,

Thanks for giving me a call.  Thanks to Jennifer Liu as well.  Here is an order where a party relied on the combination of a registered agent for service of process in Texas and the federal rule's invocation of state subpoena range.

That said, the location of the deposition was never the stumbling block here.  In our phone and email conversations, I've reiterated what the notice itself says: we can work out an agreed location.

Based on the phone conversation today there are other issues that make the deposition a non-starter for Sony Computer Entertainment America.  Likewise, our prior conversations have revealed a difference of opinion on whether SCEA is in a position to authenticate the publically available information of its corporate peers and superiors.  I believe that I have already forwarded authority on this point to you, but I attach it again here. See Kamatani, p. 9.

If SCEA's position has changed, leaving deposition location as the sole outstanding issue, please let me know.

Thanks again,

Jeff

Jeff Rambin
CAPSHAW DERIEUX, LLP
220 Energy Centre
1127 Judson Road
Longview, TX 75606
Direct:  (903) 233-4830
Fax:      (903) 236-8787

NOTICE:  This communication is confidential and is made for the purpose of obtaining legal advice or preparing for legal proceedings and is therefore subject to the attorney-client and work product privileges. If you have received it by mistake, please let us know by e-mail reply and delete it from your system. You may not copy this message or disclose its contents to anyone.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| MICROUNITY SYSTEMS ENGINEERING, INC., | § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 2-04-CV-120 (TJW) |
| v. | § | |
| | § | |
| DELL, INC. and INTEL CORPORATION, | § | |
| Defendants. | § | |

## ORDER

Before the Court is Advanced Micro Devices' ("AMD") Motion to Quash the Rule 30(b)(6) Witness Subpoena (Doc. # 81).  Having considered the submissions and arguments of counsel, the Court finds that AMD was properly served with the Rule 30(b)(6) subpoena.  Thus, AMD's motion to quash is DENIED.

IT IS THEREFORE ORDERED that AMD shall notify the court by 3:00 p.m. on August 9, 2005, whether it elects to produce its witnesses for deposition in Travis, Dallas, or Smith County, Texas.  Absent any notification from AMD, the deposition will proceed in Smith County, Texas, at the office of Ramey & Flock, P.C. at a time to be agreed upon by counsel.  In the absence of an agreement, Intel shall proceed to take the deposition pursuant to the Federal Rules of Civil Procedure consistent with the Court's directive.

SIGNED this  5th  day of August, 2005.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION


YASUO KAMATANI, ET AL.                    §

Vs.                                       §            CIVIL ACTION NO. 2:03-CV-437

BENQ CORPORATION, ET AL.                  §


## AMENDED MEMORANDUM OPINION AND ORDER[1]

**1.    Introduction.**

In this patent infringement case, the plaintiffs, Yasuo Kamatani and Laserdynamics, Inc.,

sued the defendants, BenQ Corporation and BenQ of America Corporation for infringement of

United States Patent No. 5,587,981.[2] The patent-in-suit claims methods for discriminating between

different types of optical disks inserted into an optical disk drive by reading total of contents data

or processing an optical signal.  Various discovery motions have been filed, numerous hearings

heard, and multiple sanctions entered in this battle-ridden case.

On August 30-31, 2005, this Court held a Show Cause Hearing addressing new discovery

abuses alleged by the plaintiffs against the defendants.  Prior to the Court's Show Cause Hearing of

---

[1]   This Amended Memorandum Opinion and Order is identical to the Memorandum and
Order entered on October 4, 2005 with the exception that prior footnote 7 has been deleted and
the Court has included a deadline for payment of the monetary sanction described on page 27 of
this Amended Memorandum Opinion and Order.  That portion of prior footnote 7 which
appeared in the October 4, 2005, Memorandum Opinion and Order was a typographical error.

[2]   Unless otherwise noted, the court will refer to the defendants collectively as
"defendants" or "BenQ."

August 30-31, 2005, this Court had already held three separate discovery hearings and issued sanctions against the defendants on two separate occasions.

At the Show Cause Hearing, BenQ proffered witnesses to address discovery disputes relating to the eleventh hour identification of new DVD products and the production, or lack thereof, of technical documents from non-parties Philips and Pioneer. In light of the testimony and documents provided by BenQ, this Court issues this opinion and order entering severe sanctions against BenQ for blatant and extensive discovery violations far in excess of anything this Court has ever encountered. In light of the severity of the sanctions this Court is issuing, the Court will recount the history of the discovery disputes and will set forth the Court's specific findings and the sanctions the Court has previously ordered, culminating with the Show Cause Hearing held on August 30-31, 2005.[3]

## 2.      Procedural History and Prior Hearings.

The court held a scheduling conference in this case on September 14, 2004. At the Scheduling Conference, the Court explained to BenQ's attorneys that this Court's mandatory disclosure requirements in the Court's Amended Discovery Order were far in excess of what was required under the Federal Rules of Civil Procedure. BenQ's counsel stated that they had no objections or requests for modifications of these mandatory disclosure requirements. Accordingly, the Court signed and entered the Amended Discovery Order to govern discovery in this case.

The discovery process began after the scheduling conference with certain disclosures due 30 days after the conference, and the bulk of documentary disclosures due 45 days after the conference or as otherwise set forth in the Court's patent rules. The discovery disputes in this case

---

[3] The Court's prior findings are incorporated by reference.

began to surface as early as November, 2004.

The parties focused their efforts by addressing correspondence to the court and to each other which revealed several disputes, including the issue whether the defendants needed to produce certain documents under the Court's discovery order and whether the defendants had appropriately responded to interrogatories. On February 4, 2005, the court held the first of its three hearings. At this hearing, the plaintiff addressed the following issues: (1) the defendants' failure to comply with the discovery order; (2) the defendants' use of Rule 33(d) to answer interrogatories; (3) the defendants' refusal to respond to contention discovery; (4) the imposition of an artificial time horizon (2001) before which the defendants refused to produce financial information; (5) the defendants' resistance to providing certain other financial discovery in interrogatories; (6) the defendants' refusal to produce samples of the drives; and (7) the defendants' refusal to produce documents relating to drives purchased from Pioneer and Philips and drives BenQ jointly designed with Philips through a BenQ/Philips venture known as PBDS.

The relevance of the PBDS documents has been described in prior orders. PBDS possesses many relevant technical documents showing the operation of several of the accused drives. Thus, documents in the control of BenQ through its participation in PBDS were relevant for purposes of infringement and for assessing the operation of accused products. But documents relating to the formation and operation of the PBDS joint venture were relevant for other reasons as well. The procedural history of this case illustrates why.

On October 14, 2004, BenQ filed a third-party claim against PBDS and Philips. On November 16, 2004, BenQ dismissed its third-party suit against Philips and PBDS and, on January 26, 2005, moved for partial summary judgment. In the motion for summary judgment, BenQ raised

3

a license defense based on a licensing agreement between Philips and LaserDynamics.  Under the license agreement, the plaintiffs covenanted not to sue the customers of Philips and its subsidiaries for infringement of the patent-in-suit.

The agreement defines a subsidiary as a company owned at least 51% by Philips.  Philips owns 51% of PBDS, although Philips and BenQ did not form PBDS until after the effective date of the Philips/LaserDynamics license agreement.  BenQ has repeatedly asserted, inaccurately it turns out, that it purchases all of the optical disk drives sold in the United States from PBDS.  Therefore, according to BenQ, it is a customer of a Philips subsidiary under the terms of the license agreement and is entitled to the benefit of the covenant not to sue.

In response to the motion for summary judgment, the plaintiff maintained that the PBDS joint venture is a sham through which BenQ first sells optical disk drives to the joint venture and then re-purchases those drives from the joint venture to create customer status under the Philips/LaserDynamics license agreement.  The plaintiffs assert that this arrangement is an impermissible sub-license, and therefore BenQ is not covered by the terms of the Philips/Laserdynamics license agreement.  As the Court previously found, documents related to the formation of the PBDS joint venture, the performance of the parties under the terms of the joint venture, and the relationship of between BenQ and Philips are unquestionably relevant for discovery purposes.

By the conclusion of the February 4, 2005, hearing, the Court had issued a modest sanction. It entailed a finding that the defendants were sanctioned for the record, based on subsidiary findings that the defendants had engaged in discovery abuse by delaying production and by taking various untenable positions.  Among these positions was the argument, reflected in the papers, that the

defendants objected to providing "backup" financial information on the grounds that the term

"backup" was vague and that the defendants believed they were not under an obligation to produce

documents under the Court's amended discovery order.  Mindful of the law governing discovery

sanctions, the court issued the least sanction possible – a finding that the conduct was sanctionable.

The Court accepted counsel's representations that document disclosures would be made full and

complete and that interrogatory answers would be supplemented immediately.  The Court overruled

all objections to discovery except those asserting a privilege.  The Court also required the defendants

to file verifications that they had conducted diligent searches for the requested information and had

produced the requested information.  Finally, the Court warned defendants that a failure to comply

with discovery obligations going forward could lead to a judgment being entered against them.  The

Court then recessed the hearing until March 2, 2005, to allow the defendants an opportunity to bring

themselves into compliance with the Court's orders.

On March 2, 2005, the Court held a second discovery hearing.  Among the items at issue in

the March 2nd hearing was whether the defendants had produced documents relating to the PBDS

joint venture and whether the defendants had produced documents related to the dismissal of a third-

party claim in this Court filed by BenQ against PBDS and Philips.  In addition, the plaintiffs

complained that the defendants had not explained fully their efforts to obtain technical documents

from Pioneer and Philips in the verifications filed with the court.

With respect to the documents relating to the PBDS joint venture, the plaintiffs challenged

the sufficiency of the defendants' production.  As an example, the plaintiffs pointed out that the

defendants had produced only an *unsigned* copy of a Memorandum of Understanding relating to the

PBDS joint venture.  The actual PBDS joint venture agreement explicitly stated that a binding MOU

had been concluded between the parties and the plaintiffs were skeptical that the joint venture agreement would expressly refer to a contractual document which had not been executed. Again, all of the PBDS agreements were relevant for at least two reasons: the license defense and the scope of BenQ's right to access technical documents relevant to infringement issues. The MOU was particularly relevant because it suggested that both of the parties to the agreement had a right of access to certain technical documents. BenQ told the Court that it had searched for a signed copy of the MOU but had not located one. BenQ thus represented, again, inaccurately, that the MOU had never been executed. Although the plaintiffs were skeptical, the Court informed the plaintiffs that BenQ could only produce what it had and suggested that the Court would address the issue further if a signed copy eventually surfaced.

With respect to the dismissal of the third-party lawsuit against PBDS and Philips, the defendants informed the court that no documents existed which related to that dismissal, and specifically, that they had withheld no such documents as privileged. *See* Transcript of March 2, 2005, Hearing at 38 ("And if we did withhold anything, we have a log in this case, and any documents would be in the log. There aren't any."). As to the Pioneer and Philips documents, the defendants contended that prior to the formation of the PBDS joint venture, BenQ purchased drives from both Pioneer and Philips and resold those drives. In response to the Court's questioning concerning whether BenQ could request the documents from Pioneer and Philips, the defendants contended they had made such requests and those requests had been refused. Although the plaintiffs expressed doubts as to the accuracy of these statements, based on the Court's review of the filings made in the case at that time, the Court did not order any further sanctions. The Court assumed (incorrectly it turns out), that in light of the signed verifications, the defendants had made a diligent

6

search for all documents, that the requested materials within the defendants' possession, custody, or control had been produced, and that, to the extent the documents had not been produced, they did not exist. As the Court has emphasized previously, six months had elapsed from the date of the scheduling conference, and the defendants had filed sworn declarations attesting to the diligence undertaken to search for and produce all relevant documents.

After the Court's March 2nd hearing, the plaintiffs sought to take several depositions. Immediately prior to the depositions, BenQ produced an additional 39 boxes of documents. None of the deponents could testify as to the specific contents of the boxes, the extent to which the production came from third parties, when the production first came into the possession of BenQ, or what efforts had been made to request or secure the production from third parties. Included among the documents was a signed copy of the MOU that the defendants previously represented did not exist, copies of documents relating to the PBDS joint venture, and various technical documents. Not surprisingly, the production of 39 boxes of documents over a month after the defendants had sworn that diligent efforts had been made to locate and produce documents prompted the plaintiffs to move for sanctions and to file an additional omnibus motion to compel. At approximately the same time, the defendants filed various motions of their own complaining of various discovery transgressions committed by the plaintiffs.

On May 23, 2005, the Court conducted its third hearing. As relates to this issue, the plaintiffs presented a motion for sanctions as a result of discovery misconduct and requested a judgment of infringement. The Court found that BenQ had stonewalled discovery in bad faith. Several events led the Court to conclude that BenQ's approach to discovery fit that description.

First, with respect to the signed MOU, the Court suggested at the May 23rd hearing that it

doubted the signed copy of the MOU to be a "critical" document in the case, or one on which liability would ultimately depend. It was, however, a relevant document to issues in the case, and the defendants represented to the Court that the document did not exist without ever confirming that fact with the other party to the joint venture. This despite the plain language of the joint venture agreement which suggested the parties had entered an MOU. Although BenQ suggested that it suffered great embarrassment when it approached Philips and questioned whether the document existed, BenQ did not show why it neglected to approach Philips (and suffer the same embarrassment) before it represented to the court at the March 2nd hearing that no such document existed. Indeed, at that hearing, in response to the Court's questions concerning documents in the possession of Pioneer, Philips, and the PBDS joint venture, the defendants expressly represented that they had requested documents from those entities and had been refused.

With respect to the documents relating to the dismissal of the third-party claim against Philips and PBDS, the defendants had previously represented that no such documents (privileged or otherwise) existed. However, *after* the representations to this effect had been made at the March 2, 2005, hearing, the defendants finally conducted a search that uncovered several emails between Philips and BenQ regarding the filing of the PBDS claim and the dismissal thereof. This search was ostensibly in response to one of the plaintiffs' new document requests. Again, contrary to the representations made at the March 2, 2005, hearing, several emails relating to the filing of and the dismissal of the third-party claim did exist. It was not until the plaintiffs made a more specific request for the materials that the defendants undertook a more detailed search which ultimately uncovered the emails.

Finally, with respect to the bulk of the materials in the 39 boxes, BenQ's counsel represented

8

at the May 23rd hearing that those documents were relevant technical documents (although not

necessarily "critical" documents) that had been obtained from PBDS files. According to counsel's

explanation to the court on May 23, 2005, BenQ (which is a 49% owner of the PBDS joint venture

with Philips), made no effort to search PBDS files initially because the employees of BenQ treat

PBDS files and BenQ files differently. Counsel suggested that BenQ was finally able to obtain the

documents after persuading PBDS to release its documents for production to the plaintiffs. One of

the primary contacts at PBDS was Mr. T.T. Chen. Mr. Chen, until at least December 2004, was an

employee of BenQ. The Court found that it incredible that BenQ could not "persuade" Mr. Chen

to release these documents until April, 2005, when BenQ owns 49% of the PBDS joint venture.

Again, it bears mention that as of March 2, 2005, BenQ had represented it had searched for and

produced all of the relevant documents in this case. Indeed, contrary to the position taken at the May

23rd hearing that BenQ had not looked in the PBDS files because BenQ viewed PBDS to be a

different company, BenQ's counsel represented on March 2nd that ". . . I can assure the Court that

*we raised this exact issue in going to PBDS* and producing any of the joint venture-related

documents with the clients since February 4. . . ." Transcript of March 2, 2005, Hearing, at 27, ll.

11-14 (emphasis added).

At the May 23rd hearing, the Court was persuaded that BenQ had not performed a diligent

search for relevant documents within its control. It is well-settled that a party is obligated to produce

documents within its *control*, and its obligations are not limited to those documents within the

party's physical possession. *Rosie D. v. Romney*, 256 F. Supp. 2d 115 (D. Mass. 2003); *Triple Five

of Minn., Inc. v. Simon*, 212 F.R.D. 523 (D. Minn. 2002); *Comeau v. Rupp*, 810 F. Supp. 1172 (D.

Kan. 1992). "Control" does not require that a party have legal ownership or actual physical

9

possession of the documents at issue; rather, documents are considered to be under a party's control for discovery purposes when that party has the right, authority, or practical ability to obtain the documents from a nonparty to the suit. *Bank of N. Y. v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135 (S.D.N.Y. 1997). BenQ's counsel was undoubtedly aware of this rule and expressed his understanding of it in the March 2, 2005, hearing. Transcript of Hearing, p. 29, ll. 7-21 (The Court: So you understand, the Court considers in your control to be more than physically in your possession. You understand that don't you? Mr. Risley: Yes, sir . . . .). What became apparent during the May 23, 2005, hearing was that BenQ failed to discharge its obligations before representing to the Court it had produced all relevant documents.

Based on the evidence presented at the May 23, 2005, hearing, the Court found that BenQ misrepresented the status of its efforts to comply with its discovery obligations during the March 2nd hearing. BenQ failed to conduct a diligent search to identify and produce documents in its possession, custody, or control, including documents which may have been in the technical, physical possession of a legally distinct entity. These documents include the signed MOU agreement, the emails relating to the dismissal of the third-party claim (whether privileged or not), and the technical documents obtained from the PBDS joint venture. The Court further found that BenQ made no inquiry of Philips to confirm that no signed copy of the MOU existed prior to representing to the plaintiffs and the Court that the MOU had not been executed. The Court also found that BenQ made no reasonable search for documents relating to the dismissal of the third-party action against Philips and PBDS.

With respect to the documents produced from PBDS, the Court found that BenQ failed to conduct a diligent effort to obtain documents relating to the PBDS joint venture and failed to search

for and obtain documents over which BenQ had the right of control and access, including documents in the physical possession of employees of the PBDS joint venture. To this end, the documents relating to the PBDS joint venture are (and always have been) within the control of BenQ for discovery purposes because BenQ has a 49% ownership interest in the joint venture. Pursuant to the terms of the joint venture agreement, BenQ has the right to appoint members to the board of directors. Under the testimony at the hearing, BenQ's employees in the Design House regularly access documents of the joint venture in the course of BenQ's business. That T.T. Chen was the contact person from whom many of the documents were obtained solidified the Court's findings on this issue. T.T. Chen was, during the pendency of this case (and throughout much of the time that BenQ should have been searching for and producing documents), an employee of BenQ. The court simply would not permit BenQ to reassign its employees to PBDS and then rely on that reassignment to avoid its production obligations in this case.

At the conclusion of the May 23, 2005, hearing, the Court denied the plaintiff's request for death penalty sanctions, but issued further sanctions. These sanctions resulted from the failure of the defendants to bring themselves into compliance with the Court's orders issued at the February 4, 2005, hearing and for misrepresenting the status of the efforts to search for and produce documents at the March 2, 2005, hearing. The Court ordered that the defendants would have one-third less time than the plaintiffs would have to address the jury in *voir dire*, opening statement, and closing argument. The Court also awarded the plaintiffs their attorneys fees incurred in presenting the motion. Any further relief sought by the motion for sanctions presented at the May 23rd hearing was denied.[4]

---

[4] These sanctions remain in effect.

11

**3.    Discovery Issues Identified in Reports to the Court.**

The court will now turn to the discovery issues that emerged after the May 23, 2005, hearing, which necessitated the Show Cause Hearing.   On May 27, 2005, the plaintiffs forwarded correspondence to the Court and explained what discovery was still outstanding from BenQ Corporation and from BenQ America.  As against BenQ Corporation, the requested discovery fell into three broad categories: technical information, financial information, and collection of documents.    As to technical documents, the plaintiffs identified 6 areas: (1) disc recognition/discrimination, as implemented in the PBE Purple Basic Engine Project; the Data Ref 5 Project; and the Data 3 Basic Engine Project; (2) start up procedure and subroutines for all DVD drives as exemplified for the Data-3 bit Engine in the document identified as BQC098438-098473; (3) BenQ Design House documentation of theory of operation for source code of all DVD drives in relation to disc recognition/discrimination, including DVD single layer/dual layer determination; (4) source code and related design documentation for disc recognition/discrimination in all DVD drives, including subroutines identified as "servo.c," "focus.c," "svr_disc.c," and "disked.c" in BenQ's supplemental responses to Interrogatory no. 4; (5) BenQ Design House implementation of servo control hardware implementing disc recognition/discrimination in all DVD drives; and (6) samples of all non-commercially available DVD drives, including those designated 1040A; 1640A2; 1648M; 2212DW; 1640T6; DW1600; 1640A; 1648A; 2108VR;8032EP; OPAL; CB482B; EW1621; and DW822A. The plaintiffs also requested 30(b)(6) witnesses to testify as to these areas, as well as the depositions of Andy Y.C. Song and Jerome Wu Stoic.

With respect to damages discovery sought from BenQ Corporation, the plaintiffs' May 27th letter sought seven categories of information: (1) the identification of the number of DVD drives,

differentiated by model and year, which BenQ has sold to Philips, PBDS, BenQ America and third parties, imported into the United States, offered for sale, and transported to Philips, PBDS, BenQ America and third parties; (2) the identification of that operating income realized by BenQ in the sale of DVD drives; (3) the identification of those costs incurred by BenQ in the sale of the DVD drives; (4) documents relating to BenQ's third party claim against PBDS and Philips; (5) documents evidencing BenQ's license negotiations with third parties; (6) the identification of all DVD drives sold, offered for sale, transported to the United States, and imported to the United States; and (7) the identification of whether BenQ obtained an opinion of counsel in this case, and when it was requested.  As in the technical areas, the plaintiffs sought a 30(b)(6) witnesses to testify on these subjects.

Third, the plaintiffs sought discovery into BenQ Corporation's efforts to collect documents. Specifically,  the plaintiffs sought documents evidencing when BenQ received documents from PBDS, Philips, and Pioneer, and documents evidencing when BenQ made requests on any third party for the production of documents in this case.  Likewise, the plaintiffs sought a 30(b)(6) witness to testify as to BenQ's efforts to obtain documents in this case from PBDS and all third parties.

With respect to BenQ America, the plaintiffs sought discovery into two areas—technical and financial.  Specifically, the plaintiffs' May 27th correspondence requested technical discovery with respect to drives sold, offered for sale, or imported into the United States by BenQ America to the extent the drives were different from those addressed in connection with BenQ Corporation.  As to financial discovery, the plaintiffs desired a full and complete response to Interrogatory Nos. 8, 15, 16, and 17.  The plaintiffs also demanded an identification of the number of DVD drives, differentiated by model and year, which BenQ America has sold, imported into the United States,

13

and offered for sale.  As to these categories of financial information, the May 27, 2005, correspondence indicated a need for 30(b)(6) depositions on damages.  The correspondence also stated that no depositions of BenQ America (presumably on technical issues as well) had been conducted.

On July 13, 2005, the defendants' new counsel sent correspondence to the court in response to the plaintiffs' motions to compel and the plaintiffs' May 27th report.  Although the July 13th letter itemizes several distinct responses, the court attempted to distill those responses to correspond to the plaintiffs' requests.  In addition, on July 27, 2005, the plaintiffs responded to the defendants' July 13th correspondence.  In light of these events, the court issued various orders, to the extent possible, on the items identified in the plaintiffs' May 27th correspondence.  These orders specifically required defendants to produce various categories of documents that should have been produced more than six months earlier, to the extent these documents had not been previously produced.

Of particular importance, the Court found that documents evidencing when BenQ requested and received documents from third parties were discoverable given the history of this case and ordered that they be produced.  Notwithstanding this, and other, rulings, the plaintiffs' July 27th correspondence sets forth several areas which, even in light of the representations made by the defendants' July 13th letter, needed to be addressed by this Court.  The plaintiffs continued to assert that BenQ had not produced technical documents relating to certain drives manufactured by Pioneer and Philips, although the plaintiffs noted that BenQ witnesses had suggested that Philips and Pioneer have never "refused" a demand for technical documents by BenQ.  The plaintiffs also stated that the defendants were continuing to produce materials that should have been produced no later than February, 2005, when the defendants had stated they had undertaken a diligent search for documents.

The correspondence reflects that the plaintiffs were prejudiced in taking their damages depositions because of the late supplementation of interrogatory responses. Finally, and most troubling, the plaintiffs contend that the defendants recently disclosed that they have been selling and offering for sale in the United States since 2004 seven additional models of DVD drives.[5]

The court first considers the production (or lack thereof) of technical documents showing the operation of drives manufactured by Philips and/or Pioneer. Throughout this case, BenQ has taken the position (wrongly, as it turns out) that it has no control over documents in the possession of certain third parties. BenQ has affirmatively represented that drives sold by BenQ prior to the formation of the PBDS joint venture were manufactured by either Pioneer or Philips. For several years, BenQ purchased and sold large quantities of these drives. Given this relationship, the plaintiffs have consistently doubted that BenQ does not have access to or the legal right to demand documents demonstrating the operation of those drives. At the February hearing, the Court suggested that it had confronted similar arguments, and that, if need be, the Court would question the corporate representative with the most knowledge of the commercial relationships between the parties.

The plaintiffs suggested in their July 27th letter that sufficient evidence existed for the Court to sanction BenQ for its failure to produce technical documents from Pioneer and Philips. The plaintiffs offered testimony from BenQ's witnesses which suggested that those witnesses were unaware of any situation in which Pioneer or Philips refused a demand for documents. But

---

[5] Depending on how one reads counsel's July 27, 2005, correspondence, the defendant disclosed the existence of these drives either on July 8, 2005 or in supplemental responses to interrogatories served on July 12, 2005. This distinction is not material. Either way, interrogatories requesting this information were originally propounded to BenQ Corporation on September 15, 2004, and to BenQ America on December 16, 2004.

commercial cordiality is not the same as control in the sense required to hold BenQ responsible for documents in the possession of these third parties. Thus, although the plaintiffs had not persuaded the Court that the Pioneer and Philips documents referenced in counsel's July 27th letter were necessarily within the control of BenQ, neither was the record sufficient to reach a contrary conclusion. This Court was therefore persuaded that BenQ should sponsor a witness (or witnesses) to answer the Court's inquiries as to the commercial relationship between these parties so that the Court might determine with some assurance the scope of technical documents that fall within the control of BenQ.

The most troubling aspect of the plaintiffs' July 27th correspondence was the plaintiffs' statement that BenQ recently identified seven additional models of drives sold in the United States since 2004. Quite obviously, this information did not come to BenQ from a third party–it is BenQ who has been in possession of this information.[6] Moreover, the identities of drives sold into the United States have been at issue since the very first discovery requests served by the plaintiffs. As the Court previously found, all that follows depends on an accurate identification of the models of drives sold into the United States.

## 4.    3rd Party Access/Control

The level of control of, and access to, Philips and Pioneer documents has been directly relevant to this case. It is not disputed that some of the Accused Products were manufactured by Philips and Pioneer. At numerous times during discovery and in hearings before this Court, BenQ

_____

[6] BenQ's obligations were to search for and disclose all relevant materials long ago. The court granted BenQ a reprieve until early March, 2005, to bring itself into compliance with the court's orders and the plaintiffs' discovery requests. BenQ represented it had conducted diligent searches for documents, yet it continues to locate and produce materials it should have produced long ago.

represented that it did not have control of non-BenQ technical documents and that *it had requested these documents but had been told "no."* After reviewing the documents submitted by BenQ, and in light of witness testimony, the Court finds that BenQ misrepresented its efforts to search its own records, misrepresented its efforts to collect documents from third parties, misrepresented its relationship with Philips, and engaged in activities with Philips in an effort to circumvent this Court's Amended Discovery Order.[7]

    A.    <u>Informal Technical Document Requests</u>

As part of the Court's order, BenQ was ordered to produce emails from technical personnel at BenQ requesting technical information from Pioneer or Philips. Based solely on the emails produced, the Court finds that BenQ did not have "control" of Pioneer documents. The vast majority of requests for technical information to Pioneer from Ben Q occurred in the 2001/2002 time frame. Further, the limited number of emails (approximately 50 over a six year period) does not represent a continuous and freely sharing relationship between the companies that would indicate that BenQ could get Pioneer's technical documents upon request.

The relationship with Philips is markedly different. First, rather than 50 emails, BenQ produced over 700 emails to and from BenQ to Philips. There are emails evidencing that, *after the initiation of litigation*, Philips provided to BenQ technical manuals, software, firmware, scripts, testing data, comparison/analysis of products, trouble shooting issues, etc. In an effort to show that BenQ did not have unfettered access to Philips' technical documents, BenQ offered three to four emails where Philips denied a request. However, this does not excuse BenQ's obligation to gather and produce what information Philips would produce. Even more importantly, Mr. Lester Chen, a

---

    [7] Based on the evidence, the Court does not make the same finding as to Pioneer.

Senior Manager of Optical Storage for BenQ Corp., stated that when BenQ informally requests technical information and documents Philips complies 90% of the time. August 30, 2005 Transcript at 161:1-14. The 700 emails and the testimony of Mr. Chen evidence that BenQ had the practical ability, i.e. control in the ordinary course of business, to gather large quantities of technical documents from Philips.

Moreover, effective August, 2002, Philips and BenQ entered into a Network Access Agreement. This agreement provides BenQ with access to parts of Philips' intranet and internal network, wherein the access is directly linked to the business as described by the MOU. Mr. Chen testified that the Network Access Agreement allows BenQ to access source code and problem reports related to the DW series of DVD drives. August 30, 2005 Transcript at 155:21–157:4. However, not only did BenQ not produce the DW series source code until well after the deadline set out in the Court's Amended Discovery Order and after BenQ repeatedly represented to this Court that it did not have access to Philips' technology, the Network Access Agreement itself was not produced until the Show Cause Hearing. August 31, 2005 Transcript at 25:11-14.

In light of the 700+ emails, the testimony of Mr. Chen, and the Network Access Agreement, the Court finds that BenQ had the practical ability, and therefore the requisite control, to gather and produce technical documents from Philips. That BenQ did not even attempt to gather Philips technical documents until June/July of 2005 flagrantly disregards this Court's discovery orders and, importantly, flies in the face of repeated representations to the Court to the contrary.

B.    Formal Requests for Technical Information

The Court will begin its history of the formal requests for technical information by BenQ after March 2, 2005, as very little, if anything, was requested from Philips and Pioneer by BenQ prior

18

to that date.[8]  At the March 2, 2005, hearing, BenQ represented to the Court that, in light of the

Court's orders and interpretations of control, BenQ would subpoena Philips and Pioneer for technical

documents.  March 2, 2005 Transcript at 29: 11-16.

According to the written record and the testimony of BenQ representatives, June 16, 2005,

was the first time that *any* BenQ representative requested technical documents from Philips or

Pioneer related to the litigation.  The results from the subpoenas provide a clear picture of BenQ's

attempts to evade its discovery obligations.

On July 1, 2005, Hans Pennings of Philips sent correspondence to Linh Ha of BenQ wherein

Pennings expresses frustration with having Philips served with a subpoena.  According to Pennings,

"[w]e are actively assisting BenQ to achieve a settlement with LaserDynamics . . . .  It would be

better still if you withdraw the subpoena, and *just request relevant information from me directly*."

BQ-CT 002226 (emphasis added).  That same day, Linh Ha responded to Pennings by asking him

to have someone contact Ha about the subpoena:  "In short, this process has been forced upon us by

the court and the demands of Laserdynamics lawyers."  Pennings responded to Ha by stating: "[i]n

that case, I assume you have no objection that we refuse to accept service, and will let this go

through the Hague Convention if you or Laser Dynamics decide to pursue the matter."  BQ-CT

002225.  Telephone records also indicate that on the same day, contact was made between Linh Ha

---

[8] On December 18, 2003, BenQ requested, successfully, a letter from Philips stating that
it is licensed under the '981 patent in suit.  On February 28, 2005, BenQ was provided a copy of
the license agreement Pioneer had as well.  Yet, at the hearing on March 2, 2005, BenQ
represented that it had requested information from Philips and Pioneer and been told no.  The
Court finds that the *only* requests for information from BenQ to Philips and Pioneer prior to the
March 2, 2005 hearing related to license agreements and that no requests for technical documents
were made.  Moreover, far from saying "no," the Court finds that the requests made to Philip and
Pioneer were granted.  Thus, BenQ misrepresented to the Court not only what was requested but
also misrepresented the responses from Philips and Pioneer.

and Jack Slobod at Philips.

A little over a month later, on August 9, 2005, Daniel Sharp of Wilson Sonsini, counsel for BenQ, sent a letter to Matt Rodgers of Vinson & Elkins, who represents Philips.  Mr. Sharp noted in his letter that Philips' responses to the June 16, 2005, subpoena were overdue and inquired if Philips intended to produce any documents.  On August 15, 2005, Mr. Rodgers responded to Mr. Sharp by contending that the subpoena was defectively issued and served and that therefore Philips would not be producing any documents, stating "[a]t this point in time, Philips is not inclined, as a non-party to this litigation, to voluntarily comply with informal document requests or an invalidly issued and invalidly served subpoena."

Thus, the Court finds that BenQ did not make any requests for documents to Philips from December 18, 2003 to March 29, 2005, except for a letter from Philips stating that BenQ was licensed as a customer of the PBDS joint venture.  Further, even though BenQ represented it would serve a subpoena on March 2, 2005, no subpoena was sent until June 16, 2005.  Further, the Court finds that, based on Pennings' email of July 1, 2005, Philips stood ready to assist BenQ in collecting responsive documents.  Moreover, the Court finds that the correspondence between Philips and BenQ in July, 2005, evidences that Philips assisted BenQ in not complying with this Court's discovery obligations.[9]

The Pioneer requests follow a similar time line.  First, the Court notes that at the March 2, 2005 Hearing, BenQ produced documents to the Court wherein BenQ stated that it could not get documents from Pioneer because Plaintiffs refused to give Pioneer permission to release the documents. There were two misrepresentations made on that issue in the hearing.  First, BenQ never

---

[9] This finding is not intended to bind Philips.  Philips is not a party to this suit.

requested anything of Pioneer outside of the license agreement between Pioneer and LaserDynamics.[10]  Secondly, it appears that all requests were granted by February 28, 2005, which was before the March 2, 2005.  In either event, the Court finds that BenQ continued to engage in misrepresentations to the Court and in discovery abuse.

Following the March 2, 2005 Hearing, BenQ engaged in no efforts whatsoever to gather or request technical documents from Pioneer until June 16, 2005.  On that date, BenQ served a similar subpoena on Pioneer as it did on Philips requesting various technical and financial documents.  On July 5, 2005, attorneys from Wilson Sonsini informed Pioneer that they were now representing BenQ and in letter form reiterated the requests for documents.

On July 7, 2005, attorneys for Pioneer served general objections to the subpoena, but noted that it would be searching for responsive documents.  A week later and for no apparent reason, the letters between the parties take a different tone.  First, Pioneer's attorneys take the position that the subpoena was not properly served and stated that new objections will be served within the week.  The letter does go further to state that even though Pioneer is not a party to the litigation and has no obligation to produce any documents, it would, subject to objections, provide responsive documents.  However, as of August 30-31, 2005, Pioneer still has not produced a single document requested from the June 16, 2005, subpoenas.

C.     Shipments and Banking Information from BenQ Corp.

The Show Cause Hearing was also focused on discovering why BenQ did not identify 7 DVD drives until June/July of 2005 even though many of those drives existed in Fall of 2004.  Two issues

---

[10]  BenQ's behavior has become clear.  BenQ only requested from Pioneer and Philips those limited number of documents it wanted to help its perceived defense without requesting other documents related to claims or defenses in the litigation.

arose out of that issue: (1) the level of effort BenQ Corp. took in meeting its discovery obligations and (2) the "real" relationship BenQ has with PBDS. During the hearing, BenQ stated that it did not discover the 7 drives earlier because they did not appear in BenQ America's sales records.

However, on cross examination, BenQ was presented with an invoice showing a sale of 3,100 drives in September, 2004, of one of the newly identified DVD drives. BenQ was questioned about why this information was not included in the sales data provided to Plaintiffs and why these drives were not identified. BenQ stated that these new drives were not discovered earlier because searches of sales records were only done for BenQ America. BenQ admitted that it did not do a search of BenQ Corp. sales or shipping records at all until June/July, 2005, or ten months after the deadline set under this Court's discovery orders. Shipping and sales records from BenQ Corp. have been relevant since the inception of the suit as Plaintiffs have asserted claims of infringement and inducement of infringement. Further, the Court finds that if BenQ had performed the requisite searches, it would have found most of the newly identified drives in the fall of 2004.[11] BenQ's choice not to even make a cursory search of its records violates this Court's discovery orders and has consequences.

Moreover, BenQ was also questioned on whether the invoice was accurate in that it had a sale from BenQ Corp. to BenQ America. BenQ representatives testified on August 30, 2005, that even though the invoice said BenQ Corp., it was really a sale by PBDS because all sales to BenQ America were done through PBDS after 2003. The defendants essentially stated that the invoice was not accurate and that the payment was to PBDS and not BenQ Corp.

---

[11] The Court also notes that in 2004 and 2005, BenQ shipped or sold nearly 900,000 of the newly identified drives. BenQ's representations that these drives were small in number as a basis for not knowing of them is simply implausible.

On the following day, the defendants changed their position. BenQ stated that the sale was made from BenQ Corp. to BenQ America. However, BenQ represented that BenQ Corp. handled the payment of sales for PBDS and indicated, but did not outrightly say, that PBDS had access to BenQ Corp.'s account. The Court was unconvinced by this change in testimony and demanded that BenQ provide to the Court a list of all persons and entities who have access to the account listed on the September invoice.

On September 23, 2005, BenQ filed submissions with the Court that allegedly explain the September, 2004, invoice and the methods of handling sales to BenQ America from BenQ Corp. and PBDS. In the September 23, 2005, submission, BenQ represents that BenQ America purchases its drives from PBDS through a "netting arrangement."[12] The netting arrangement allegedly works in this manner:

> BenQ America orders DVD drives from PBDS or BenQ Corp. BenQ Corp. then ships the drives directly from its facilities to BenQ America. BenQ America then pays BenQ Corp. – not PBDS – for the DVD drives by wiring the money to BenQ Corp.'s Citibank account. After receiving the payment, BenQ Corp. will then pay PBDS for the "net" difference between the sales price for the DVD drives sold from PBDS to BenQ America and the sales price for the DVD drives sold from BenQ Corp. to PBDS.

The Court notes that this information would provide strong evidence supporting Plaintiffs' position that BenQ's sales through PBDS are "sham" sales and that the PBDS license defense is an impermissible sub-license. Even more importantly, none of this banking evidence was ever provided to the Plaintiffs or the Court until well after two summary judgment motions had been filed on the issue by the defendants. Once again, BenQ has engaged in discovery misconduct, misrepresented

---

[12]  The Court notes that the "netting arrangement" was not produced to the Court. Thus, either BenQ is (1) not producing a highly relevant document or (2) alleging a defense based in part on a verbal agreement between BenQ Corp. and PBDS.

facts to this court in its motion for summary judgment, and violated this Court discovery orders.

**5.      The Law on Sanctions**

Federal Rule of Civil Procedure 37 authorizes sanctions for failure to comply with discovery orders. This Court may bar the disobedient party from introducing evidence, or it may direct that certain facts shall be "taken to be established for purposes of the action . . ." Rule 37 also permits this Court to strike claims from the pleadings and even to "dismiss the action . . . or render a judgment by default against the disobedient party." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 763 (1980). "Rule 37 sanctions must be applied diligently both 'to penalize those whose conduct may be deemed to warrant such a sanction, [and] to deter those who might be tempted to such conduct in the absence of such a deterrent.'" *Id*. at 763-64.

Rule 37(b)(2) sanctions requires that any sanction be just and that the sanction must be related to the particular claim which was at issue in the order to provide discovery. *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 413 (5th Cir. 2004) (citations omitted) (sanction was a finding of alter ego rooted in party's behavior regarding discovery related to the alter ego issue). Further, the penalized party's discovery violation must be willful. *United States v. $49,000 Currency*, 330 F.3d 371, 376 (5th Cir. 2003). Finally, a severe sanction under Rule 37 is only to be employed where a lesser sanction would not substantially achieve the desired deterrent effect. *Id*.

This Court also has inherent powers to enter sanctions. The inherent powers of this Court are those which "are necessary to the exercise of all others." *Roadway Express*, 447 U.S. at 764. The most prominent of these is the contempt sanction, "which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court[.]" *Id*. The inherent power includes the power of the court to control its docket by

dismissing a case as a sanction for a party's failure to obey court orders. *Juul v. Fed. Express*, 260

F.3d 622 (5th Cir. 2001). However, when inherent powers are invoked they must be exercised with

"restraint and discretion." *Gonzalez v. Trinity Marine Group, Inc.*, 117 F.3d 894, 898 (5th Cir.

1997). Thus, severe sanctions should be confined to instances of "bad faith or willful abuse of the

judicial process." *Id*. In any event, when parties exploit the judicial process, a court may sanction

conduct beyond the reach of other rules. *Natural Gas Pipeline v. Energy Gathering, Inc.*, 2 F.3d

1397, 1407 (5th Cir. 1993).

**6.      The Court's Findings and Sanctions**

The Court finds that BenQ has made repeated misrepresentations to this Court concerning

the extent to which it has searched records and attempted to obtain records from third parties

Pioneer and Philips. Moreover, the Court finds that Philips has an absolute right to lodge objections

to a subpoena. However, Philips does not have the right to aid or abet a party to litigation in this

Court from compliance with the orders of the Court. The Court takes no action against Philips as

it is not a party to this case, but the Court is on notice of Philips' willingness to engage in such

activity.

Further, the Court finds that BenQ has known since the filing of its first motion for summary

judgment that the relationship between BenQ, Philips, and PBDS was extremely relevant to this case.

BenQ Corp. has made a conscious decision not to search its own records for documents, which

would have revealed shipments (and sales) of products by BenQ into the United States. These

records, which should have been produced more than eight months ago, were relevant both to the

relationship between BenQ, Philips and PBDS, as well as the Plaintiffs' claims for inducement.

Further, the Court finds that BenQ has made repeated misrepresentations in its moving papers

and before the Court in hearings regarding the relationship between BenQ and PBDS and the method in which sales are handled. This information was never accurately provided to Plaintiffs and instead was a moving target based on what the evidence needed to be to support a license defense.

BenQ's conduct leading up to and during the Show Cause Hearing, coupled with the conduct of BenQ previously found by the Court to have occurred, demonstrates a conscious intent to evade the discovery orders of this Court, as well as violate this Court's orders and the rules to an extent previously unknown by this Court. The Court has already issued lesser sanctions on two separate occasions in an effort to get Defendants to comply with this Court's rules.

Accordingly, while the Court does not strike Defendants' pleadings in their entirety,[13] the Court does hereby strike any defense raised by BenQ related to the Philips/LaserDynamics license agreement pursuant to Fed. R. Civ. P. 37 and the Court's inherent powers. This sanction is tied directly to the numerous willful and bad faith misrepresentations made to this Court regarding the relationship between the entities and the requests for documents from Philips and Pioneer. Further, this sanction is warranted in light of the attempt to mislead the Court regarding bank accounts and sales of DVD drives to BenQ America.

Pursuant to Fed. R. Civ. P. 37, the Court further awards to the Plaintiff its attorney's fees and costs incurred in attending the show cause hearing. Finally, pursuant to the Court's inherent powers,

---

[13] Based on the record, striking of Defendants' pleadings in their entirety would be warranted. However, in light of Defendants' efforts to enter into a product stipulation agreement to minimize the prejudice to Plaintiffs from the eleventh hour identification of new DVD drives, this Court will refrain from entering a "death penalty" sanction. Moreover, the Court believes that the lesser sanction of striking a single defense as opposed to the entirety of Defendants' pleadings will result in professional behavior from Defendants moving forward. Defendants are forewarned, however, that continued discovery abuse, violation of court orders, and misrepresentations to the Court will result in a striking of Defendants' pleadings in their entirety.

this Court also issues a monetary sanction in the amount of $500,000 to be paid to the Fines and

Restitutions Account of the Court within 30 days of the entry of this Amended Memorandum

Opinion and Order for the willful disregard of this Court's Discovery Orders.[14]  The undersigned

judge must protect the integrity of this Court.  While BenQ has been required to pay attorneys' fees

for earlier motions to compel and for sanctions, these smaller sanction have failed to correct BenQ's

behavior before a United States District Court.  In light of the hundreds of millions of dollars

generated by BenQ through the sales of DVD drives, a sanction of $500,000 is modest.  The Court

hopes, however, that this represents the last sanction that must be entered against BenQ in this case.

SIGNED this  6th  day of October, 2005.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

---

[14]  This sanction is both a deterrent and a punishment for BenQ.  Further, this Court's docket includes 60+ active patent cases that are subject to many of the same discovery issues. This sanction will hopefully also act as a deterrent to other patent litigants that might consider engaging in similar behavior.  *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764 (1980) (noting that sanctions must be applied "to deter those who might be tempted to such conduct in the absence of such a deterrent.").

**Jeff Rambin**

| | |
|---|---|
| **From:** | Jeff Rambin |
| **Sent:** | Wednesday, January 20, 2010 4:47 PM |
| **To:** | 'Dan_Herp@playstation.sony.com' |
| **Cc:** | 'Michael Ng' |
| **Subject:** | Cell Numbers |

Dan

Sorry we're playing phone tag this evening.  My cell is (903) 520-5789.  Mike Ng's is (415) 260-3583.  I gave Mike the highlights of our earlier conversation, so you may call either of us.

Thanks,
Jeff

Jeff Rambin
CAPSHAW DERIEUX, LLP
220 Energy Centre
1127 Judson Road
Longview, TX 75606
Direct:  (903) 233-4830
Fax:      (903) 236-8787

NOTICE:  This communication is confidential and is made for the purpose of obtaining legal advice or preparing for legal proceedings and is therefore subject to the attorney-client and work product privileges. If you have received it by mistake, please let us know by e-mail reply and delete it from your system. You may not copy this message or disclose its contents to anyone.