Exhibit O

1

FILED—CLERK
U.S. DISTRICT COURT

05 AUG 10 AM 8: 53

TX EASTERN-MARSHALL

BY

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   MICROUNITY SYSTEMS        *    Civil Docket No.
     ENGINEERING, INC.         *    2:04-CV-120
 4                             *
     VS.                       *    Marshall, Texas
 5                             *
                               *    August 4, 2005
 6   DELL, INC., ET AL         *    2:30 p.M.

 7

 8              TRANSCRIPT OF MOTION TO QUASH
            BEFORE THE HONORABLE T. JOHN WARD
 9             UNITED STATES DISTRICT JUDGE

10

11   APPEARANCES:

12

13   FOR THE PLAINTIFFS: (See sign-in sheet.)

14

15   FOR THE DEFENDANTS:     (See sign-in sheet.)

16

17

18

19

20   COURT REPORTER:         MS. SUSAN SIMMONS, CSR
                             Official Court Reporter
21                           100 East Houston, Suite 125
                             Marshall, TX   75670
22                           903/935-3868

23

24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on CAT system.)
```

COPY

```
 1              P R O C E E D I N G S
 2          THE COURT:  All right.  Please be seated.
 3          All right.  We have got a couple of matters to take
 4   up in this MicroUnity Vs. Dell, and the parties had requested
 5   and the Court had changed it to meet y'all's request.  The one
 6   that I have got down first now is the Motion to Quash, I
 7   guess, that's Advanced Micro Devices.  Have we got the parties
 8   here necessary to present that?
 9          MR. KLEIN:  Yes, Your Honor.
10          MR. HEALEY:  Yes, Your Honor.
11          THE COURT:  All right.  Who is here for the Movant?
12          MR. KLEIN:  Michael Klein, Your Honor, for AMD.
13          THE COURT:  All right.  Mr. Healey, you're here for
14   Intel?
15          MR. HEALEY:  Yes, sir.
16          THE COURT:  All right.  Both of you ready to
17   proceed?
18          MR. KLEIN:  Yes, sir.
19          MR. HEALEY:  Yes, sir.
20          MR. CAPSHAW:  Calvin Capshaw is here for MicroUnity,
21   Your Honor.
22          THE COURT:  All right.  What is your position in
23   this?  Other than observing the fight, what are you here for,
24   Mr. Capshaw?
25          MR. CAPSHAW:  Your Honor, we're here on behalf of
```

1  MicroUnity because we're involved in negotiations with AMD, so

2  we have an interest in whether those settlement discussions

3  are part of discovery.

4          THE COURT:  Okay.  I just thought that maybe you

5  were going to try to convince me that you were here as a

6  friend of the Court or something like that?  Nothing that

7  silly, okay, thank you.

8          All right.  Counselor, it's your motion, let's hear

9  it.

10          MR. KLEIN:  Your Honor, my name is Michael Klein,

11  and our arguments on the Motion to Quash are really relatively

12  simple, Your Honor.  AMD, the witnesses who would be

13  testifying or responding for documents of the subpoena are --

14  they live, reside or transact business in the Austin area or

15  some of them may be in Sunnyvale, California.  But we can work

16  that out, that's not the problem.

17          But Rule 45 says that a subpoena for attendance at a

18  deposition shall issue from the court for the district

19  designated by the Notice of Deposition at the district in

20  which the deposition is to be taken.

21          And then further on in Rule 45 under (c)(3)(a), it

22  says:  On timely motion, the court by which a subpoena was

23  issued shall quash or modify the subpoena if it, number 2,

24  requires a person who is not a party or an officer of a party

25  to travel to a place more than 100 miles from the place where

```
 1  that person resides, is employed or regularly transacts
 2  business in person.
 3          So, under that rule, Your Honor, what they should
 4  have done was serve the subpoena out of the Austin Division of
 5  the Western District since the AMD individuals reside in the
 6  Austin area.  Obviously, the purpose of Rule 45 with regard to
 7  third-party subpoenas is not to unduly burden or inconvenience
 8  these third parties, since they are not parties to the
 9  lawsuit.
10          As we attached to our Motion to Quash, we wrote
11  letters to the lawyers for Intel explaining to them that those
12  subpoenas needed to be issued out of the Austin Division of
13  the Western District because that's where the witnesses
14  resided, but for some reason Intel decided to issue the
15  subpoena out of Marshall, serve it on AMD's registered agent,
16  CT Corporation in Dallas for a deposition to be held in Tyler.
17  None of those places are within a hundred miles or even a
18  hundred-and-fifty miles of where the AMD witnesses reside or
19  regularly transact business.
20          So, we think that pursuant to Rule 45, it's pretty
21  clear that the subpoena should be quashed.  And I might point
22  out also to the Court that by way of history that the original
23  subpoena was issued out of the Northern District of
24  California, and a Motion to Compel on that was filed here in
25  Marshall.  Fortunately, we were able to convince the
```

```
 1   Plaintiffs that that was improper and they withdrew that
 2   subpoena and also the Motion to Compel.  But then they issued
 3   it here out of Marshall, as I mentioned, for the CT
 4   Corporation in Dallas for a deposition in Tyler.
 5            So, we think the rule is clear that the subpoena is
 6   improper and as Subsection (3)(a)(2) of Rule 45 provides, it's
 7   mandatory that on timely motion, the subpoena shall be
 8   quashed.
 9            THE COURT:  Or modified.
10            MR. KLEIN:  I'm sorry, Your Honor?
11            THE COURT:  Or modified.
12            MR. KLEIN:  Or modified.  Although with regard to a
13   distance issue, I'm not sure how it would be modified since
14   you can't change a distance.  If it were a scope issue, you
15   know, the scope of the subpoena could be modified, but since
16   it's a distance issue, I just don't see how it could be
17   modified to change a distance between --
18            THE COURT:  Well, if I read Mr. -- if I read Intel's
19   response, Mr. Healey, what he's saying is that there are other
20   provisions in that rule that actually says we're operating
21   with -- under -- effectively what you're saying is that the
22   distance provided under the state rule is really what
23   controls, and since your company has elected to appoint an
24   agent for service of process in the State of Texas, that
25   that's really where I am, is that I'm looking to Dallas.  Is
```

```
 1   that what your argument is, Mr. Healey?  Or did I misstate it.
 2              MR. HEALEY:  Yes, sir, it's that, and it's also that
 3   in terms of where they want to have the deposition, we'll go
 4   wherever they want to do it.  We have told them that from Day
 5   One.  So, but technically if you want to get technical, which
 6   we're doing here, we served them correctly under the state
 7   rule, and it's not only their registered agent, but if you go
 8   to their website, they have a sales office in Dallas too.  The
 9   person here is AMD, not whoever this unnamed corporate
10   representative is.
11              THE COURT:  Well, you are willing to take it in
12   Austin, then?
13              MR. HEALEY:  Austin, wherever they want to take it,
14   if they'll just tell us where to show up.
15              THE COURT:  Why is it that you say -- you're
16   effectively saying is that this Court cannot conduct
17   discovery, is that what you're saying?
18              MR. KLEIN:  Me, Your Honor?
19              THE COURT:  Yes.  I'm saying -- I mean, on behalf of
20   your client that you are saying that the only way that they
21   can subpoena your client is through the Western District of
22   Texas that doesn't know anything about this case.
23              MR. KLEIN:  Well, that's what the rule provides,
24   Your Honor.
25              THE COURT:  Well, that's your interpretation of the
```

1   rule.

2          MR. KLEIN:   That's my interpretation of the rule,

3   correct.  And its come up in other cases, Your Honor, one of

4   which we didn't cite.  Well, in fact, in the MicroUnity case

5   which we cited in response to their Motion to Compel, that

6   same issue came up where you have different district courts

7   deciding whether or not various parties -- non-parties rather

8   had to provide documents in response to a subpoena, and the

9   court said, that, you know, in appropriate cases what those

10  courts can do if they have a question about relevancy, they

11  can refer that matter back to the court where the trial is

12  pending.  But on issues such as whether or not the subpoena

13  has been served properly, and those kinds of things, it needs

14  to be served out of the district in which the -- the witness

15  or respondent deponent resides, and if not, our interpretation

16  and AMD's interpretation of the rule is that it must be

17  quashed.

18          THE COURT:  All right.  Let's hear from you, Mr.

19  Healey.  What's my legal -- he says that I just don't have the

20  authority under the rules to enforce the subpoena.

21          MR. HEALEY:  Well, Your Honor, it's clearly not

22  correct.  First of all, under Rule 45, you can refer to the

23  state rules, Rule 176.3 of the Texas Rules of Civil Procedure

24  let us serve their registered agent within 150 miles.  Their

25  registered agent is in Dallas, we did that.  AMD also has a

```
 1   sales office in Dallas.  The point here though is under --
 2   whether it is under any interpretation of the rule, we have
 3   good service.  What they are really doing is looking at a
 4   separate provision of the rule, Rule 45(c)(3) on when a court
 5   can quash a subpoena for undue burden.  And they are saying if
 6   it's a hundred miles beyond where the person transacts
 7   business or resides, then the court can quash or modify the
 8   subpoena.
 9         Well, the person here is AMD, and it is where AMD
10   resides, not where this unnamed corporate representative,
11   whoever he or she is that they haven't given us a name or told
12   us who it is, whether they live in Austin or Roundrock or
13   Georgetown, you know, Salado or -- you know, I don't know
14   where they live or who it is, it is AMD.  AMD's registered
15   agent is in Dallas by their choice, and they have an office in
16   Dallas.  That's -- you know, it's about a hundred miles from
17   Tyler, if you want to get fussy, but it's certainly within the
18   150 miles under the Texas Rule under Rule 45 that we're
19   allowed to use for service.  And if it's unduly burdensome, we
20   have told them from Day One, we'll take the deposition
21   whenever, wherever, just tell us where it is.
22         We cut back the original subpoena we served from, I
23   believe, seven or eight categories to four that were carefully
24   tailored to this lawsuit.  And so now what we are dealing with
25   is four categories carefully tailored to the lawsuit, and the
```

1  reason we issued the subpoena out of this Court is because
2  this is a large complicated case, and this Court is presiding
3  over it, and if there were to be a dispute over the subpoena,
4  logically this Court should handle it as opposed to a court
5  that had no knowledge of the case.

6          So, one, under Rule 45 service is proper under
7  (c)(2). So, the jurisdictional issue is satisfied, period.
8  And then we go to (c)(3) and see if it is burdensome. It is
9  not burdensome because if you want to count miles, Tyler is a
10 hundred miles from Dallas, and that's where they have a sales
11 office and their registered agent, and AMD is the person not
12 whoever this unknown corporate rep is. But putting that
13 aside, we will go wherever they want us to go to do the
14 deposition or depositions if it's more than one person. They
15 can just tell us where and when, and we'll show up.

16         And finally, you know, we have got four categories
17 directly related to the lawsuit, we cut it back. This Court
18 knows the case, and knows the parties, and there should be no
19 issue as to whether or not those four categories needs to be
20 addressed in discovery, and I think they clearly do.

21         So, I think this is a -- you know, a fight over
22 nothing here or at best it's a fight over some very bizarre
23 procedural technicalities that I have not been able to find
24 any court that has chosen to written (sic) on these procedural
25 technicalities, but I think under a plain reading of the rule,

 1  jurisdiction is established and burden is just not an issue
 2  because we will accommodate them however they need to be
 3  accommodated in terms of timing, so long as it is a reasonable
 4  time and location, so long as it is within the United States,
 5  we'll go there.
 6              MR. KLEIN:   May I have a brief response, Your Honor?
 7              THE COURT:   Yes, the operative word is brief.
 8              MR. KLEIN:   Mr. Healey's interpretation of the word
 9  person, I would have to differ with that because (c)(a)(2)
10  says:  It shall be quashed if it requires a person who is not
11  a party or an officer of a party to travel.  So, it doesn't
12  focus on -- it doesn't use the word person in the sense of a
13  party, it, in fact, distinguishes between a person and a
14  party, and a person who is an officer of a party.  So, the
15  rule is clearly intended to not cause undue burden to persons
16  such as AMD employees in the Austin area who would have to
17  travel to Tyler for depositions.  It matters not from a legal
18  standpoint whether or not Mr. Healey is agreeable to come to
19  Austin or anywhere else to take those depositions.  It's just
20  that the rule requires that for someone who is going to give
21  his deposition, they shouldn't -- the rule doesn't want them
22  to have to travel more than a hundred miles from where they
23  reside, employed or regularly transact business.  So --
24              THE COURT:   All right.  The Court's ruling is that
25  your client has been properly served with a subpoena to

Case 6:07-cv-00204-LED Document 291-16 Filed 03/15/08 Page 2 of 35 PageID # 16671

```
 1  produce a witness, okay?  I'll give you until Tuesday at 3:00
 2  o'clock to advise the Court if you want to produce that
 3  witness voluntarily at the place in Travis County, Texas,
 4  Dallas County, Texas, or Smith County, Texas; your choice.
 5  Absent a written indication received by this office by my
 6  chambers before that time, the deposition shall proceed in
 7  Smith County, Texas -- was that Ramey and Flock's offices, Mr.
 8  Healey?
 9              MR. HEALEY:  Yes, sir.
10              THE COURT:  At the law firm of Ramey and Flock, 500
11  Citizens -- it used to be the Citizen's Bank, what is the name
12  of the bank now over there, Mr. -- oh, that's not -- somebody,
13  what's the name of the bank building over there.  Anybody know
14  that address?
15              MR. HEALEY:  I'm sorry, sir, I'd have to look.
16              COURT REPORTER:  Is it Region's?
17              THE COURT:  Huh?
18              COURT REPORTER:  Is it Regions Bank?
19              THE COURT:  I don't know, I can't keep up with -- in
20  the offices of Ramey and Flock in Tyler, Smith County, Texas.
21  Are we clear on that?  Any question about my ruling?
22              MR. KLEIN:  No, Your Honor.
23              THE COURT:  All right.  Now then, let's take up the
24  next matter if we can.
25              That takes care of your client, doesn't it?  What
```

```
1   you had filed?
2             MR. KLEIN:  No, Your Honor, because he's also asking
3   for documents, and we think that a lot of the documents he's
4   requesting we should not have to produce.
5             THE COURT:  Well, I just said that subpoena was
6   lawfully served on your client and you had to comply with it,
7   that includes the document request.
8             MR. KLEIN:  And we have objections to various of the
9   requests.  I mean, are you saying you are overruling all of
10  our objections?
11            THE COURT:  No, I'm not saying that, I didn't know
12  that was set for today.
13            MR. KLEIN:  I don't think that it was, but we're
14  ready to argue it if the Court wants to take that up.
15            MR. HEALEY:  Your Honor, there's really one issue
16  and whether the Court wants to take it up today or on another
17  occasion.
18            THE COURT:  Well, I'd rather take it up.
19            MR. HEALEY:  Sure.
20            THE COURT:  I mean, I don't want to have y'all
21  travel up here.
22            MR. HEALEY:  It's one issue really, and that is,
23  there are patent license negotiations and other business
24  negotiations between AMD and MicroUnity from 1999 forward, and
25  there have been objections by AMD to producing evidence that
```

```
 1  relates to these patent license negotiations and offers to
 2  license back and forth between these parties.
 3         THE COURT:  Okay.  Now, I do recall -- I thought
 4  that was in -- okay, I didn't have the parties right.
 5         MR. HEALEY:  Right.
 6         THE COURT:  Well, what are the facts surrounding
 7  whether or not there was litigation or threatened litigation
 8  during the period of these negotiations?
 9         MR. HEALEY:  Your Honor, the facts are, as best we
10  can divine them, and I have got, I think, two pages from the
11  deposition of Mr. Buckmaster which is the deposition of
12  MicroUnity's corporate representative, who was their
13  president, that has been attached to various briefs, if I
14  could hand it up for the Court's convenience.  It is pages 188
15  and 189.
16         There has never been an active lawsuit or lawsuit of
17  any kind between AMD and MicroUnity.  AMD and MicroUnity say
18  they started having threats of litigation in 2003, but if you
19  look at Mr. Buckmaster's testimony starting on page 187 --
20  188, the bottom quadrant on the miniscript on the second page
21  that I handed you.
22         THE COURT:  Yes, sir.
23         MR. HEALEY:  And you read it to page 189, the top
24  quadrant on the third page, you will see that Mr. Buckmaster
25  never actually says that there was a threat of litigation
```

1    until there was a written threat of litigation -- what he
2    calls a written threat of litigation in April 2004. We
3    attached that letter to our motion, and even that letter is
4    not an explicit threat of litigation. It informs AMD of the
5    filing of the lawsuit against Intel, and encourages AMD to
6    take license in light of that filing of the lawsuit against
7    Intel.

8         The bottom line, Judge, is that there are two points
9    here. In the Soverain case that they rely on out of this
10   district on the settlement privilege; first of all, the court
11   held the settlement privilege didn't apply to prior art, and
12   in that case the court ordered that even prior art from
13   settlement negotiations had to be produced. And one of our
14   four document requests is broad prior art. So, putting aside
15   the settlement privilege doesn't apply to prior art, if they
16   have prior art they ought to produce it.

17        The second thing, Your Honor, is in the cases they
18   cite there was all active litigation, and if you say in a
19   patent infringement lawsuit that a patent license negotiation
20   is a, quote, settlement negotiation because a patent is
21   inherently a right to exclude someone from practicing a
22   invention. Well, you go against the cases we've cited such as
23   the Papst case, and the Deere case that upheld that patent
24   license negotiations are business negotiations and not
25   settlements of claims. And what we're saying here is that at

```
 1   least -- if you -- you know, you should limit the settlement
 2   privilege to an active lawsuit, but if you're going to take it
 3   beyond an active lawsuit, it ought to be to the point where
 4   it's explicitly clear to everyone that there is an actual
 5   threat of litigation. And if you look at Mr. Buckmaster's
 6   deposition, that's not until April of 2004, because otherwise
 7   in every patent case, you could shield patent negotiations
 8   over licenses from discovery by claiming that patents are
 9   nothing more than an ability to sue somebody to stop them from
10   making your invention or to get royalties from making your
11   invention, and prevent discovery on all patent license
12   negotiations. You have either got to have the brightline test
13   that there is actually a lawsuit or something so explicit that
14   to anyone it's clear there is a lawsuit, and here we think
15   that the evidence shows in the form of Mr. Buckmaster's
16   deposition and the letter we have attached, that the earliest
17   you can possibly say is that written -- what Mr. Buckmaster
18   calls the written notice of April 2004. But even so, I think
19   that given how that the threat that in the -- especially in
20   the peculiar context of patent license negotiations to expand
21   the settlement privilege beyond where there has been a lawsuit
22   to a situation where since 1999 there has never been a
23   lawsuit. Have these people been negotiating for seven years,
24   and there has never been a lawsuit? And now they are going to
25   say that all of a sudden the conversations that they have had
```

```
 1  in the last year and a half are under settlement privilege?  I
 2  think that pushes the settlement privilege beyond the bounds
 3  that courts want to legitimately protect settlement of active
 4  litigation --
 5          THE COURT:  All right.  Prior to April 2004, you
 6  produce them; subsequent to 2004, you produce them in-camera
 7  to the Court for the Court to consider.
 8          What type of time frame do you need on that?
 9          MR. KLEIN:  Does the Court want them in electronic
10  form or -- we have got them in electronic form.
11          THE COURT:  Well, how hard -- you know, I don't want
12  you to go to great expense, but electronic form is not very
13  good for the Court, you know.
14          MR. KLEIN:  Well, it will take a while to print them
15  all out.  We have got about, I think, six or seven CD roms and
16  --
17          THE COURT:  Since before -- since April 2004?
18          MR. KLEIN:  No, most of it is after, I believe, Your
19  Honor.
20          THE COURT:  Well, no, that's what I'm saying,
21  subsequent to April 2004.
22          MR. KLEIN:  We don't have it divided up that way
23  yet, so I can't tell you exactly, but my sense is that most of
24  it is after April 2004, and the total universe, both before
25  and after is one banker's box and then about six or so CD
```

```
 1   roms.  So, what we will have to do is print them out, and I
 2   guess depending on --
 3           THE COURT:  Well, you can produce -- you can produce
 4   those though that -- prior to April 2004, you are going to
 5   have to print them out anyway, aren't you?
 6           MR. KLEIN:  Yes, yes.
 7           THE COURT:  You are going to have to make this
 8   distinction.
 9           MR. KLEIN:  Yes, I was just saying it was going to
10   take time to print out the --
11           THE COURT:  Well, all I am asking you is how much
12   time?
13           MR. KLEIN:  I would say that we could get it done
14   within two weeks.
15           THE COURT:  How about three weeks?  Is that all
16   right with you, Mr. Healey, would that work out?
17           MR. HEALEY:  Yes, sir.  So, they will be producing
18   before April 2004, and you will review in-camera after April
19   2004.
20           THE COURT:  That's correct.
21           MR. HEALEY:  And just in terms of the burden on the
22   Court to review, are you going to review prior art too, or is
23   the prior art --
24           THE COURT:  The prior art, I thought we had -- I
25   mean, I have ruled on the prior art, I think that needs to be
```

1    produced.

2        MR. KLEIN:  Your Honor, our prior art was developed
3    by in-house and the attorneys.

4        THE COURT:  Well, it may have been developed by
5    them, but --

6        MR. KLEIN:  And they -- it's their work product of
7    their analysis of various things out there as to whether or
8    not it is prior art.  I mean, they put it together and our
9    position is that's their work product and that absent some --
10   I mean, they got it from information out of the public domain,
11   which Intel could do as well.  I mean, all they have to do is
12   go look for it.  Our in-house attorneys have done that,
13   expended their legal talent doing that, and we shouldn't have
14   to give that over to Intel just because they got sued in a
15   patent infringement case.

16       THE COURT:  Of course, I don't know what kind of
17   work you -- what -- let's hear, Mr. Healey, what do you got to
18   say about that?

19       MR. HEALEY:  Well, I think that prior art -- what is
20   the prior art? A list of patents or the list of publications,
21   that's not privileged.  What they say might say reads on Claim
22   7 of the '432 patent, that would be.

23       THE COURT:  Well, that's what I understood his
24   objection to was -- I hope it wasn't to --

25       MR. HEALEY:  We are not asking -- he can -- I agree

1  that what their internal analysis of what prior art reads on

2  what claim on what patent is privileged, but the actual

3  references themselves are not privileged and would be

4  produced.

5        THE COURT:  Counsel, do you understand the

6  distinction he just made?  I'm sure you do, because I think I

7  do, and if I do, then probably most folks walking down the

8  street will.

9        MR. KLEIN:  I think I do, Your Honor.

10        THE COURT:  Well, that's what -- then that's what we

11  are going to produce is the prior art is identification of

12  what it is that was considered prior art without the --

13        MR. KLEIN:  The analysis.

14        THE COURT:  -- the analysis made by your clients

15  in-house.

16        Three weeks take care of that also?  Within this

17  three weeks?

18        MR. KLEIN:  It is starting to get to be -- if we

19  could get four weeks, Judge, I think that would be better.

20        THE COURT:  Any problem with you, Mr. Healey?  Where

21  are we on time?

22        MR. HEALEY:  I think our opening expert reports are

23  due in September, but I guess we could work something out with

24  MicroUnity or AMD as time gets --

25        THE COURT:  Well, I prefer not to try to set

```
 1  everything in stone for you since it's better if y'all got a
 2  little flexibility.  So, I will put 30 days.
 3           MR. HEALEY:  Okay.  And if we need to work something
 4  out, I'm sure we can.
 5           THE COURT:  That's what I say, if a problem arises,
 6  y'all need to address it.
 7           MR. KLEIN:  One of our other concerns in these
 8  documents, Your Honor, is there are references to a new
 9  product to be developed by AMD, and sometimes those
10  discussions take place in conjunction with these licensing
11  discussions, because they are sort of -- they sort of go hand
12  in hand, and we would like to be able to redact any references
13  to any new product discussions by AMD, even if it's with
14  MicroUnity.
15           THE COURT:  Well, I -- can you live with that, Mr.
16  Healey or not, at this point?  I need to think about that.
17           MR. HEALEY:  Well, I guess, Your Honor, that if --
18  you know, in general the proposition is something that makes
19  sense.  The only specific problem would be is if there is
20  something in the documents where they present to MicroUnity a
21  future product, without getting into all of the details of it,
22  that says, well, we have this feature, this feature, and this
23  feature, and MicroUnity admits in the negotiation in their
24  notes, well, that doesn't infringe.  So, you know, so long as
25  there is not a discussion of whether or not this specific
```

```
 1   future product has features that would infringe a specific
 2   claim of a MicroUnity patent, I think we could live with that.
 3             THE COURT:  You -- you can redact it except for
 4   those where there is specific discussions of infringement, and
 5   that will be produced in-camera to the Court.
 6             MR. HEALEY:  That's fine, Your Honor.
 7             THE COURT:  What other problems with respect to the
 8   document request?
 9             MR. KLEIN:  Let me check right quick, but I think
10   that has got it.
11             THE COURT:  Yes, sir.
12             MR. KLEIN:  I think that has got it, Your Honor.
13             THE COURT:  Anything else that you know of, Mr.
14   Healey?
15             MR. HEALEY:  No, sir, that's it.
16             THE COURT:  All right.
17             *      *      *      *      *
18             THE COURT:  Let's move on to our next matter in this
19   same case.
20             Now, is this your Motion to Compel also as to
21   Stexar?
22             MR. HEALEY:  Yes, sir, Stexar.
23             THE COURT:  All right.  Who is here for -- who is
24   going to speak on behalf of Stexar?
25             MR. GONSOULIN:  I am, Your Honor, Dewey Gonsoulin of
```

```
 1  Beaumont.

 2           THE COURT:  Anybody else?  You are the well known

 3  patent lawyer today, Mr. Gonsoulin?

 4           MR. GONSOULIN:  Judge, what I know about patents,

 5  you could take --

 6           THE COURT:  That's all right, you don't answer that

 7  question.  It is strictly meant in jest to an old friend.

 8           All right.  Are you ready to proceed, Mr. Gonsoulin?

 9           MR. GONSOULIN:  We are ready to proceed, Your Honor.

10           THE COURT:  All right.  Mr. Healey, let's hear it,

11  it's your motion.

12           MR. HEALEY:  Yes, sir.  Your Honor, we had served a

13  subpoena on a company called Stexar Corporation because they

14  were doing business dealings with MicroUnity.  They responded

15  ultimately after we negotiated the scope of the subpoena with

16  several pages of documents, many of which were redacted.  And

17  at first those redactions didn't make a whole lot of sense to

18  us, and we had asked for a log and whatnot and that was never

19  forthcoming, so ultimately we filed the Motion to Compel.

20           Recently, Mr. Gonsoulin and his firm appeared and

21  they filed an affidavit from someone at Stexar that --

22           THE COURT:  Is this the Calderwood affidavit?

23           MR. HEALEY:  Yes.  That lays out some of the basics

24  of the trade secret nature of some of these documents, and we

25  didn't object to them filing that.  Really what I would like
```

1  to point out to you is some of the things in the documents,
2  for instance, directly relate to the lawsuit. For example,
3  one of the documents is a Thursday, March 10, 2005 e-mail,
4  subject, MicroUnity, from, redacted, to, redacted, cc,
5  redacted, subject, MicroUnity, redacted; and it refers to
6  apart from a proposed consulting agreement with Stexar
7  MicroUnity NDA, and some draft tech and patent license
8  agreements, I'm afraid that I have no documents, none at all
9  from MicroUnity. I had requested the technical documents,
10 etc. Well, here we have somebody who sent an e-mail to
11 somebody, ccing somebody about MicroUnity regarding technology
12 and patent licenses from MicroUnity, and we're entitled to
13 know who this person is and who they are sending it to, and I
14 have no idea how disclosing that information can be a Stexar
15 trade secret or why it would hurt Stexar and who has these
16 draft technology and patent license from MicroUnity and what
17 they say, is directly relative to this lawsuit. So, that is
18 one example.

19        There is another example on the same page on the
20 same day with from, to and certain things blanked out, then it
21 says, I think that blank has been the gatekeeper and records
22 keeper. This seems to refer to the patent license and
23 technology licenses or similar documents and we're entitled to
24 know who this blank is who is the gatekeeper and records
25 keeper and who is discussing these documents.

1     If you also look, you will some handwritten notes of

2  a meeting with MicroUnity that seems to talk about the whole

3  history of the company, the nature of their inventions and

4  what they are discussing, and yet -- and it talks about great

5  anticipation, whatever that is, and yet it is all blanked out.

6  And this is a meeting between MicroUnity and Stexar.  So, how

7  can these notes of a meeting between MicroUnity and Stexar be

8  trade secret to Stexar?

9     Again, we're talking about notes that relate to the

10  history of MicroUnity and what MicroUnity is telling Stexar

11  about the nature of their inventions and the nature of their

12  company.

13     So, you know, where we are, Your Honor, is we have a

14  very strict Protective Order in this case.  The Protective

15  Order applies to third parties.  Stexar did offer for a more

16  limited -- much more limited restriction for one in-house

17  counsel and two outside counsel to have access to their

18  documents, but to be frank given the complexity of the case,

19  given the Protective Order that is already in place, given

20  that other third parties, such as Hewlett Packard, and

21  Phillips, for example, have already produced documents under

22  this Protective Order and that we are currently negotiating,

23  for example, with people like Motorola and Texas Instruments

24  to produce documents under this Protective Order, it would

25  cause, I think, havoc and chaos in the litigation for us to

```
 1   start amending or changing the Protective Order for Stexar,
 2   especially when this Protective Order seems to be good enough
 3   for a lot of major companies in the industry, including Intel,
 4   who obviously has a lot at risk here, albeit we're a party.
 5   But even, for example, Hewlett Packard who is not a party,
 6   Texas Instruments who is not a party, Phillips who is not a
 7   party.  Motorola has asked for additional protections under
 8   the Protective Order, and we are negotiating that with them.
 9              THE COURT:  Well, maybe I'm confused.  What is the
10   volume of the redacted documents?
11              MR. HEALEY:  I think it's attached to the Motion.
12              THE COURT:  Is it the 45 pages as set forth in this?
13              MR. GONSOULIN:  Yes, Your Honor.
14              THE COURT:  Okay.  Well, let's hear from Mr.
15   Gonsoulin here about why it is that this -- I mean, the
16   examples he's given me are a little hard for me to conjure up
17   in my mind the objection which you are making, Counsel.  So,
18   go ahead, Mr. Gonsoulin.
19              MR. GONSOULIN:  May it please the Court.  Your
20   Honor, we represent Stexar, which is a non-party to this
21   lawsuit.
22              Secondly, Stexar is a competitor of Intel.
23              Now, those are two very important things.
24              Thirdly, the information sought by Intel is not
25   relevant to any issue in this lawsuit that we can determine.
```

```
 1   I would like to point out -- Mr. Healey has pointed out
 2   letters and said, well, you know, March of 2005.  I should
 3   like to point out, Your Honor, first of all, that unlike
 4   Hewlett Packard that has existed for a number of years,
 5   Motorola which has existed, Stexar was not organized until
 6   March of 2004.  This lawsuit was filed in March of 2004.  Now,
 7   I would like to point out -- I think that is very significant,
 8   Your Honor.

 9          And the correspondence -- if you'll look in the 45
10   pages, you will see that the correspondence ranges from June 1
11   of 2004 to maybe April of 2005, long after any alleged patent
12   infringement took place what have you.  Our company was just
13   getting started in 2004.

14          So, Your Honor, I don't see how anything that we
15   have would be relevant to this lawsuit.  And Intel has not
16   shown any necessity for this information.

17          Their subpoena, Your Honor, is overly broad and
18   global because it is not limited in time, it's not limited to
19   a specific subject matter, and they have not shown any
20   necessity.  In fact, some of the information that they have
21   requested has already been produced, as I understand it, by
22   MicroUnity, some of the correspondence.  So, they have already
23   gotten some of this information, Your Honor.

24          But the thing about it, Your Honor, as you will see
25   in the affidavit of Richard Calderwood, who is the general
```

```
 1   counsel for my client, Stexar, the information that has been
 2   redacted -- and let me point out, that we've submitted 45
 3   pages of documents, that's all that we believe is responsive
 4   to their subpoena.  We -- some of those are completely
 5   unredacted, some of them are partially redacted, some of them
 6   are fully redacted.  As Mr. Calderwood pointed out, the names
 7   of our clients, officers, directors, partners, business
 8   partners, the product space, where we are focusing, strategic
 9   business places, that is all trade secret.  And that is
10   something that the rules permit us to do it.  Rule 45 that we
11   just talked about a little earlier in the previous hearing
12   says that you cannot require disclosure of trade secret
13   information or confidential information, and that is exactly
14   what we are asking this Court, is that we want no disclosure.
15   But rather than just stonewalling it, Your Honor, we submitted
16   45 pages of redacted documents.  We also made an offer for one
17   outside counsel and, I believe, one inside counsel to look at
18   these things -- these documents, unredacted, and show us what
19   -- why this information that has been redacted is relevant to
20   this lawsuit.  And they have refused that offer, Your Honor.
21   We feel that we have gone well beyond what we are required to
22   do under the Federal rules, and therefore we object to this
23   Motion to Compel.

24          If, as an alternative, we have said that if they
25   cannot convince us that this information is relevant, we would
```

1   like to submit this information unredacted to the Court for an

2   in-camera inspection.  But, Your Honor, who our partners are,

3   who our -- the names of our employees, where we are going as

4   far as the marketplace is concerned, and we're just a young

5   company, Your Honor, it is very important that all of this

6   information be concealed as trade secret.  It is business

7   communications, and it's just very, very important that this

8   not be given to Intel, Your Honor, or to any of their experts.

9           THE COURT:  All right.  Mr. Gonsoulin, under your

10  theory of trade secrets, then we could just take people that

11  had a lot of knowledge about things and just hide them out

12  forever and not disclose them, you know.  That's a little

13  contrary to what's been going on in this District for a number

14  of years.  I'm just saying that you're saying that employees

15  that have relevant knowledge, do not have to be disclosed

16  because that would somehow -- that would tell them something

17  about it.  That is a little foreign to the Court under the

18  present practice as I understand it.

19          MR. GONSOULIN:  Well, Your Honor, let me say this:

20  Some of these employees have knowledge, but -- as to where we

21  intend to go, where our client intends to go, that has nothing

22  to do with Intel.

23          THE COURT:  Well, I know, but you're wanting to

24  stretch it to the point that you don't even have to tell them

25  their names.  I haven't said that they have to give up

```
 1  everything they know yet, but what you're wanting to do is
 2  say, they can't even know who the potential witness is.
 3            MR. GONSOULIN:  Well, Your Honor, we think that some
 4  of those witnesses have knowledge that they -- if they know
 5  the name, they can -- Intel can know where we are going, Your
 6  Honor.
 7            THE COURT:  Well, that's a little foreign to me.
 8  Mr. Healey, are y'all not even going to look at these
 9  documents?  You want me to try to figure it out without some
10  help?
11            MR. HEALEY:  Your Honor, we would be happy to look
12  at them and give you some help.  I can -- these are a couple
13  of pages that are in the record that I can show you just to
14  make the point, just from the redactions you can see what I'm
15  talking about.  If I could approach?
16            THE COURT:  Yes.
17            MR. HEALEY:  If you look, here is the one I
18  mentioned earlier where we are talking about somebody who has
19  draft patent license agreements and he's the gatekeeper, you
20  know, clearly we are entitled to know who that is.
21            Here is one -- if you look at the -- an e-mail from
22  Darrell Boggs and it is blanked out a bunch of stuff about
23  group floating point operations and whether they -- and it
24  says, they don't directly read on blank.
25            The whole subject matter of this lawsuit is whether
```

 1 | MicroUnity's group floating point operations technology reads
 2 | on certain things at Intel microprocessors. That's the
 3 | subject matter of the lawsuit.

 4 |         So, what we have are -- and they have only produced
 5 | 45 pages because we sent them a very narrowly tailored
 6 | subpoena, we are not asking them for more documents. We are
 7 | not saying give us more stuff. We will keep the 45 pages,
 8 | we're just saying fill in all of these blanks so that we can
 9 | pursue it.

10 |         Now, if it would be of assistance to the Court for
11 | two outside counsel and one inside counsel to go through this
12 | and us to supplement the record with a letter or a brief under
13 | seal, I'll happily do that. Our problem, of course, Your
14 | Honor, is we've got thousands of pages from Hewlett Packard,
15 | and pages from Phillips and Texas Instruments and other
16 | companies, and it seemed to us where it was so clear that this
17 | information from Stexar was not entitled to be redacted, that
18 | Stexar ought to produce the information, identify these
19 | people, have it handled under the Protective Order as the
20 | information from other technology companies in this space, as
21 | opposed to create a precedent where some subset of lawyers has
22 | to go through the productions of technology companies that we
23 | have got to deal with.

24 |         THE COURT: Well, I'm faced with a sworn affidavit
25 | that says it's going to damage them, you know, and I don't

```
1   really have anything that sort of --

2              MR. HEALEY:  Well, I would --

3              THE COURT:  -- and I have some serious question

4   about it, the breadth of it.  So, in order for me to feel

5   comfortable in ruling contrary to what's in this sworn

6   affidavit from general counsel of Mr. Gonsoulin's client, I

7   want -- I'm going to take you up and have you submit that.

8              MR. HEALEY:  We'll do it, sir.

9              THE COURT:  Now, there is no disagreement about two

10  outside counsel and one inside counsel looking at it, is that

11  right, Mr. Gonsoulin?

12             MR. GONSOULIN:  That's correct, Your Honor.  But

13  with the understanding that they would not disclose it either

14  to Intel or to any technical experts, Your Honor.

15             THE COURT:  Well, it is limited -- it is limited to

16  them, they will not disclose it to any other person without

17  further order of this Court.

18             MR. HEALEY:  Yes, sir.  Now, I take it that support

19  staff is exempted, so that we can put it in a letter and send

20  it to you.

21             THE COURT:  Well, how much time -- yes, I think the

22  Court and its staff is always exempted.

23             MR. HEALEY:  Yes.  As well as my secretary and

24  paralegal.

25             THE COURT:  Well, yes, but you are going to protect
```

```
 1    the --
 2             MR. HEALEY:  Yes, sir.
 3             THE COURT:  You are responsible for that.
 4             MR. HEALEY:  Absolutely.
 5             THE COURT:  How much time are you going to need to
 6    file a written brief.
 7             MR. HEALEY:  If we can get it, we'll file the brief
 8    under seal within a week of when we get the documents.
 9             THE COURT:  Well, you can get them to him by Monday,
10    can't you, Counselor?
11             MR. GONSOULIN:  Sir?
12             THE COURT:  You can get them to him by Monday,
13    today's Thursday.  I'm sure Federal Express works over the
14    weekend between wherever your client's got a copy -- you got a
15    copy in your office?
16             MR. GONSOULIN:  Yes, I have a copy.
17             THE COURT:  Well, all right.  Then all you have got
18    to do is make a copy of 45 pages and get it over to Houston, I
19    believe you can do that by Monday.
20             MR. GONSOULIN:  Yes, sir.
21             THE COURT:  To Mr. Healey's office.
22             MR. HEALEY:  If we could say April (sic) 16th
23    because I was going to take the 15th off.
24             THE COURT:  April?
25             MR. HEALEY:  I mean, August 16th.  I'm sorry, Monday
```

```
 1   is the 8th, right?  So, the 15th is a week from Monday, so the
 2   16th, because I was going to take the 15th off.
 3               THE COURT:  Well, how about the 17th, Mr. Healey?
 4               MR. HEALEY:  Okay.  Thank you.
 5               THE COURT:  I'm feeling so generous today, I got
 6   back at 10:00 o'clock last night from vacation, so I'm still
 7   in a good mood.  So, I will give you an extra day.
 8               MR. HEALEY:  The 17th will work, Your Honor.
 9               THE COURT:  All right.
10               MR. GONSOULIN:  Your Honor, let me understand what
11   the Court's ruling is, would you repeat that for me and the
12   dates.
13               THE COURT:  All right.  Monday at 5:00 o'clock --
14   Monday, August 8th at 5:00 o'clock, you shall cause to be
15   delivered to Mr. Healey's office an unredacted set of
16   documents to be reviewed by one in-house counsel and two
17   outside counsel.  And that Mr. Healey, then, shall file a
18   written brief, under seal, with his arguments to the Court by
19   August the 17th at 5:00 o'clock why I should disregard the
20   affidavit of your general counsel.  And you may file within
21   five days after the -- well, the Monday following the 17th,
22   whatever -- that would be the 25th, I guess, no, the 22nd, any
23   response.  And then I will rule on it.
24               MR. GONSOULIN:  Okay.
25               THE COURT:  Okay?  That take care of it?  Anything
```

```
 1  else that we need to take up today?

 2          MR. HEALEY:  No, sir.

 3          THE COURT:  All right.  These are a little bit more

 4  micro-managed questions than I normally deal with.

 5          MR. HEALEY:  We try to avoid trouble.

 6          THE COURT:  I know.

 7          (Discussion off the record.)

 8          COURT SECURITY OFFICER:  All rise.

 9          (Court adjourned.)

10          *       *       *       *       *       *

11

12

13                      CERTIFICATION

14

15          I HEREBY CERTIFY that the foregoing is a true and

16  correct transcript from the stenographic notes of the

17  proceedings in the above-entitled matter to the best of my

18  ability.

19

20

21

22  _____          _8-10-05_
    SUSAN SIMMONS, CSR                    Date
23  Official Court Reporter
    State of Texas No.:  267
24  Expiration Date:  12/31/06

25
```