```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE EASTERN DISTRICT OF TEXAS
 2                      TYLER DIVISION

 3  MARVELL SEMICONDUCTOR, ET AL )
                                 )      DOCKET NO. 6:07cv204
 4     -vs-                      )
                                 )
 5  COMMONWEALTH SCIENTIFIC AND  )
    INDUSTRIAL RESEARCH          )
 6  ORGANISATION, INC.           )

 7

 8
                 TRANSCRIPT OF PRETRIAL CONFERENCE
 9              BEFORE THE HONORABLE LEONARD DAVIS,
                   UNITED STATES DISTRICT JUDGE
10

11
                   A P P E A R A N C E S
12

13          (SEE SIGN-IN SHEET DOCKETED IN THE CASE.)

14

15

16

17  COURT REPORTER:        MS. SHEA SLOAN
                           211 West Ferguson
18                         Tyler, Texas  75702

19

20

21

22  Proceedings taken by Machine Stenotype; transcript was
    produced by a Computer.
23

24

25
```

```
 1                    P R O C E E D I N G S

 2              THE COURT:  Please be seated.

 3              All right.  Ms. Ferguson, if you will call the case,

 4      please.

 5              THE CLERK:  Court calls Case No. 6:07cv204, Marvell

 6      Semiconductor v. CSIRO.

 7              THE COURT:  Announcements.

 8              MR. TINDEL:  Good morning, Your Honor.  Andy Tindel.

 9      I'm here for the Marvell entities in the case.  With us I have

10      our client Jennifer Oates, who is the director of our

11      intellectual property litigation.  Ruffin Cordell.

12              MR. CORDELL:  Good morning, Your Honor.

13              MR. TINDEL:  Warren Heit.

14              MR. HEIT:  Good morning, Your Honor.

15              MR. TINDEL:  Kevin McGann.

16              MR. McGANN:  Good morning.

17              MR. TINDEL:  Eric Krause.

18              MR. KRAUSE:  Good morning.

19              MR. TINDEL:  And Indy Mukerji.

20              MR. MUKERJI:  Good morning, Your Honor.

21              MR. TINDEL:  We are ready to proceed.

22              THE COURT:  Thank you.

23              MR. MICHAUD:  Good morning, Your Honor.  I am Fred

24      Michaud from Capshaw & DeRieux for the patent owner CSIRO.

25              Mr. Calvin Capshaw and Jeff Rambin from Capshaw &
```

3

1    DeRieux.

2              THE COURT:  Okay.

3              MR. MICHAUD:  Mr. Jordan Jones --

4              MR. JONES:  Good morning, Your Honor.

5              MR. CAPSHAW:  -- from Townsend and Townsend and

6    Crew.  Mr. Bassett from Townsend also is going to be helping

7    us with the slides.

8              We have with us today from CSIRO, Terry Healy, who

9    is special counsel.

10             THE COURT:  Mr. Healy.

11             MR. MICHAUD:  And I will introduce John Lord while I

12   am on this side of the room.

13             MR. LORD:  Good morning, Your Honor.

14             MR. MICHAUD:  He is with Townsend as well.

15             THE COURT:  All right.

16             MR. MICHAUD:  And Jim Wagstaffe from Kerr &

17   Wagstaffe; and Gary Ritchey with the Townsend Firm.

18             THE COURT:  Very well.

19             MR. MICHAUD:  We are ready.

20             THE COURT:  All right.  We have quite a bit to cover

21   in this pretrial.  Let me just start with -- ask each side to

22   give me a five-minute overview, opening statement of what you

23   think is the most important issues before the Court and any

24   suggested order you have for tackling this pretrial.

25             So who would like to go first?  If I could ask

1   someone -- oh, I have a pen.  I need one with ink.  This one

2   is out.  Thank you.

3           All right.  Mr. Cordell.

4           MR. CORDELL:  Thank you, Your Honor, Ruffin Cordell,

5   Fish & Richardson on behalf of the plaintiff, Marvell.

6           Perhaps, it would be best to begin with where we

7   think the battle order ought to be.  We got together with

8   CSIRO this morning and talked about all of the motions, and

9   the Court is exactly right, we do have quite a bit to get

10  through.  And the order that we would like to suggest is that

11  we start with our motion to dismiss, which is Docket 301.

12          We then argue the motion to realign, which is docket

13  337.

14          We then argue a grouped motion that deal with the

15  Court's claim construction in this case, which are Dockets 281

16  and 306.

17          THE COURT:  What are those numbers again?

18          MR. CORDELL:  I'm sorry, Your Honor, 281 and 306.

19          THE COURT:  Okay.

20          MR. CORDELL:  And then turn to CSIRO's summary

21  judgment motion on our third through six defenses, which is

22  Docket 232.

23          And after that, we thought that perhaps we could see

24  what the Court's preference is and go from there.  Perhaps

25  each side could pick one of the other motions in a draft --

1          THE COURT:  You don't want to start with your

2   motions in limine?

3          MR. CORDELL:  They are a highlight, Your Honor, to

4   be sure.

5          THE COURT:  I love them.  They're great.

6          MR. CORDELL:  We will get to those, I'm sure.

7          THE COURT:  I'm not so sure.  I am thinking about

8   just starting to deny all motions in limine and just let

9   everybody deal with it at trial like we used to.

10         But, anyway, all right.  What about CSIRO, what is

11  your position with regard to the best way to proceed?

12         MR. MICHAUD:  We are pretty much in agreement on

13  that order.  Obviously there is a pretrial order for issues

14  that are of concern to us, but they may fall by the wayside as

15  we go through these various motions.

16         THE COURT:  Let's start with 301, Marvell's motion

17  to dismiss.

18         MR. CORDELL:  Very well, Your Honor.  Did the Court

19  want to hear any more about an opening statement or just go in

20  the motions --

21         THE COURT:  No, I will be glad to hear an opening

22  statement.

23         MR. CORDELL:  I will be very brief.  I would just

24  like to highlight a couple of issues.  The first is the motion

25  to dismiss.  That is something, as I am clearly new to the

1   case, I found to be --

2          THE COURT:  You are not new to the case.  You have

3   been around for a long time.

4          MR. CORDELL:  That is true, Your Honor.  But this

5   particular case this was an issue that was new to me, and I

6   found very, very provocative.  What I will do when we get to

7   that part is walk the Court through --

8          THE COURT:  If it is so provocative, why did it take

9   so long to dream it up?

10          MR. CORDELL:  Well, I have struggled with that,

11   given my longevity in the overall matter, and someone

12   suggested that I should plead the 5th at a moment like this.

13          THE COURT:  Well, go ahead with your opening

14   statement.  We will get to that in a minute.

15          MR. CORDELL:  The motion to dismiss issues I do want

16   to emphasize because I do think they are weighty, but we will

17   spend a fair amount of time on that.

18          When we get to the merits of the case, there are two

19   very, very significant issues that we are going to consider in

20   various forms as we move through the day.

21          The first has to do with the claim construction in

22   this case.  The Court has done a lot of claim construction

23   work in this matter and on this particular patent.  I think we

24   have probably set a record for the amount of time that the

25   Court has spent on it.  And yet we still do have issues.

1          What we found after the last -- the trial last April

2     is that, at least we believe, that CSIRO went home and put

3     their thinking caps on and tried to find a way to avoid the

4     very compelling invalidity case that the defendants in the

5     April 2009 trial were able to adduce.  And what they did is

6     they began to tinker with the claim construction, for lack of

7     a better word.

8          So at the end of it, we believe the issues we are

9     going to talk about here are directed to that issue.  And

10    CSIRO's effort to move those claims back away from that

11    invalidity precipice -- and that has had two very profound

12    effects.

13         Number one, it required them to go back and

14    reconsider some of their PICs, for example.  And that is one

15    of the motions that we are going to argue.  Their infringement

16    case doesn't line up exactly right, once they try to move the

17    claim construction away.

18         And then the second thing that it does is it

19    actually opens up infringement defenses that might not have

20    existed before.  So it is a fairly disruptive process.  So I

21    do think it is worth a fair amount of attention here today.

22         And then the other significant issue that we have

23    seen develop has been the jurisprudence, the jurisprudence

24    surrounding the ResQNet decision from the Federal Circuit

25    dealing with settlement agreements.

1          Last Friday CSIRO served a new expert report Friday

2     night, wherein their damages expert announces his reliance on

3     settlement agreements and is putting those into issue.  We had

4     been watching the cases out in Marshall, the DataTreasury

5     cases for example, and Judge Ward's dealing with the issue in

6     Tyco, with some interest; but, again, until last Friday night

7     we hadn't heard anything from CSIRO on the issue.  But they

8     have now put them in.

9          It does have a very profound effect on the case

10    itself.  The longstanding jurisprudence of the Eastern

11    District, of course, is that settlement agreements were never

12    admitted, they were never talked about in front of the jury.

13    They were never put into evidence.

14         ResQNet suggests that that should change, so we

15    would like to challenge that here today.  We would like to try

16    to convince the Court that it is a bad idea.  It has always

17    been a bad idea, and it remains a bad idea.  But if they are

18    to be admitted, then we need to take significant steps to try

19    to ensure that there is no prejudice that befalls Marvell.

20         One of the reports that I got out of Marshall in the

21    DataTreasury case, that as soon as the plaintiff opened on the

22    settlement agreements, the jury quit listening because they

23    figured if others had settled, there was no reason for them to

24    go into the difficult issues of validity and infringement.

25    And that is exactly the prejudice that we seek to avoid.

1           And so when we get, again, to that -- I don't want

2   to give away too much of our argument; but we are going to ask

3   the Court to exclude the settlement agreements.  But if they

4   are admitted, then take significant steps -- perhaps even

5   bifurcate the matter so that the jury hearing liability does

6   not have to hear about the settlement agreements.

7           With that, Your Honor, we are ready to proceed with

8   the motions.

9           THE COURT:  Thank you.

10          Would CSIRO like to make an opening statement?

11          MR. MICHAUD:  No, I don't think so, Your Honor.  We

12  would like to go ahead and proceed with the motions.

13          THE COURT:  Let's proceed with Docket No. 301,

14  Marvell's motion to dismiss counterclaims for lack of

15  standing.

16          MR. CORDELL:  Your Honor, as is our habit, we have

17  PowerPoint slides prepared.  I find that when I am lecturing

18  my teenagers, I have to have a PowerPoint now.  And the motion

19  to dismiss is at Tab 1.

20          THE COURT:  I will try to listen better than your

21  teenagers.

22          MR. CORDELL:  I'm sure of that, Your Honor.  My

23  eldest starts driving in about two weeks.

24          THE COURT:  Good luck.

25          MR. CORDELL:  Thank you.

1           Your Honor, it is appropriate that we consider the

2   motion to dismiss at the outset of this hearing because it is,

3   in fact, jurisdictional.  We are here to talk about whether or

4   not all of us should be here in the first instance.

5           And the issue is squarely raised --

6           If I can have Slide 1.

7           -- did CSIRO assign any of its ownership rights to

8   the subject matter claimed in the '069 patent?  We believe the

9   clear answer is yes; that IBM is at least a co-owner of the

10  '069 patent and because they are a co-owner, their absence

11  divests us of jurisdiction here and we can't even talk about

12  the case.

13          The law is very, very clear that without all of the

14  joint owners in the case, you can't litigate the rights that

15  are the subject of the lawsuit, the '069 patent.

16          We also believe that it is a fundamental defect in

17  one of the two primary elements of patent infringement.  There

18  are only two elements of patent -- no matter how we dress it

19  up, it is ownership and infringement.  That is what the

20  patentee has to prove.

21          CSIRO can't do that if they aren't the sole owner of

22  the '069 patent, and so we believe the case should be

23  dismissed.

24          This is not the first time I have stood before you

25  in this context.  The Court may recall we had a case between

1    Softvault and Microsoft a couple years ago where we had

2    similar facts.  There it was an employee assignment agreement

3    where an employee had developed technology with a former

4    company, and I believe we ended up resolving that with a

5    dismissal and a direction to go and arbitrate the matter,

6    which is how it was ultimately resolved.

7           And Judge Folsom, one of the cases that we cited was

8    the Reid v. Microsoft case.  And there Judge Folsom did, in

9    fact, dismiss it on very similar grounds.

10          THE COURT:  I know in one case I ordered a suspected

11   part owner joined as an involuntary plaintiff in the case.

12          MR. CORDELL:  That would be a possibility, Your

13   Honor.  There is some law that suggests that it is difficult

14   to force an involuntary plaintiff as a patent owner because

15   their validity rights are at stake.  So whenever we walk into

16   court and sue somebody on a U.S. patent, we are squarely

17   testing the validity of that patent, so the patent owner can

18   end up with nothing.  They can end up with an invalid patent.

19   So there are cases that suggest that it is difficult to compel

20   a plaintiff to appear.  We sometimes --

21          THE COURT:  Does this Court even have jurisdiction

22   over this Australian entity?

23          MR. CORDELL:  That is an excellent question, Your

24   Honor, one I hadn't considered.  We have always looked at IBM

25   as a monolith; but the Court is quite correct, it was IBM

1   Australia that signed the agreement, not IBM U.S.

2          THE COURT:  Did the agreement pertain to just the

3   Australian patent rights or to U.S. patent rights as well?

4          MR. CORDELL:  The agreement pertained to all

5   intellectual property rights.  One of the things that I will

6   show the Court is that there was actually a little bit of a

7   back and forth between the parties about what rights IBM would

8   get.  And originally CSIRO had taken the position that IBM

9   should only have very, very narrow rights.  They should have

10  copyright rights, and a little bit of trade secret rights; and

11  that the information was to be used only in IBM for its own

12  internal purposes.

13         The draft history shows us that that was thrown away

14  in favor of a much broader grant to IBM; that there was some

15  discourse back and forth between the parties.  After that

16  discussion, the agreement was reformed to give IBM unfettered

17  rights, unencumbered rights -- is the words that the parties

18  actually used -- to this technology.

19         So at bottom it is a very simple and straightforward

20  analysis.  There was an agreement, it transferred the rights,

21  and IBM took the rights.

22         Let me just touch on the timeline, if I may at Slide

23  3.

24         We started in 1991 where CSIRO had contacts with IBM

25  to discuss a collaborative relationship.  They wanted to deal

1   with IBM.  They knew IBM was a leader in the technology

2   business.  They needed IBM to be able to promote this.  They

3   needed IBM to be able to tell other people that it was okay to

4   use it.

5          So they actively sought out that collaboration.  In

6   August of 1992, five members of CSIRO, including two of the

7   inventors, went over to New York to visit with the IBM

8   folks.  They then filed a provisional that in the first case I

9   wrongly assumed would be the basis for CSIRO's priority claims

10  in this case, for the '069 patent.

11         What has then become clear since I have been gone,

12  is that CSIRO has made it eminently clear they were not

13  relying on that provisional for priority purposes.  Instead,

14  instead, what they are relying on are the deliverables they

15  gave to IBM.  So the material they gave to IBM is what CSIRO

16  says forms the priority basis of the '069 patent.  Not our

17  words.  Their words.

18         There was a meeting in November/December of 1992

19  where there was significant discussions of the technology.

20         If I can go to Slide 4.

21         On December 21st, 1992, a draft agreement was

22  exchanged.  And I apologize, Your Honor, because that was

23  something I had not seen before I actually prepared for this

24  argument.  But we found it.  And we have the draft agreement.

25         With the Court's permission, I will hand it up.

1        (Document given to Court and Counsel.)

2             And the Court, if you were to compare it to the

3    ultimate agreement, which is at Exhibit M to our motion, you

4    will find it is in exactly the same form, the same kinds of

5    font, the headers and the footers on that document are

6    identical.  I will get into the analysis of that agreement in

7    a few moments.

8             After that draft agreement was exchanged, CSIRO had

9    a discussion with IBM.  We don't know exactly what was said,

10   but we have a letter -- we have a letter that CSIRO wrote to

11   IBM that says, based on your discussion we understand that you

12   have a problem with the intellectual property rights clause;

13   so based on our discussion, we are going to change that

14   agreement and give you unencumbered rights in the

15   deliverables.  We are going to take the shackles off and give

16   you everything that there is.

17            THE COURT:  I probably should know this, but tell me

18   what you mean by "deliverables."

19            MR. CORDELL:  Very good, Your Honor.  If you go to

20   the next slide at Slide 5, the contracts set forth two very

21   specific deliverables.  And the deliverables themselves are

22   actually in our motion.  It was a very, very thick technical

23   specification.  There were two of them that were given.  One

24   was in March of 1993 and the other was in April of 1993.

25            They were detailed specifications that described

1   exactly how the process worked.  And CSIRO has admitted that

2   in those deliverables, in those detailed specifications, every

3   single element of the '069 patent claims are disclosed.

4           So this isn't a case where we are arguing about

5   whether the thing included all of the patent or not, which we

6   often do in these cases.  We are arguing about whether an

7   invention assignment was operable because the person's job

8   wasn't close enough to a particular patent.

9           We don't have any of the technology issues in this

10  particular case because CSIRO has admitted that the

11  deliverables that they made to IBM contained all of the '069

12  patent, but it is a very extensive specification.

13          THE COURT:  All right.

14          MR. CORDELL:  And I believe it is Exhibit M --

15          Somebody check that.

16          THE COURT:  Okay.  Go back to your timeline.

17          MR. CORDELL:  Exhibit E, I'm sorry, Your Honor.

18  Exhibit E.

19          So at Page 6 of our motion, for example, we have a

20  block diagram represented from the deliverables that show each

21  of the elements of the '069 patent as delivered to IBM.

22          Importantly, IBM in early 1994 abandoned the

23  wireless market.  They decided that -- they had a new CEO come

24  in, and they decided they ought to go on and do other things.

25  So they left this business.

1        One of the things that CSIRO keeps pressing us on

2   is, why hasn't IBM complained?  And the answer is simple, IBM

3   moved on.  They have forgotten about this.  And because all of

4   this is filed under seal, I don't think anybody has told IBM

5   about it.  But it would be keenly interesting to found out how

6   they would react.  But let's go into the contracts

7   themselves.

8        If I can have Slide 6.

9        We have had some debate on this motion between --

10   primarily between our respective Australian Counsel -- both

11   sides went out and hired some Australian lawyers to advise us.

12   And the only thing that seems to have come with that is that

13   the Australians look at the so-called fact matrix.  They look

14   at the surroundings of an agreement to make sure everything is

15   appropriate.

16        I don't think it is widely different from what we do

17   here in Texas or in the United States generally, but they do

18   look at other parts of the agreement.  They look at the

19   factual context.  So we look at the other recitals in the

20   agreement to see what the purpose and intention of the

21   agreement was.

22        At Slide 6 we quote the fact that one of the primary

23   recitals was to give the client -- in this case IBM -- give

24   the client certain rights identified as project technology

25   rights, according to the terms of this agreement.  It was one

1    of the primary purposes to transfer rights.

2              We look at Section 6 of the agreement at Slide 7.

3    And very straightforwardly in plain black and white language

4    they tell us CSIRO hereby assigns or grants to the client,

5    ownership of and intellectual property rights subsisting in

6    the deliverables.

7              They didn't pull any punches.  They didn't carve

8    anything back from that particular phrase.  They said you get

9    the intellectual property rights subsisting in the

10   deliverables.  Plain and simple.  There is a reason we write

11   these things down is to keep us from having to debate what

12   people really meant and what they were really thinking.  And

13   here we have a very straightforward recitation.

14             The assignment is tied directly to the

15   consideration.  It says subject to receipt by CSIRO of the

16   contract fee.  So this assignment doesn't take place unless

17   the money comes in.  Other parts of the agreement are premised

18   on IBM paying money, but this one says CSIRO has actually got

19   to receive it.  There have been no problems in transmission

20   whatsoever.  And the assignment is automatic, Your Honor.

21   There is no additional executory covenant necessary to

22   transfer those rights.

23             The contract further defines intellectual property

24   rights at Slide 8 --

25             THE COURT:  Where is the assigning language in the

1    agreement?

2         MR. CORDELL:  Yes, Your Honor.  The operative

3    covenant is, CSIRO hereby assigns or grants to the client --

4         THE COURT:  All right.

5         MR. CORDELL:  -- ownership of and intellectual

6    property rights subsisting in the deliverables.

7         THE COURT:  All right.

8         MR. CORDELL:  The intellectual property rights are

9    further defined to include patents.  At Slide 8 we quote one

10   of the definitions.  And they specifically call out

11   trademarks, patents, circuit layouts, copyrights, and

12   designs.

13        CSIRO has taken the position that this contract only

14   somehow transferred copyrights.  Well, that would make no

15   sense, Your Honor.  Why would they then enumerate --

16        THE COURT:  What was CSIRO getting in exchange for

17   this broad conveyance?

18        MR. CORDELL:  They were getting two very important

19   things; they were getting $100,000, Australian dollars,

20   100,000 Australian dollars at a time when nobody knew whether

21   this was worth anything.  So they were getting a significant

22   sum of money.

23        And then, number two, they were getting IBM's help.

24   They were getting IBM's technical assistance, but more

25   importantly they were getting IBM's sponsorship of this

1  technology.  We have evidence, and I will show you in a

2  moment, where CSIRO's own witnesses said we had to have IBM.

3  They were a key to this because people understood they were a

4  market leader in technology.  They would be able to promote

5  it.  So that consideration was very, very profound, and it is

6  why they sought out IBM.

7          I will also show you that CSIRO sought out many

8  technology companies at that time, none of which, none of

9  which would give them anything for this; wouldn't give them

10  $100,000, wouldn't promise to help them.  It was done of it.

11          There was a carve-out, and I will dwell on this just

12  briefly at Slide 9.  There was a carve-out that CSIRO took

13  back.  They said we are going to give you all of the

14  intellectual property rights except for three things.  That

15  carve-out we have got highlighted at the bottom of the slide.

16          One had to do with something called gallium

17  arsenide-based passive and active components.  Mercifully,

18  none of that is relevant to anything that we are talking about

19  here.  Gallium arsenide is an alternative to silicon used as a

20  semiconductor.  It is one of the early semiconductors that was

21  developed.

22          Number two is an Australian provisional patent

23  application, and that was the one we thought they might point

24  to for priority on the '069 patent, but they told us now

25  unequivocally that that provisional application is not, is not

1    the priority document for the '069 patent.

2           And then the third is an Australian patent

3    application that is important because it is a PCT, Your

4    Honor.  It is a patent application that was filed all over the

5    world.  And one of the arguments that CSIRO makes is that this

6    transferred only Australian rights.  If that were true, there

7    would be no reason to reserve this PCT application that was

8    filed in the United States, all over Europe, Japan, and

9    Korea.  But the subject matter of that application is not

10   particularly relevant.

11          So at Slide 10 we show what the overall contract

12   looks like if you were going to put it on a diagram.  They

13   transferred all of the intellectual property rights subsisting

14   in the deliverables and then they reserved those three items;

15   the gallium arcenide, the provisional and then the PCT

16   application.  Those were the carve-outs.

17          We believe it is an integrated document.  We believe

18   that the Court can apply this in the four corners of the

19   papers and not have to go any further.  But I acknowledge that

20   the Australian Counsel have had a debate about this thing

21   called the fact matrix.  I want to look at the surrounding

22   circumstances.  I don't think it quite rises to the level of

23   parol, but they look at the overall context of the agreement.

24          If that is appropriate, Your Honor, I would like to

25   show you the draft history because I think it is compelling in

1    this case.

2              THE COURT:  All right.

3              MR. CORDELL:  So we start at Slide 11 with the

4    December 21 draft.  That was in the document that I handed out

5    a few moments ago.

6              MR. WAGSTAFFE:  Your Honor, may I note for the

7    record that this is not part of the papers, and they objected

8    to parol evidence in their papers here?

9              THE COURT:  Okay.

10             MR. CORDELL:  So in the document that I have handed

11   up, Your Honor, which for the record is Bates CSI-0014184 --

12             THE COURT:  Wait a minute.  Let me be sure I

13   understand.  What you are getting into now are the surrounding

14   facts regarding entering into this agreement?

15             MR. CORDELL:  Correct.  It is the draft history in

16   particular, the draft right before the final one.

17             THE COURT:  Okay.  And what is your objection?

18             MR. WAGSTAFFE:  Your Honor, we submitted

19   declarations from the people that actually negotiated both

20   sides, and said we never intended to give any patent rights,

21   as I will argue.  And then Page 9 of their reply brief they

22   said that is extrinsic evidence, don't consider it.  Their

23   expert says under Australian law, which governs this contract,

24   you don't consider extrinsic evidence.

25             I am seeing it here today, never having presented a

1   paper.  For the record, this is not the way we are supposed to

2   do things.  Their own expert says look at the terms of the

3   contract --

4           THE COURT:  You are saying this has never been

5   presented to you until today?

6           MR. WAGSTAFFE:  Counsel can correct me if I am

7   wrong, this is not part of their papers, this history is not

8   part of their papers; and on Page 9 of the reply, consistent

9   with their own expert -- and, frankly, ours -- they said

10   generally in Australian law you don't look to parol.

11           MR. CORDELL:  It is correct, Your Honor.  This is

12   the first time we have presented this particular document

13   because I simply wasn't aware of it until we prepared for the

14   argument.  However, we are entitled to rebut the parol

15   statements they make.  It is all extrinsic, I would admit

16   that, but I wouldn't necessarily characterize the draft

17   history as parol because it does show the progression of the

18   parties as they came to a meeting of the minds.

19           THE COURT:  Well, I may hear that or I may allow

20   supplemental filing or something, but let me hear what their

21   response is before we get down to this level of history.

22           MR. CORDELL:  Thank you.

23           MR. WAGSTAFFE:  Thank you, Your Honor.

24           Let me simply say that we start with the notion of

25   where we are today right before trial.  Your Honor has

1   correctly noted in a prior case, you consider it as a Rule

2   12(b)(7) concept.  Do we have to join this other party as an

3   involuntary plaintiff?  It's a joinder argument.  That is how

4   the case law deals with it.  We have cited case law that deals

5   with it that way.  It's a joinder argument.

6          Even when courts talk about a standing, they mean

7   prudential standing.  My client clearly has constitutional

8   standing.  We have injury in fact.  No question there.  Their

9   papers suggest we are a co-owner.

10          So their position would be, number one, that if a

11  co-owner -- and we will talk about that is not the case

12  here -- but a co-owner wants to not appear or doesn't appear,

13  that would destroy my client's ability to go forward.

14          More importantly, Your Honor, if it is, in fact, as

15  Your Honor has indicated in prior rulings, as the case law

16  supports, a joinder issue, it can be waived.  They have had

17  this contract, this IBM contract for over two years.

18          They had it, by the way, Your Honor, when they filed

19  their amended complaint in this case.  The good or bad news of

20  parachuting in once in awhile and you see me, Your Honor, from

21  California, is I read things like their complaint, the first

22  amended complaint filed long after they got this contract.

23  May I read it?  It is very short.

24          Paragraph 10, this Court has subject matter

25  jurisdiction pursuant to 28 USC, Section 1331 and 1338.  They

1   have acknowledged that.  But, Your Honor, they will say, well,

2   you can't waive subject matter jurisdiction.  I understand

3   that.  The case law we submitted says this is simply a joinder

4   issue.

5           But there is something more fundamental, Your Honor,

6   that gets us started and it says we have to go any further.

7   You can't raise this issue a few weeks before trial having

8   known about the issue.

9           Something more fundamental, Your Honor, of course,

10  is they are making an unprecedented argument.  They have read,

11  as they said on their last screen -- perhaps, we can put the

12  last screen up.

13          Can you help me there, the one -- 6.1.1.

14          Your Honor, if you look at 6.1.1 they say at the top

15  it is unambiguous, and it says that CSIRO hereby assigns or

16  grants to the client ownership of and intellectual property

17  subsisting in the deliverables.  Your Honor, this is well

18  before the '069 patent.  Subsisting means existing.  The

19  evidence, both by way of the definition of the terms, means

20  what patent rights were existing?  Not future patent rights.

21          And it defines patent rights in a way that talks

22  about statutory patent rights.  And Your Honor's concern about

23  is this Australian only, our expert tells us the word

24  "statutory" means since the contract was governed by

25  Australian law between two Australian entities in which they

1   carve out the only existing patent right that exists, which is

2   the provisional Australian patent, Your Honor, this would be

3   an unprecedented argument.

4        Every case they have where they say co-owners have

5   to both be here, everyone involved in assignment that assigned

6   the invention, it assigned the invention, there is not a

7   single case they cite that is this clause that assigns

8   intellectual property rights in a written document conveying

9   ownership of the invention.

10       THE COURT:  But it says intellectual property --

11       MR. WAGSTAFFE:  It does.

12       THE COURT:  Subsisting --

13       MR. WAGSTAFFE:  Subsisting that exists now, that

14   exists now that are statutory; and, Your Honor, that are

15   subsisting in the deliverables.

16       Your Honor asked a good question, what are the

17   deliverables?  The contract tells us.  It describes them as

18   two documents.  There is not a case out there in which a

19   research agreement that provides some documents, has

20   intellectual property rights subsisting in it.

21       But, Your Honor, there is something -- and I am

22   happy to give you my whole argument, if you like.  I am happy

23   to also wait for their argument and walk you through the terms

24   because the terms of this agreement don't comply with the

25   argument they are making, even if they could make it three

 1    weeks before trial.  I am happy to let them finish and

 2    respond.

 3            THE COURT:  Well, are you through responding to what

 4    they have said other than the surrounding circumstances?

 5            MR. WAGSTAFFE:  No, Your Honor.  I can take you

 6    through the actual document itself, both the terms and the

 7    terms that make no sense at all if you interpret it their way.

 8    I am happy to do that.

 9            THE COURT:  All right.  I would be interested in

10    seeing, if you will turn to what Mr. Cordell quoted from the

11    deliverables, as representing all of the elements of the '069

12    patent and what your response is to that.

13            MR. WAGSTAFFE:  Thank you, Your Honor.

14            Let's start with -- because context -- parol they

15    say is admissible.  I understand that.  The context is.  Let's

16    start with the actual title of the document.  The title of the

17    document is Contract Research Agreement For Preliminary Design

18    Phase.  The very title of the document tells you what was

19    going on here.  For a fairly small sum they were going to

20    engage in some preliminary research that would produce some

21    documents.

22            There is no conveyance of a patent in the title, for

23    starters.  If we go -- as I said, Your Honor, without

24    repeating myself, they specifically used the word

25    "subsisting"; that is, what rights exist now, intellectual

1   property rights exist in the deliverables?  We know that it,

2   therefore, doesn't apply to future patent rights because every

3   case they cite is dealing with trying to clarify that, if that

4   is what they wanted.  Or worldwide patent rights or otherwise.

5        And, frankly, Your Honor when it says subsist in

6   the deliverables, the patent right itself does not exist in

7   the written document.  That is simply a report.  It is simply

8   a report.

9        Now, Your Honor, the parties did, however, want to

10  make sure that people didn't misinterpret this.  So, Your

11  Honor, in Paragraph 6.2, almost virtually the next paragraph,

12  they -- in describing what was assigned, they make clear they

13  are not assigning things that are described in the background

14  technology.

15       So if you look at 6.2, the client IBM Australia

16  argues that -- acknowledges and agrees that it shall not,

17  under this agreement, obtain any rights, including but not

18  limited to intellectual property rights subsisting in the

19  CSIRO background technology.

20       So, they want to make clear that if there are some

21  patent rights that exist -- that exist; not may exist -- or in

22  the future, they want to make clear that we are not getting

23  that over.

24       If you, therefore, then look to the definition as

25  they put on the screen, Your Honor, of that background

1    technology, the only existing patent right that existed at

2    that time --

3              THE COURT:  Where is the background?

4              MR. WAGSTAFFE:  That is on Page 13, Your Honor, of

5    the schedule.

6              MR. CORDELL:  Your Honor, if I can interrupt, I

7    believe that Mr. Wagstaffe hasn't handed up the actual

8    agreement.  I do have the final agreement.

9              THE COURT:  What am I --

10             MR. WAGSTAFFE:  It is attached as Exhibit A to Mr.

11   Heit's declaration.

12             THE COURT:  Excuse me.  What am I looking at here?

13   Is this the draft agreement?

14             MR. CORDELL:  That is the draft, Your Honor.

15             THE COURT:  Okay.  Let me see the final agreement.

16   I have probably got it here somewhere.

17             MR. WAGSTAFFE:  Yeah, if you have Mr. Heit's

18   declaration, Your Honor, it is Exhibit A to his declaration.

19             MR. CORDELL:  I apologize, Your Honor.  I should

20   have handed them both up.

21             MR. WAGSTAFFE:  It is of the agreement itself.

22   There are some incorporated -- this is at Page 13 which

23   describes the schedule.

24             THE COURT:  All right.  Just a minute.

25        (Pause in proceedings.)

 1            MR. WAGSTAFFE:  Do you have that, Your Honor, where

 2  it says, CSIRO Technology?

 3            THE COURT:  Not yet.

 4            MR. WAGSTAFFE:  I'm sorry, Your Honor.

 5            THE COURT:  I was back on 6.2.  So you are at

 6  Paragraph 13?

 7            MR. WAGSTAFFE:  It is on Page 13 of the agreement.

 8  It is Bates 14308 down at the bottom.

 9            THE COURT:  Background --

10            MR. WAGSTAFFE:  And it says, The Schedule, at the

11  top.

12            THE COURT:  All right.  CSIRO Background Technology.

13            MR. WAGSTAFFE:  Correct.

14            THE COURT:  All right.  Go ahead.

15            MR. WAGSTAFFE:  And this is the background

16  technology that is excluded from any possible suggestion that

17  IBM Australia is getting this for this very small research

18  fee.  And they exclude the only existing patent right at that

19  time.  They exclude, among others, Paragraph 2, the Australian

20  patent application.

21            THE COURT:  And remind me, the Australian

22  provisional application, where was that in the development of

23  the technology of the '069 patent at this time?

24            MR. WAGSTAFFE:  Well, the '069 patent was later, in

25  terms of being filed.  But the Australian provision --

1          THE COURT:  I'm talking about the technology of --

2          MR. WAGSTAFFE:  Yeah, it does.  The same basic

3    invention -- and it presumes under Australian law further

4    development, and it is carved out.  And we are not relying on

5    the provisional for priority because of the U.S. written

6    description requirement.

7          But, Your Honor, the only patent right that existed

8    at that time, because the '069 is down the line, it is a

9    future patent application.  The only one is the provisional

10   Australian patent.  And the parties carve it out.

11         Now, Your Honor, think about it, if I may, the

12   parties carve out the one existing or subsisting patent right,

13   yet their argument is that for this small fee that never

14   discusses this, they got the worldwide patent rights in the

15   future forever and yet carved out the Australian provisional

16   patent.  It doesn't make any sense, as I see it.

17         THE COURT:  All right.  Let me ask you this:  If the

18   elements of the Australian provisional patent application were

19   excluded, then what was included --

20         MR. WAGSTAFFE:  That's a great question, Your Honor.

21   Let me answer that.

22         The first thing is, is that the contract itself --

23   copyright rights were included.  I will say that.  When you go

24   to the definitions, Your Honor, where they want to rely on

25   patent and trademark and copyright subsisting in the

1    deliverables, at the very beginning of the definition it says,

2    these definitions will apply unless the context requires

3    otherwise.

4              THE COURT:  Where are you reading from?

5              MR. WAGSTAFFE:  That is on Page 3 of the contract,

6    Your Honor.

7              THE COURT:  What paragraph?

8              MR. WAGSTAFFE:  Paragraph 1, first sentence.  So the

9    writer said, these are our definitions in this frankly formed

10   contract, but it defines -- it says unless the context

11   requires otherwise.  So let's figure out why it does, Your

12   Honor.  And the parties did not transfer these rights.

13             If you ask yourself what intellectual property right

14   could subsist in the deliverables, these documents that simply

15   describe research, what consists, the copyright rights subsist

16   in them, no question about that.  And Your Honor knows

17   copyright law.  The copyright is created, and that is assigned

18   and granted over to IBM for the purpose of letting them share

19   these deliverables with their related companies.  That is

20   right there in the contract.

21             That is why they wanted the copyright so to be sure

22   they could have an unencumbered right to share the

23   deliverables with their related companies.  We will see in a

24   moment they weren't allowed to share with anybody else.

25             Now, Your Honor, trademarks wouldn't be in the

1    deliverables, yet that is an intellectual property right.  It

2    is term that is there in the definition that, in context,

3    doesn't apply.

4            As I will show you in a moment, Your Honor, not only

5    due to the carve-out but due to the language of the agreement

6    and its context, patents weren't part of these written

7    documents.  Patents weren't subsisting at that -- patent

8    rights to the American patent board subsisting the document.

9            So you say, well, is the word "patent" meaningless?

10   But that is an interesting argument.  But there is a response,

11   Your Honor.  We just went through why the word "patent"

12   matters, because the intellectual property rights that exist

13   in the background technology, which is clearly a patent right,

14   would have to be carved out.

15           So in this situation you ask yourself does the

16   context of this agreement tell us that they were transferring

17   a major patent -- future patent right to -- as a result of

18   this research contract?  And so we start with what it is, Your

19   Honor.  It is a preliminary research contract.  That is what

20   it says.  It is a three-month preliminary research project

21   conducted by CSIRO for the limited purpose of the research.

22           THE COURT:  It was three months in duration?

23           MR. WAGSTAFFE:  Three months in duration.

24           And, Your Honor, they weren't silent.  You asked a

25   good question also about consideration.  They weren't silent

1    about consideration, because the proposal that was

2    incorporated by reference and accepted here, describes exactly

3    what they were paying for it.  It describes that.

4            And, Your Honor, we looked at that page before.

5    Excuse me, this happens to be in the -- what is Attachment 1.

6    Your Honor, my kids are grown up.  I probably should have had

7    PowerPoints.

8            But, Your Honor, in Attachment 1, which is Bates

9    14344, so it is Page 5 of the proposal, they tell us both what

10   deliverables are and they tell us what they are paying for it

11   and what schedule.  This is a research project for three

12   months that they described.  And I quote the agreement, small

13   scale research project; preliminary research project.

14           And on that page they tell us that the deliverables

15   are these documents for the initial results.  And then right

16   below it tells us what they are paying for and what schedule.

17   They are paying two payments, and they describe what they are

18   for.  They are for the deliverables.  There is not one dollar

19   in this contract that reflects patent rights.  It is for the

20   written documents as described right there.  For the research.

21           Now, Your Honor might say, what were they buying?

22   Well, the agreement tells us what they were doing.  It not

23   only said it would be limited in duration, they write that no

24   party -- Your Honor, I don't mean to keep shifting you around,

25   but that is the way the contract goes.

1           On Page 5 of the agreement itself, that's Page 5,

2    which is -- I am looking now at -- particularly at Paragraph

3    3.  Paragraph 3 sets forth, if anybody had any mistakes about

4    it, it sets forth that neither party is nor shall be by reason

5    only of entering into this agreement under any obligation to

6    the other party to enter into any other agreements whether

7    contemplated by this agreement or otherwise.

8           This was a first look.  It was for a small amount of

9    money to give some written documents and research.  Did not

10   transfer the patent.  Expressly carved out the one subsisting

11   patent right.  And the party said it is solely preliminary;

12   and if we want to have any future agreements, we will

13   negotiate them.

14          This is a pre-design phase, a development phase.

15   This is let's see if it is something that IBM Australia wants

16   to help us commercialize.  This contract happened, and this

17   contract went away.  But as the parties summarized it, it was,

18   in fact, understood that there might be no further agreements;

19   and we are going to see whether for this relatively small sum

20   we are going to want to go further, and they didn't.

21          And the definition of "deliverables" describes it as

22   preliminary, describes it as initial; and we know that

23   context.

24          But, Your Honor, sometimes we know -- as Groucho

25   Marx says, you believe me or your own two eyes.  Let's look at

1    the other terms of the agreement and ask ourselves whether

2    this was something that it did not appear to be.  And, by the

3    way, if they want parol, Your Honor, they is plenty of parol

4    that is submitted by us in the record that is properly before

5    you, which is the negotiators on both sides testified in our

6    declarations, transfer of patent rights, no way.  This was a

7    preliminary design agreement --

8            THE COURT:  This includes declarations by IBM --

9            MR. WAGSTAFFE:  It does.  David Bantz, who was part

10   of the negotiations and part of the very exhibit they did

11   submit to the Court --

12           THE COURT:  Is he still part of IBM Australia?

13           MR. WAGSTAFFE:  He is not, Your Honor.  And they

14   will say he is on our side, which we -- you know, Your Honor,

15   whether that is the case or not, it is the only evidence

16   before you on that point.

17           THE COURT:  Is IBM Australia, to your knowledge,

18   aware of this motion?

19           MR. WAGSTAFFE:  I don't know that, Your Honor,

20   personally.  I don't know.

21           THE COURT:  All right.

22           MR. WAGSTAFFE:  But, Your Honor, if we look at the

23   contract itself, the contract has a strict confidentiality

24   clause.  I can walk you through it, but trust me, it is a

25   strict confidentiality clause.

36

1          And it says that as to the information being given

2    over, these deliverables, that IBM Australia must keep it

3    absolutely confidential.  That includes the written reports,

4    absolutely confidential, with the exception they carve out an

5    exception, which is, but you can share it because you have got

6    the copyright, you can share it with your related companies

7    only.

8          I want to ask ourselves this:  If we transferred the

9    entire worldwide future patent rights that would require this

10   confidentiality and IBM Australia got it for this $100,000

11   preliminary fee that is not described as a patent fee, how

12   would they be keeping it confidential under these

13   circumstances when my client under their theory would have

14   retained no interest in the assigned future patent rights?

15         But that is not only what they have, Your Honor.

16   Because, in fact, 6.1.1, the very contract clause they want to

17   rely on, specifically says -- if you will look at it, Your

18   Honor, it has got not only subsisting, it has got not only

19   statutory, and not only to the written documents, it is

20   subject to the obligation of confidentiality.  It is subject

21   to the confidentiality clause.

22         It would be absurd to suggest that the parties would

23   have intended obliquely and apparently accidentally to

24   transfer major future patent rights and yet have the

25   confidentiality clause that gets us there.

1          Your Honor, there is more.  Paragraph 22.1, which is

2     on Page 10 of the agreement, addresses a question you asked.

3     Page 10 of the agreement does, in fact, deal with the question

4     of assignment.  And it says, with the exception of 6.1.3

5     allows them to assign things -- the copyright to related

6     companies.  It says, a client shall not assign, charge, offer

7     for security, or in any way deal with its rights under this

8     agreement without the prior written consent of CSIRO, which

9     consent CSIRO will not unreasonably withhold.

10          Well, that makes sense for the copyright which would

11     subsist in the written documents.  It would be utterly

12     incomprehensible if they get the entire future patent rights

13     across the world with nothing in this agreement giving my

14     client any license rights, and nevertheless my client gets to

15     approve any assignments of the patent rights.  That makes no

16     sense.  It makes sense on copyright.  It makes absolutely no

17     sense if it is truly a transfer of patent rights.

18          Your Honor, if you excuse me for being like a Ginsu

19     knife ad and say there is more, but if you turn -- and I will

20     not belabor this because there is plenty of them, but on

21     Paragraph 14 on Page 7, there is an indemnity clause.  That is

22     not uncommon when you are giving over rights.  Make sure you

23     are giving them to me.  Make sure you hold them.  The

24     indemnity clause, you will see there, Your Honor, only

25     provides indemnity for actions brought against IBM Australia

1   in respect to any infringement of copyright in the

2   deliverables however arising out of the client's exercise of

3   rights under this agreement.

4          Perfectly sensible if in context they are

5   transferring the copyright rights in the written document, as

6   would make sense because they exist upon creation.  It makes

7   no sense, so exclude patents because that would be a term that

8   would -- if you were transferring all of the worldwide future

9   patent rights and you want to make sure you are giving me

10  something you actually own, then you give them the indemnity.

11  They do not put the word "patent" in here because it was not

12  part of their agreement.

13         So, Your Honor, the terms of the agreement itself,

14  subsisting meaning now, carving out Australia -- the only

15  existing patent rights, no patent rights subsist in written

16  documents; and, and the context of the agreement at a macro

17  level also tells us that this isn't what the parties could

18  have intended.

19         And, Your Honor, they want to say, until their last

20  brief, we're probably co-owners.  Now they are suggesting a

21  footnote in the last brief maybe they are the only owners.

22  But that is very interesting.

23         Your Honor, if you will travel one more line with

24  me, it'd be 24.1, which is on Page 10.  Page 10 with Paragraph

25  24.1 specifically says, CSIRO and IBM Australia agree that the

1  relationship between them is that of independent contractor --

2  that is a research assignment -- and not that of agency,

3  partnership, joint venture, or otherwise.  They are not

4  co-owners by their own discussion point.  No one ever thought

5  they were.  And, in fact, they weren't.

6       Your Honor, let's imagine for a moment that IBM

7  Australia really thought they were buying this, and that Mr.

8  Bantz, who was in negotiation, is just our paid cad to say

9  something.  Let's assume that.  You asked about whether IBM

10  knew about it, but IBM itself was contacted by my client in

11  2003 and given notice of the patent; and, you know, that

12  process took place, there is not one word that IBM said, you

13  own a patent?  We own the patent.

14       There is a reason they didn't say it, if I may say

15  so, Your Honor, is because they knew they didn't own the

16  patent in the context of this agreement.  So this joinder

17  argument raised at the -- it's not even the eleventh hour,

18  Your Honor.  It is like the thirty-fourth hour of the day

19  because we have been through a couple of cases already.  An

20  awful lot of fine lawyers, very fine lawyers who knew about

21  this agreement; and it has never been raised until now.

22       That may mean something.  It may not.  But I think

23  it means something in the sense that very skilled lawyers and

24  very skilled parties and IBM itself knew that that is not what

25  this was, for $100,000 they got this valuable patent right.

1          And that, Your Honor, is why I think the delay is so

2   very revealing because the delay -- I am not going to

3   criticize cleverness.  I am simply going to say that is not

4   what the agreement says.  That is not what it means in

5   context.  And if Your Honor does look at parol and they tell

6   us you can't -- and I understand that -- the negotiators say

7   that is not what we meant in context.  That is the --

8          THE COURT:  Okay.  Response?  We have spent an hour

9   on this one motion.

10          MR. CORDELL:  I'm sorry, Your Honor.

11          THE COURT:  I hope it is that important.

12          MR. CORDELL:  I think it is, if it is worth

13   anything.

14          I would first like to begin with the notion that

15   there wasn't anything significant in this project.  I mean the

16   facts absolutely don't hold that up.  I am holding in my

17   right-hand Exhibit N, which is the Flying Fox Specification

18   that existed at CSIRO before the project.  And the Court can

19   review it at its leisure, but it is a very sparse document.

20          I am holding in my left hand Exhibit E, which are

21   the deliverables, which are hundreds of pages long.  These are

22   double-sided.  Hundreds of pages long with very, very detailed

23   specifications of exactly how this circuitry should work.  And

24   the excerpt in our brief is at CSI-0009712 that has a figure

25   in there that would be very familiar to the Court because it

1     looks a lot like what is in the '069 patent.

2            It is absolutely a misstatement to suggest that the

3     deliverables here were not part and parcel exactly what we are

4     talking about in this technology, exactly what they were paid

5     to develop and deliver to IBM.  It is a little bit like a

6     Government contract; that when you make a deliverable to the

7     Government, you give them the intellectual property rights

8     that go along with it.  That is part of our law.  In this case

9     this was done by contract rather than by operation of law.

10            I took as good of notes as I could, so I will try to

11     address them as quickly as I can.

12            The idea that these were statutory rights that

13     somehow didn't exist, is also incorrect.  The deliverables,

14     when the contract was signed in January of 1993, were still a

15     future event.  All of this is in the future.  It is -- it

16     doesn't advance the analysis at all to suggest there were

17     rights that would come into being afterwards.  Of course,

18     there were rights that would come into being.

19            But patent rights, statutory rights in this country

20     arise as of the date of conception, not when they are

21     perfected in the Patent Office.  It is true that you have to

22     go through each of those stages, but it is a misstatement to

23     suggest that patent rights, any less than copyrights exist

24     upon creation.  They both exist upon creation.  They are

25     statutorily-recognized rights.  So you can't simply say that

1   because they may be perfected down the line, that that somehow

2   defeats the assignment because the cases say otherwise.

3           The subsisting issue.  We have got a number of

4   citations in the slides talking about subsisting.  So I would

5   like to advance to that quickly, if I can.

6           Subsisting is used twice --

7           If I can have Slide 19.

8           -- it is used twice in the actual contract.  The

9   first time is in the grant clause that we talk about; that

10  they assigned all of the intellectual property rights

11  subsisting in the deliverables.  The second time is when they

12  were doing their carve-back.  When CSIRO was saying, wait a

13  minute, we don't want to give you everything.  We are carving

14  out all the intellectual property rights that subsist in the

15  background technology.

16          And CSIRO readily admits that means all of the

17  statutory rights that were associated with the background

18  technology.  Any patents on gallium arsenide technology.  Any

19  patents that arise out of the provisional or the PCT

20  application.  The provisional, Your Honor, is not an

21  enforceable right of any kind.  It is a priority document.

22  That's all it is.  You can't sue somebody on a provisional.

23  You can't enforce a provisional.

24          All you can do is refer back to it and say, aha, you

25  see that proves I knew something as of a particular date.

1   That is its only function in the world.  So it is yet another

2   example of rights that may arise in the future -- or be

3   perfected is probably a better phrase.  They subsist in the

4   provisional because they can be perfected.

5          And nobody disputes -- CSIRO doesn't tell us that

6   somehow the clause using the word "subsisting" quoted at the

7   bottom half of the slide was ineffective to pull those rights

8   back.

9          It makes no sense, Your Honor, it makes no sense to

10  suggest that this contract did not, did not transfer all of

11  the patent rights, because if that were true, if CSIRO's right

12  that this contract transferred nothing, why would you need to

13  claw back the provisional application?  Why would you need to

14  claw back the internationally-filed PCT?  Why would you need

15  to do these reservations if all you were doing was

16  transferring merely the copyrights?  Why do you bother listing

17  out the patents that you say have to be carved out of the

18  corpus that was assigned?

19         The big VENN diagram that we put on the board.

20  There would be no reason to talk about patents.  There would

21  be no reason to do that reservation.

22         At Slide 20 there is another use of the word

23  "subsist"; and it in the attachment to the agreement.  It is

24  in the confidentiality agreement.  And in that confidentiality

25  agreement it recognizes that there is no license granted --

1   and this is at Slide 20 -- in the patent or copyrights that

2   subsist in the information that is given.  So they recognized,

3   the parties did, that, in fact, patents can subsist in that

4   information.

5          Let me touch on the idea that this was preliminary

6   research that IBM didn't value.  Your Honor, it is exactly

7   correct that Dr. Bantz is an expert they have retained, and he

8   is on their side of the case.  I take the man at his word in a

9   lot of ways; however, at Exhibit D to our motion we quote his

10   expert report, we present his expert report.

11          In his expert report he says right out loud that he

12   was only peripherally aware of the agreement.  This is at

13   Exhibit D, Page 9.  I will read it.  The reply further refers

14   to contractual discussions between CSIRO and IBM of which I

15   was peripherally aware but not necessarily a direct

16   participant.  His own testimony suggests that he didn't know

17   exactly what was happening there.

18          THE COURT:  Mr. Cordell, let me stop you a second

19   and ask you, if you are correct on this, where does that leave

20   us?

21          MR. CORDELL:  It is very simple.  Counsel suggested

22   that there might be some decision that the Court could make

23   about prudential standing and that it could be waived.  That

24   is not my reading of the law.  It means we have to dismiss the

25   case.  It means that CSIRO perhaps, if the Court chose to

1   dismiss it without prejudice, could join IBM and refile the

2   case.  That would be a possible outcome.  But they would --

3            THE COURT:  After all this work and on the eve of

4   trial?

5            MR. CORDELL:  I understand it is inefficient.  I

6   wish we had come to it much sooner.  I am not disputing that.

7   I may have to explain this to others, the fact that we didn't

8   come to it earlier.  It may be something that's difficult for

9   me to explain.

10           THE COURT:  Okay.  Anything further?

11           MR. CORDELL:  Could I just touch on the draft

12   history, because we heard a lot about parol.  I think I am

13   entitled to rebut some of that.

14           THE COURT:  Is this before the Court?

15           MR. CORDELL:  It is in that we have got the

16   documents there, and we have got a letter that talks about the

17   change that was made.  And so what is not before the Court,

18   but I will be sure to make a supplemental filing if the Court

19   will permit it, is the original draft.  So there is just one

20   piece of the puzzle missing.

21           THE COURT:  All right.  But do make a supplemental

22   filing.  And if CSIRO wishes to make a supplemental response

23   filing, they can.

24           MR. CORDELL:  Thank you, Your Honor.  At Slide 11 we

25   start with the December 21 draft.  The December 21 draft

1    transferred certain rights to CSIRO -- I'm sorry.  CSIRO

2    transferred certain rights to IBM, but they were very, very

3    limited.  They said, in fact, that CSIRO was going to retain

4    everything.

5         If we look at Paragraph 611, it says except as

6    provided in 612 all rights, including but not limited to

7    intellectual property rights subsisting in the deliverables,

8    shall vest in CSIRO.

9         So, originally, CSIRO was keeping everything except

10   what was specifically granted in 6.1.2.  And what were they

11   talking about at that time?  The December draft says they were

12   going to grant to IBM ownership of the deliverables, copyright

13   in the deliverables, and then a right to use information.  So

14   really we were talking about copyrights and perhaps trade

15   secret rights at that point, but that was it.

16        Further in the contract at 6.1.4 they put a severe

17   restriction on what IBM could do with the technology.  So at

18   Slide 12 we quote it.  They say that, IBM, you can use these

19   copyrights and trade secret rights only for internal research

20   purposes -- right in the middle of the paragraph.  Very, very

21   strict about what they could actually do with the information

22   and with the copyrights.

23        We then have a letter that is in the record, Your

24   Honor, at Slide 13, which is Exhibit B to Mr. Heit's

25   declaration on the motion, that references -- it is a letter

1    from Mr. Bantz to Drs. Percival and O'Sullivan.  And it

2    references a telephone conversation at the beginning of the

3    letter.

4            It says, following that conversation we would like

5    to propose resolution to the intellectual property rights

6    issue.  So there was clearly something between the parties

7    where they were discussing the intellectual property rights

8    and how to dispose of those rights.

9            He then says CSIRO will amend clauses 6.1.2 and

10   6.1.4 to provide unencumbered rights to IBM in the

11   deliverables and the information therein.  They started the

12   position where they were giving them limited rights.  Here he

13   says we are going to back away from that.

14           We then look at the final.  And in the final at

15   6.1.1 CSIRO says they grant to IBM ownership of and

16   intellectual property rights subsisting in the deliverables.

17   No more limitations to copyrights.  No more limitations to

18   trade secrets.  All of the intellectual property rights as

19   defined as we have seen up above.

20           One thing that I thought was very, very significant,

21   Your Honor, is that they struck -- at Slide 16 they struck

22   6.1.4.  It is gone.  So no longer are they restricting what

23   IBM can do with their rights.

24           So at Slide 17 we put them side by side.  Before,

25   they said you only get -- that all of the rights stay with

1    CSIRO, and you only get limited rights in the copyrights and

2    trade secrets.  After the amendment they said you get all

3    rights to the intellectual property.

4         Your Honor, if I could make one more point -- and I

5    promise this is my last one -- there was a suggestion that the

6    provisional was not, was not that far off of the '069 patent.

7    CSIRO has admitted in responses to requests for admissions,

8    their RFA response number 16 says flatly that they admit that

9    the Australian provisional does not disclose every element of

10   any independent claim asserted in this lawsuit.  This is as

11   clear as it possibly can be.  That is at Exhibit P to our

12   motion.

13        If there are no other questions, I will thank the

14   Court for its attention.

15        THE COURT:  Okay.  Any final response?

16        MR. WAGSTAFFE:  Very briefly.  Every argument that

17   has been made, they had in documents two years ago.

18        Second, Your Honor, the reason -- you asked a good

19   question about jurisdiction.  If they somehow think that IBM

20   Australia is going to be brought in and we are going to

21   dismiss it and start from scratch, what they are asking us to

22   do, start from scratch; and maybe if we can get IBM Australia

23   to agree or even if Your Honor has jurisdiction, that is why

24   it is waivable.

25        Your Honor, there are a lot of cases cited.  Just

1    two quick last points.  The one we cite is Source One.  It is

2    a case in our brief.  So it does a nice job of explaining why

3    this is waivable.  It describes the various Circuit opinions.

4    I think it is a good way to get through it.  It ought to be

5    waivable for obvious reasons.

6              And, lastly, Your Honor, the fact is if they are

7    going to look at parol, then the best parol is going to be

8    what the people negotiated said.  That's the only parol we

9    have.

10             So thank you, Your Honor.

11             THE COURT:  All right.  Thank you very much.  Motion

12   to dismiss is denied.

13             What is next?

14             MR. CORDELL:  That would be the motion to realign,

15   Your Honor.

16             THE COURT:  All right.  I think I am going to pass

17   on that one for the moment.  I would like to work through some

18   of these others first.  We are going to be through by noon, so

19   y'all have burned an hour and 10 or 15 minutes of the morning

20   on one motion, so we need to pick it up a bit.

21             What is next after -- we will skip the motion to

22   realign.

23             MR. CORDELL:  It would be the claim construction

24   motion.

25             THE COURT:  Good.  Let's get into those.

1          MR. CORDELL:  Mr. Heit will present those for us.

2          MR. HEIT:  Good morning, Your Honor.

3          THE COURT:  Let me just state at the outset, and I

4     may be able to save you some time, but I do not really view --

5     the claim construction that was handed down a year ago in the

6     course of the trial, that opinion has not been entered in this

7     case.  It is -- that was dealing with a specific issue

8     regarding mapping, which I don't think exists in this case,

9     does it?

10          MR. HEIT:  Your Honor, I believe both sides have

11     litigated this case as if that order does apply.

12          THE COURT:  I know you have, but I am saying I don't

13     think it does.

14          MR. HEIT:  Well, Your Honor in Marvell's response --

15          THE COURT:  I don't know why you took off thinking

16     it did when it hadn't been entered into this case.  What is it

17     in this case that makes that order relevant?  I know you both

18     try to spin arguments off of it, but I think the better thing

19     to do is just start over with the claim construction.  Y'all

20     have got an issue.  Let's deal with it.

21          MR. HEIT:  Your Honor, one of Marvell's

22     non-infringement defenses would be similar to the ones --

23          THE COURT:  Well, your non-infringement is running

24     right into your invalidity, isn't it?  How are you going to

25     have it both ways?

1          MR. HEIT:  Well, Your Honor, Marvell -- going back

2     to before the April 2009 orders, the construction was of the

3     DRE means with a half-rate TCM encoder.

4          And Marvell put forward non-infringement arguments

5     saying that a TCM encoder is not equivalent to the encoder

6     that Marvell uses in its WLAN products.  And the arguments

7     would have been similar to the ones the defendants raised in

8     the April 2009 trial --

9          THE COURT:  That it has to be a convolutional

10    encoder.

11         MR. HEIT:  Well, Marvell's is not really a

12    convolutional encoder.  Marvell will show in some of our

13    documents --

14         THE COURT:  But they are saying it has to be, aren't

15    they?

16         MR. HEIT:  I think CSIRO's position is that the

17    802.11 specification shows a particular type of convolutional

18    encoder.  Marvell's encoder is quite unique.

19         THE COURT:  It's a Reed-Solomon, right?

20         MR. HEIT:  No, Your Honor, with respect to the

21    Reed-Solomon encoder, that is the encoder that is used in the

22    Harris modems, and CSIRO --

23         THE COURT:  Okay.  Right.

24         MR. HEIT:  And CSIRO, to avoid the Harris modem art,

25    has, off of the April 2009 order, has said that order

1   specifically excluded Reed-Solomon encoders.  And, therefore,

2   whether Reed-Solomon is a finite state encoder or not, there

3   is no -- under no reading of the April 2009 orders could a

4   Reed-Solomon encoder satisfy that.

5          What we have raised with you, Your Honor, the Court

6   looked to Column 9, Lines 36 to 46 which specifically call out

7   the Reed-Solomon encoder and the convolutional encoder.  And

8   it was that disclosure in the '069 patent that allowed the

9   Court -- that the Court found highly relevant in making its

10  determination that a mapper was not part of the disclosed DRE

11  means.

12         And yet CSIRO and CSIRO's -- I took the deposition

13  of CSIRO's experts.  CSIRO's experts chose not to read the

14  Court's reasoning in its April 2009 order, just ignored it.

15  They said I didn't think it was important.  I read the Court's

16  order.  I am just going to look at the Court's construction.

17  And allowed CSIRO to say, well, because I didn't read the

18  Court's reasoning, reliance on the Reed-Solomon encoders, I

19  can come up with what is best described as an extremely narrow

20  construction and say I am going to read out Reed-Solomon

21  encoders and, therefore, let me read out the Harris modem out

22  of this case.

23         And what Marvell has done --

24         THE COURT:  Okay.  Let's go to the claim

25  construction.  I mean what -- I am setting aside the April '09

1    claim construction.  I am not considering it part of the claim

2    construction in this case.

3            Is there a need from Marvell's part, for further

4    claim construction based on the August '08 and other claim

5    construction orders that have been entered in this case?

6            MR. HEIT:  Well, Marvell is subject to the August

7    '08 claim construction.

8            THE COURT:  Right.

9            MR. HEIT:  Marvell was part of that.

10           THE COURT:  Right.

11           MR. HEIT:  So that stands.  To go forward from that

12   Marvell would -- I mean, there are now an array of claim

13   constructions that we would have to deal with.  To go forward,

14   if the mapper remains part of the structure, Marvell would

15   have the non-infringement argument that TCM includes mapper

16   and, therefore, Marvell's convolutional encoder, which does

17   not include a mapper, does not infringe for the reason related

18   to substantial differences between the disclosed DRE means and

19   Marvell's implementation of its encoder.

20           So that would be an issue.  As the Court had its

21   hearing back in April of 2009 reconsideration, there was a

22   dispute between the parties, is that a question of fact that

23   should go to the jury?  Or is that a question of law that the

24   Court should resolve as a matter of claim construction?  The

25   Court found that was a matter of claim construction, and

1    resolved that issue by pulling the mapper out and said the DRE

2    means in the claims relates to FEC.

3            FEC, what is the FEC disclosed in the patent?  FEC

4    only.  And the Court looked at the Reed-Solomon encoder,

5    convolutional encoder, and that led naturally into the April

6    2009 trial where Gabe Luhowy and Dr. Wicker was able to put

7    forward the Harris modem and was able to show quite a

8    substantial showing of invalidity.

9            So, Your Honor, if we go back to April of 2008, I do

10   still think we are at a claim construction juncture --

11           THE COURT:  What further construction from the

12   August 2008 opinion is Marvell asking for?

13           MR. HEIT:  If Marvell needs to come forward and say

14   that based on Ungerboeck that TCM encoder is a combined

15   functionality and it is not just these two blocks that has a

16   FEC and a mapper, I think back to Buffalo that was the

17   original error that was committed back then, and it is a --

18   TCM is a specialized type of encoder, it is a specialized type

19   of encoder that is different than the convolutional encoder

20   and Marvell can put forward to the jury that the convolutional

21   encoder with Marvell's implementation of the encoder is

22   substantially different than a TCM encoder, then that is how

23   we would proceed, Your Honor.

24           Unfortunately, at this point our expert reports

25   don't say that.  Our expert reports were based on what the

55

1    Court said in its April 2009 order.  I don't know that it

2    would take us too long to go back to that state before the

3    April 2009 order; but that is how we would proceed, Your

4    Honor, and that is that a convolutional encoder, or Marvell's

5    implementation, is substantially different than this TCM,

6    which is a high -- you know, as disclosed at the bottom of

7    Column 9, top of 10, this system gets improved bandwidth.

8            How the improved bandwidth is achieved with TCM

9    encoders is very different than how bandwidth is addressed in

10   the 802.11 specification.  And we put that evidence forward.

11   So if the Court goes back to before its April 2009

12   construction, I think Marvell would come forward with a

13   substantial non-infringement defense and would say that its

14   convolutional encoder is different than the TCM encoder.

15           THE COURT:  Okay.

16           MR. JONES:  Your Honor, I mean, you started out by

17   asking the question why do we behave as if the April 9th, 2009

18   order applied to this case.  And I think what you have heard

19   form Mr. Heit kind of explains that.

20           They are making the exact same arguments, or would

21   propose to make the exact same arguments that you heard a year

22   ago.  Marvell was a member of the CIG.  Now, granted they were

23   not part of the trial.  But up until that point, they were a

24   member of the CIG and had common interests.  And what you are

25   hearing from Mr. Heit today is we would make the same argument

1   that you heard last year about TCM includes mapping.

2        THE COURT:  Well, does he not think my claim

3   construction would be the same if they make that argument?

4        MR. JONES:  Well, let me point something else out.

5   They have retained the same experts that you heard from last

6   time.  You heard from Dr. Bims.  You rejected the arguments

7   they put forth.  What may be at issue, Your Honor, is the

8   argument before focused on what is inside the TCM that is

9   linked to the data reliability enhances means.

10        If you listen to Mr. Heit's argument, what he has

11   said a couple of times, which is very, very slight and subtle

12   but very substantial, he has referred to the rate 1/2 finite

13   state encoder that was within the TCM encoder as simply FEC.

14   That is not what the Court concluded.  So, if anything, one of

15   the issues that is different now that was not presented before

16   seems to be over what is the encoder's subcomponent within the

17   rate 1/2 TCM encoder?

18        THE COURT:  What makes you think there is a

19   subcomponent?

20        MR. JONES:  Well, the parties agreed that there was

21   a subcomponent.  The parties agreed that there is an encoder

22   and a mapper.  And the fight last time was whether the mapper

23   was linked to the data reliability enhancement means.  And

24   Your Honor heard arguments and declarations from experts about

25   that issue and also about the encoder subcomponent.

1           What Your Honor found -- CSIRO's position was that

2    the encoder subcomponent is a rate 1/2 convolutional encoder.

3    And where you came out, because there was an apparent

4    agreement amongst the experts, at least competing experts, is

5    that there is actually a slightly broader term to categorize

6    those class of encoders within a TCM'ing system.  That is how

7    you arrived at the rate 1/2 finite state encoder.

8           But if you go back and look at that record and look

9    at the declarations, there was no fight over block encoders or

10   Reed-Solomon encoders, which are also block encoders.  There

11   was no suggestion at all and it wasn't at issue whether a

12   block encoder was in a TCM system.  And there is a reason for

13   that because it simple isn't so.

14          And Marvell's own expert, which is the same expert

15   from last time, Dr. Wicker, who published a book Encoding, he

16   has a whole chapter on TCM encoders.  I deposed him about it.

17   When you go through all of those structures and that

18   chapter -- and this book was published in 1995 right before

19   the patent was issued, the '069 patent was issued -- there is

20   not one mention, not one suggestion of a block encoder or a

21   Reed-Solomon encoder as being part of a TCM encoding system.

22          So maybe they are two different issues, but if we

23   want to go back and revisit this, I think the outcome in terms

24   of the mapper is likely to be the same.  And I think you have

25   intimated that.  And if there is a question in terms of the

1    class of encoders within that TCM encoder, the evidence would

2    show that Your Honor got it right; that, yes, by agreement

3    there are convolutional encoders and there are finite state

4    encoders.

5          But to one of ordinary skill in the art, you would

6    never come to the conclusion that a block encoder or a

7    Reed-Solomon encoder, which is a type of block encoder, is an

8    encoder that is used in a TCM structure.

9          THE COURT:  Okay.  Response?

10          MR. HEIT:  Well, Your Honor, a couple of points.  It

11    seems that Mr. Jones is arguing again back to where the

12    parties currently are as to whether if the April 2009 order

13    applies, how should that be applied in this case.

14          Let me -- I believe I can try to clarify what

15    CSIRO's point is.  CSIRO has this -- and it is somewhat clear

16    that it wants to change the Court's construction and say it

17    has to be a finite state encoder such as the type that would

18    be found within a TCM structure -- a TCM structure.

19          Well, two responses to that, Your Honor.  One, that

20    is not what the Court found.  Again, the Court looked to the

21    existence of the Reed-Solomon encoder and the coding

22    structures at Column 9, Line 36 to 46 in finding that with

23    respect to the DRE means we were looking at and at FEC, and

24    the mapping structure was not part of that.

25          And I read with a great deal of interest the hearing

1    before Your Honor on the motion to reconsider.  Mr. Furniss --

2    and his unfortunate passing -- testified, Your Honor, what was

3    actually in that TCM encoder as disclosed in the '069 wrapper

4    is multiplied by one function.  That is really what the mapper

5    is inside that TCM encoder multiplied by one.

6         Well, if that is the mapper in there, you could put

7    a Reed-Solomon encoder in there, you could put a finite state

8    encoder in there.  You could put any type of encoder in there.

9    You multiply it by one, you get the same output.

10        So with respect to CSIRO's argument is such as that

11   would be -- you know, an encoder such as would be typically

12   found within a TCM encoder, under CSIRO's own view of that

13   based on Mr. Furniss's testimony that what is found in the TCM

14   encoder within the '069 patent, it's a multiplied by one

15   function.  You can put a Reed-Solomon encoder, you can put

16   everything inside that.

17        So under that construction Reed-Solomon encoders

18   would still appropriately be within that construction.  So,

19   Your Honor, I guess Marvell needs a little guidance from Your

20   Honor as to how we should proceed from this.  If we should

21   proceed with respect to the Court's April 9, 2009 -- April 9,

22   2009 order, we can address that; or if we want to go before

23   that, we can move in that direction.

24        THE COURT:  All right.  I would suggest that you

25   proceed with regard to the Court's April 2010 order, which I

1    will have out to you in a couple of days.

2              MR. HEIT:  Okay, Your Honor.  May I go to --

3              THE COURT:  I will issue an opinion clarifying the

4    claim construction for you.

5              MR. HEIT:  May I go to collateral estoppel, Your

6    Honor?

7              THE COURT:  What?

8              MR. HEIT:  Collateral estoppel.

9              THE COURT:  Which motion is that?

10             MR. HEIT:  It is a very important part of Marvell's

11   claim construction motion.

12             THE COURT:  All right.

13             MR. HEIT:  This Court has already found collateral

14   estoppel on certain issues, so let me go to Slide 2.

15             As this Court is very much aware, the claim

16   construction issue with respect to TCM -- with respect to the

17   DRE means, dates back to the Buffalo trial.  And the dispute

18   in the Buffalo trial was whether the convolutional encoder is

19   the same as or a structural equivalent to the rate 1/2 TCM

20   encoder.

21             So at issue in the Buffalo trial was, what is -- the

22   Court found what the structure was -- and then the question

23   was what is the way and what was the result as disclosed in

24   the '069 patent?  And CSIRO's expert Dr. Monsen said that the

25   way the TCM encoder of block 42 performs the function of

1    applying data reliability enhancement is to add renundancy

2    with the delay line, and the result is that the output bit

3    rate is larger than the input bit rate.

4            So Dr. Monsen in Buffalo set forth the way test

5    adding redundancy and the result test.  The output bit rate is

6    larger than the input bit rate.  That is at Page 15 of the

7    Court's order.

8            Then the Court found that Buffalo's expert did not

9    dispute -- and, in fact, did not dispute that the way the

10   function of data reliability is performed by block 42 is by

11   adding redundancy bits by the delay line and the result

12   obtained is having a larger output bit rate than the input bit

13   rate.

14           And then the Court found -- this is at Page 16 of

15   the Buffalo order.  The Court found there is no dispute that

16   the claimed function is being performed in substantially the

17   same way by a convolutional encoder standing alone -- and that

18   is adding redundancy bits -- and the result obtained by the

19   convolutional encoder standing alone, the larger output bit

20   rate than the input bit rate.

21           So the Court found -- and this is at Page 16 of the

22   Court's order -- that the way the '069 patent performed DRE

23   was adding redundancy bits, and the result was there was a

24   larger output bit rate than the input bit rate.

25           Again, going back to the Court's hearing on the

1    motion to reconsideration, Mr. Furniss said there is no

2    dispute the way that the DRE means work is by adding

3    redundancy bits.

4           This went to the Federal Circuit.  The Federal

5    Circuit at 542 F.3d 1363 affirmed the Court's order on

6    infringement.

7           So we get to the doctrine of collateral estoppel.

8    Collateral estoppel applies when in the initial litigation the

9    issue at stake in the pending litigation is the same.  Two,

10   the issue was actually litigated.  And, three, the

11   determination of the issue in the initial litigation was a

12   necessary part of that judgment.

13          Turn to Slide 6.

14          Well, if you apply that test to what occurred in

15   Buffalo, Your Honor, the Court -- the same issue was in

16   Buffalo as is in this case, and that is, what is the way the

17   '069 patent performs DRE and what is the result?

18          The issues were litigated and the Court found that

19   the way was adding redundancy bits and the result was a larger

20   output bit rate than the input bit rate.  And, clearly, those

21   determinations were necessary for a finding of infringement

22   and the Federal Circuit affirmed.

23          So Marvell submits, Your Honor, that on those very

24   clear facts, the issue of collateral estoppel applies.  And if

25   we turn to Slide 10, CSIRO is estopped from deviating from the

1    way and result test.  And the way the '069 patent performs

2    DRE, adding redundancy bits and is estopped from arguing that

3    the result of the DRE means in the '069 patent is anything

4    other than achieving a larger output bit rate than the input

5    bit rate.

6            Now, Your Honor, if we look at Column 10, on the

7    right side of that column is CSIRO's new test.  So CSIRO's new

8    test -- and I will read it into the record.  This is the test

9    that it wants to apply to the prior art.  That the prior art

10   must produce for each additional input bit supplied to the

11   encoder, two additional output encoded data bits that depend

12   on the then current additional input bit and the fixed finite

13   number of sequentially shifted previous input data bit rates

14   already stored in the encoder.

15           So, Your Honor, as a result of the Court's April

16   2009 claim construction orders, CSIRO thinks that it can

17   change the way test from adding redundancy bits, to this mass

18   of narrowness to get around the validity -- the substantial

19   validity showing that it faces.

20           I submit, Your Honor, that CSIRO by the operation of

21   collateral estoppel is bound --

22           THE COURT:  Response?

23           MR. JONES:  Your Honor, for collateral estoppel the

24   issues have to be the same and have to be actually litigated.

25   Well, fundamentally, the claim construction that we have been

1   discussing from the April 9th, 2009 order is not the same

2   claim construction that was involved in Buffalo.  Therefore,

3   it follows that the issues are not the same and, therefore,

4   these issues have not been litigated.

5          With respect to the comment that Mr. Heit has made

6   about the one times mapper.  That is taken out of context.  If

7   you put it back into context, what Mr. Furniss's and what

8   CSIRO's position has always been at that time was that we were

9   talking about the convolutional encoder and then followed by

10  the trivial mapper.

11         But, fundamentally, the issues are not the same in

12  Buffalo.  If you remember, when you denied the defendants'

13  motion for reconsideration last year, you heard very strenuous

14  argument from Buffalo and from Mr. Van Nest on behalf of the

15  other defendants, about how there had been a sea change and

16  how everything had been disrupted and the construction was

17  different.

18         And, therefore, by their own admission and by their

19  own acknowledgment what you did in April 9th last year is

20  different, it is a different construction.  And so to argue

21  for some reason that we have to be held to an articulation --

22         THE COURT:  Well, the April 9, 2009 is not in this

23  case.  So -- unless I put it back in.  It is not part of the

24  record in this case.  It is not -- I have not dealt with that

25  issue in this case.  It is not teed up, and it is not part of

1    the claim construction in this case.

2            MR. JONES:  So, Your Honor, my response to that

3    would be -- and Mr. Heit and Mr. Cordell alluded to this -- is

4    that the real issue that is arising has to do with the

5    equivalency of whether Reed-Solomon block encoder --

6            THE COURT:  Exactly.  So let's get to that issue.

7            MR. JONES:  And if we get to that issue you will

8    find -- the jury will find as a matter of fact that they are

9    not equivalent.  And if it needs to be visited as a matter of

10   claim construction, we think that the Court would come to the

11   conclusion as a matter of claim construction.

12           THE COURT:  Well, do you think that it needs to be

13   visited by the Court as a matter of claim construction?

14           MR. JONES:  Your Honor, in the first instance

15   looking at the TCM encoder, we think that is clear.  We

16   thought it was clear before, in terms of finite state

17   encoding.  Obviously there is a dispute between us as to what

18   class of encoders are within that TCM structure that is linked

19   to the DRE means.  That is the argument that we are having.

20   And what you will note in Marvell's papers --

21           THE COURT:  Do I need to resolve that for you?

22           MR. JONES:  That's a good question.  I will be

23   frank, we have debated and tried to understand whether that is

24   a question of law or a question of fact.  It is certainly a

25   question of fact once you give us the claim construction and

1   you compare it to the art of the accused products, that

2   process is a question of fact.

3          But for Your Honor in terms of defining the claim

4   construction, that is a matter of claim construction and

5   matter of law for the Court.  And what we are hearing and what

6   I think is materializing is that we are having an argument, we

7   are having a dispute over what the encoder is within that rate

8   1/2 TCM encoder.  They say it can be a block encoder or a

9   Reed-Solomon block encoder.  And we say, no.  As a matter of

10  claim construction, as a matter of pure logic, as a matter of

11  the viewpoint of a person of ordinary skill in the art, that

12  is not the case.  Block encoders are not used in TCM encoders.

13  They are used in other types of systems.  They are called BCM

14  systems.

15          THE COURT:  Would Marvell like for the Court to

16  resolve that issue?

17          MR. HEIT:  As to whether the TCM encoder includes or

18  does not include a mapper?

19          THE COURT:  No, Reed-Solomon.

20          MR. HEIT:  And is the question, Your Honor, that

21  whether --

22          THE COURT:  Is that a question of law, question of

23  claim construction that you are asking the Court to decide; or

24  is it a question of fact for the jury?

25          MR. HEIT:  Your Honor, I will talk a little out of

1    school here, and I will give you my view on Reed-Solomon

2    encoders.  I think the Court -- going back to Buffalo long

3    ago, took a position -- took a position and said even though

4    the patented BPSK at Column 9, Lines 36 to 46, even in BPSK

5    the patent discloses Reed-Solomon and convolutional encoders.

6    The Court found that because there wasn't a box that said

7    Reed-Solomon and wasn't a box that said convolutional, the

8    Court found it is limited -- the DRE means is limited to TCM.

9           And that really created a fork in the road.  That

10   forced us into a TCM world.  Once we were in that TCM world,

11   the Court was faced with lots of arguments about

12   convolutionals and mappers.  And, you know, Marvell would put

13   forward evidence that they are not separable functions, they

14   are not subcomponents; that a TCM is a very unique specialized

15   type of encoding structure.  And what Marvell implements is

16   very different.

17          I submit, Your Honor, that if you look at the patent

18   as a whole, the DRE means, Your Honor, means for adding data

19   reliability, as that term is used -- that term is used, I

20   think a Reed-Solomon encoder and a convolutional encoder and a

21   TCM encoder all fall within the ambit of DRE means.

22          And, honestly, Your Honor, that was a position that

23   CSIRO took back in Buffalo.  And the Court said, no, CSIRO, I

24   disagree with you.  And then we have gotten -- from that point

25   we have gotten to this strange world of half-rate finite state

1    encoder and whether the mapper is there or not there.  And now

2    that it is there or not there, it is whether it is a

3    subcomponent.

4           It is really just a strangeness that -- we have

5    played within -- all of the parties have played within Your

6    Honor's rules; but if we have to take an intellectually honest

7    view of what the technology is -- and if you look at the -- we

8    have submitted to Your Honor the testimony of Dr. Percival and

9    the testimony of Dr. O'Sullivan.  And both of them have said

10   quite clearly that Reed-Solomon encoders are part of their

11   invention.  On the record they testified to that fact, Your

12   Honor.  Dr. Percival just confirmed that.

13          So if you look from the inventor's perspective, they

14   always viewed that Reed-Solomon encoding was part of their

15   invention.  How do we get there?  We can get there by reliance

16   on your April 2009 order and say when the Court put up a

17   broader category of finite state encoder, if a Reed-Solomon

18   encoder is a finite state encoder, sure, it is part of the

19   invention.

20          Or we can go back and go before Buffalo and say,

21   look, what a DRE means is adding data reliability enhancement,

22   does a Reed-Solomon encoder do that?  Yes, it does.  How does

23   it do that?  By adding redundancy bits.  What is the result?

24   The larger output bit rate than the input bit rate and go back

25   to that world, Your Honor.

1           There are a couple of ways of getting there, but I
2    think the only right result is that a Reed-Solomon encoder and
3    block encoders are very much a part of the invention as
4    testified to by the inventors.
5           THE COURT:  Okay.  Response?
6           MR. JONES:  Your Honor, that's a little bit taken
7    out of context.  Maybe I need to apologize.  I think listening
8    to Mr. Heit and having deposed Marvell's experts, having
9    watched their experts be deposed, I do think it is an issue
10   that needs to be resolved by the Court.  We certainly don't
11   want to have the jury confused in having experts in
12   round-about ways giving their spins or interpretations on what
13   the patent teaches and what is disclosed as the linked
14   structure for the DRE means.  I think that is in the purview
15   of the Court and should be decided as a matter of claim
16   construction.
17          THE COURT:  All right.  Very well.  Well, I will get
18   y'all an order -- are there any other subissues in the claim
19   construction?  What about the indoor/outdoor issue; do y'all
20   want to argue on that at all?  Has that been resolved or is
21   that still up in the air?
22          MR. HEIT:  Let me just touch quickly upon
23   interleaving.  The same estoppel issue applies to
24   interleaving.  CSIRO has now come forward --
25          Please go to Slide 16.  Same estoppel issues -- I

1  won't burden the Court's time -- occurring with respect to the

2  change of how the '069 patent performs interleaving and there

3  was the reordering algorithm.  Today, according to CSIRO, it

4  is a reordering algorithm of writing the complete set of data

5  for a single ensemble symbol into rows and then reading it out

6  from columns.

7          Again, CSIRO is trying to narrow its inventions to

8  address the prior art invalidity showing that Marvell intends

9  to put forward in front of the jury.  I am just going to say

10 for the record that I think technically that CSIRO's new test

11 is wrong, but that is not an issue here.

12         Your Honor, the result is that CSIRO, again, tries

13 to narrow the result.  On the basis of collateral estoppel,

14 Your Honor, CSIRO could not leave the test that it

15 successfully litigated in Buffalo.

16         Turning to Your Honor's question on indoor, in its

17 questioning -- any questions about interleaving, Your Honor?

18 Or shall I move on to indoor?

19         THE COURT:  Indoor is fine.

20         Well -- do you want to respond to interleaving?

21         MR. JONES:  Yes, I do, Your Honor.

22         Collateral estoppel does not apply, and there is one

23 fundamental reason.  It is similar to one I made earlier, but

24 Your Honor said, well, the order may not apply from April

25 2009; and that is that the claim construction is different.

1  And it may seem slight, but it is substantial.

2          And Marvell agreed to a claim construction that

3  incorporated aspects of the specification, and those aspects

4  of the specification were not included in the Buffalo action.

5  So what Marvell now wants to do is retreat from that agreement

6  that it did in this case, along with the other defendants in

7  the last case, that supports the notion and an explanation

8  that the way the interleaver in the '069 patent performs

9  interleaving is within the frequency domain.

10         And CSIRO's experts -- excuse me, CSIRO's experts

11  and Marvell's experts are in agreement on this.  It is in our

12  briefs.  It was attached and I have shown that Dr. Bims in his

13  own report describes the '069 patent as doing frequency

14  interleaving.

15         Dr. Williams, who is not involved in this case but

16  was involved on behalf of Intel last year, also described the

17  '069 patent using that same construction we have agreed to, as

18  interleaving in the frequency domain.

19         When I deposed Dr. Wicker and I showed him the

20  agreed construction and asked him to read the language from

21  the specification.  I then asked him to look at Dr. Williams'

22  report that described the '069 as doing frequency

23  interleaving.

24         I asked him, do you agree with that?  Is that a fair

25  representation of what is going on?  He says, yes.  So there

1    is no disagreement between the parties about the way.

2              THE COURT:  Okay.  Let's go to indoor.

3              MR. JORDAN:  Your Honor, in terms of indoor, I don't

4    think we have much to say here.  I think Marvell's position

5    seems to be that they want to transform the construction into

6    just being "capable for indoor operation" as opposed to "for

7    operation in an indoor environment."

8              And the arguments we have had before and gone back

9    and forth in some instances are is the intent the test?  We

10   are not suggesting that design intent is the test.  But what

11   is clear in terms of how you talk about this issue and the

12   evidence, is that you look at the structures, you look at the

13   design of the structures, whether it be the art or the accused

14   products and you look at those elements and you come to the

15   conclusion or make an assessment as to whether those

16   structural elements make the transceivers for operation in a

17   indoor environment.

18             That is what the dispute is.  I don't really have

19   more to say on that, Your Honor.

20             THE COURT:  Okay.

21             MR. HEIT:  Your Honor, the indoor limitation is

22   another limitation that has been around and bandied about for

23   years.  I have always wondered about that limitation.  As I

24   have just heard Counsel's argument, if you only look at the

25   structural limitations and you make your determination, well,

1    if that is the test, the Rault reference anticipates the '069.

2    It is admitted on the record, Your Honor, that the Rault

3    reference has all of the structural limitations that the '069

4    patent has.

5           The only thing the Rault reference didn't have was a

6    statement that it worked indoors.  So according to what CSIRO

7    has just said, you look at the structure and then you make

8    your determination of whether it is an indoor and outdoor.  If

9    that is the test, I think the '069 patent is really more on

10   shaky grounds because the Rault reference is admitted to

11   having all of the elements.

12          On indoor/outdoor, Your Honor, I think the

13   defendants previously and Marvell really believes it is not a

14   structural limitation.  The Court has heard that.  I don't

15   want to burden the Court.

16          But, Your Honor, if you look at Marvell's WLAN

17   parts, Marvell's WLAN parts work everywhere.  They work

18   everywhere.  They work indoors.  They work outdoors.

19   According to CSIRO if they work indoors they infringe, but if

20   they work outdoors they don't infringe.

21          Your Honor will hear from Marvell that because of

22   that, there is a substantial non-infringing use.  When you

23   take Marvell's chips and you put them in -- for example, older

24   versions of iPhones had Marvell's chips in it.  When you put

25   it in an iPhone and they work outdoors, then you are not

1    infringing.  But if you do it indoors, oh, you are infringing.

2    You owe CSIRO lots of payment.

3            That creates a real problem, Your Honor.  We asked

4    Dr. Monsen, if a device is not designed for indoor use, does

5    it infringe the '069 patent?  And Dr. Monsen couldn't answer

6    that question.  He said he couldn't tell.  He just didn't

7    know.

8            THE COURT:  Say that again, designed for what?

9            MR. HEIT:  And this was Marvell's issue -- Marvell

10   raised the issue of indoor use.  CSIRO -- Mr. Michaud asked

11   Marvell's -- one of Marvell's founders, isn't it a fact, Mr.

12   Sutardja that Marvell's chips are designed for indoor use,

13   designed for indoor use?  That is the test that CSIRO wants to

14   apply.  Designed for indoor use.

15           And the testimony was, Marvell's chips are designed

16   to work everywhere; designed to work anywhere.  Designed to

17   indoors.  Outside.  They are designed to work everywhere.

18           THE COURT:  You must have had a well-prep'ed

19   witness.

20           MR. HEIT:  Very bright fellow.  He is a very bright

21   fellow.

22           So Marvell asked Dr. Monsen the question, if a chip

23   is not specifically designed to work indoors -- Dr. Monsen

24   testified that he took his laptop and he walked down his

25   driveway a hundred yards from his house, and lo and behold his

1    laptop was still connected to the LAN, to the WLAN.

2            So we asked him, Dr. Monsen, if a chip is not

3    specifically designed to work indoors, does it infringe?  He

4    said, I don't know, can't tell you that, I just don't know the

5    answer to that question.  That creates an indefiniteness

6    problem.  And it really points to the problem of this

7    limitation.  It is an environmental issue.  It is not a

8    structural limitation.

9            And we have raised that before, Your Honor, and Your

10   Honor has found it is a structural limitation.  We understand

11   that.  But it is going to come back in some aspect.  And what

12   Marvell asks Your Honor and that is CSIRO should not be

13   permitted -- when Gabe Luhowy testifies that the Harris modem

14   was set up indoors, transmitted data indoors, worked indoors,

15   CSIRO can't go to Luhowy and say, well, Mr. Luhowy the Harris

16   modem wasn't designed for indoor use; isn't that right, Mr.

17   Luhowy?

18           That is not the relevant inquiry.  The relevant

19   inquiry was is it for operation in an indoor environment if

20   the Court maintains its construction that that is a structural

21   limitation of the claim.  That's what Marvell seeks in the

22   claim construction, Your Honor.

23           THE COURT:  Okay.  What else would y'all like to

24   visit about?

25           MR. HEIT:  The last issue, Your Honor, is a

1    dependent claim, and we will touch upon this very briefly.

2    Claim 44 is stated -- Claim 44 is a dependent claim that says

3    wherein said blocks of input data are bits.

4           CSIRO -- this Court has construed that blocks means

5    one or more bits.  So Claim 44 says, wherein said blocks which

6    are one or more bits are bits.  CSIRO wants to read Claim 44

7    as requiring bit-by-bit interleaving.  Blocks can only be a

8    single bit.  And, Your Honor, three reasons --

9           THE COURT:  Haven't we already been down this road

10   once?

11          MR. JONES:  It did come up and it was briefed, but

12   Your Honor never resolved it --

13          THE COURT:  I will resolve it this time for you.

14          MR. JONES:  Your Honor, if I can address a couple --

15   just two points.  Counsel talks about -- he talked about the

16   Rault reference and that it somehow is an indoor reference.

17   That is not true.  And it is clear that the Rault had

18   structures, structures that were made for operation or outdoor

19   environment and not for an indoor environment.

20          And the discussion about in the abstract where a

21   product needs to be specifically designed for an indoor and

22   outdoor environment, kind of misses the point.  Dr. Monsen's

23   report is very clear in pointing to those structural aspects

24   of the accused products that make them for operation in an

25   indoor environment.  He is also conversely very clear in

1    discussing the prior art, what those structural aspects and

2    components are of the art that make them not for operation in

3    an indoor environment.

4         With respect to the notion that we cannot ask Dr. --

5    excuse me, Gabriel Luhowy or any other witness, very

6    common-sense questions about the products and what is their

7    intended or designed application, makes no sense.  It makes no

8    sense because we are not saying that designed for or intended

9    for is the test.  But it is certainly circumstantial evidence

10   when you look at the Harris modem with the big antennas and

11   the outdoor long transmissions, that is all indicative and

12   circumstantial evidence that supports Dr. Monsen's opinion

13   that they are not for operation in an indoor environment.

14        THE COURT:  Okay.  Thank you.

15        MR. JONES:  Thank you.

16        MR. HEIT:  Thank you, Your Honor.

17        THE COURT:  All right.  Does that conclude all of

18   the claim construction matters?

19        MR. MICHAUD:  I believe so, Your Honor.

20        THE COURT:  Let's see.  All right.  Let's talk

21   about this contract cause of action.  I think CSIRO has teed

22   it up as a motion for summary judgment.  I guess that would be

23   the best way to start with it.

24        MR. WAGSTAFFE:  It would, Your Honor.  Thank you.

25   It is also before the Court in other, may I say, prisms; the

1    Daubert motions and in-limine motions.  Perhaps we can make it

2    simple.

3            I promised only one PowerPoint slide, which is to

4    the contract itself, which I -- is the letter itself which

5    forms the supposed basis.

6            If we could we have that.  I'm sorry.

7            Your Honor, while that is getting ready and we are

8    looking at just ourselves and not our screens, let me frame

9    it, if I can, very quickly.  Your Honor, they have got four

10   causes of action, the third through the sixth, which are

11   predicated upon the notion that the letter -- the LOA creates

12   a third-party beneficiary right, and a subcomponent maker who

13   is being sued for indirect infringement.  Not only do they get

14   to argue RAND equitably, they also want it to be part of the

15   jury trial because they have already talked about a damage

16   claim that we can talk about briefly.

17           THE COURT:  Did this come up in any of the other

18   cases?

19           MR. WAGSTAFFE:  The damage issue did not come up in

20   the other cases, no, Your Honor.  As to the -- I don't believe

21   that the RAND motion for summary judgment as to whether it is

22   a proper third-party beneficiary issue has been addressed by

23   this Court.

24           I think it is fairly straightforward, Your Honor.

25   We can talk about damages and why that one goes, but it starts

1   with a simple question -- well, first, we say it is a contract

2   interpretation, Your Honor, so it is perfectly appropriate for

3   summary judgment.  That is what the courts do on summary

4   judgment in this situation.  And I will indicate why I think

5   the term is unambiguous; and for all of the stacks of stuff

6   before Your Honor, I think if we look at this single document,

7   we are going to find that it answers the question for us.

8          The first question is, is Marvell an intended

9   third-party beneficiary of the LOA because if it is incidental

10   or it is not covered by the LOA or reasonably within the

11   contemplation of the parties, then that is the end of the

12   theory.

13          And, Your Honor, I think it is easily answered.  The

14   only real evidence that there was shared meaning between the

15   parties is the IEEE's request and the letter that was

16   ultimately given.  And the LOA does not expressly name any

17   beneficiaries.  We know that.  Therefore, the question is, was

18   it applied when it says it was directed to those who practice

19   the standard?  Not component suppliers.  The chip does not

20   practice the standard since it does not have complete

21   functions of the standard.

22          And, Your Honor, again -- the glory of reading the

23   complaint last night -- both in Paragraph 15 and Paragraph 48

24   of their first amended complaint, they say it enables

25   devices -- that's Paragraph 15.  And in Paragraph 48 they

1   say -- in that particular paragraph they say that it is

2   incorporated in the implementations.

3          So the Marvell product does not practice the

4   standard as set forth in the LOA.  It is being sued for

5   indirect infringement, which is a legal theory that is

6   allowed, of course, in the counterclaim; but for this the LOA

7   does not apply, by its own terms.  And that is the beginning

8   and end of that point, frankly in the plain meaning of the

9   contract.

10         The IEEE when it talks about, you know, applicants

11  for licenses, talking is referring back to those who implement

12  the standard.  Therefore, they are not the intended

13  third-party beneficiary of this contract.

14         There is something, may I say, Your Honor, equally

15  simple that won't take long argument, I hope, which is that if

16  you look at the letter and the LOA they are relying on, it

17  specifically refers to the 802.11(a) standard.  That is the

18  standard that was proposed.  That is the only standard covered

19  by the letter.  And we know it was only covered by that letter

20  because there was no LOA for 802(g) and (n).  We know that.

21         CSIRO did not choose to have an LOA in that

22  situation.  Therefore, we don't have a RAND issue.  And it is

23  undisputed that Marvell has no (a)-only chips at issue in this

24  case.

25         THE COURT:  Is that correct?

1          MR. CORDELL:  The (a)-only chips are at issue, but

2     we believe are licensed.  So it is hard for me to say

3     categorically that they are not an issue.  We have a defense

4     to them, so they won't be part of any damages proceeding that

5     is ultimately --

6          MR. WAGSTAFFE:  Your Honor, there is definitely a

7     license matter.  The only ones that are at issue in this case

8     have (a), (g), and (n).  Therefore, this LOA, which is limited

9     to (a) would not, otherwise, affect this summary judgment

10    ruling.

11         MR. CORDELL:  But, Your Honor, that doesn't mean

12    that the chips don't practice (a).  The chips as sold practice

13    (a).  They practice (a), (g), and (n) together.

14         THE COURT:  But there are no (a) chips at issue?

15         MR. CORDELL:  That's right -- well, but the point is

16    nobody -- that nobody makes just an (a) chip.  You make an

17    (a), (g), and (n) chip.  So the technology that was licensed

18    under the patent that is up on the screen, is, in fact, the

19    same.

20         THE COURT:  All right.

21         MR. WAGSTAFFE:  Well, you asked before, Your Honor,

22    with respect to this issue; but the infringement is as -- not

23    as to (a) only, and this is an (a) only, so we don't have a

24    RAND there.  That is ripe before Your Honor in the briefing.

25    I think it is nice and straightforward.

1          Also, in the letter it says that they have to --

2    that it has to be, of course, a request in writing.  There has

3    to be that there be a request in writing from a

4    written request -- we don't have that request in writing in a

5    timely fashion.  And, Your Honor, there was put forth why --

6    the facts are straightforward.

7          There was no -- they suggest somehow we had to offer

8    them a license or they were relying on us for saying we don't

9    need a license.  The LOA is clear by its terms.  It will not

10   apply unless there is a written request.  So we don't get a

11   written request until March of '07.  We don't get a written

12   request until March of '07.

13         Your Honor, we have set forth in our brief why when

14   Marvell knew about this issue years and years earlier and it

15   is now in a litigation position to give a written request,

16   supposed written request late in the game.  It is not the good

17   faith required to rely on this doctrine either for damages or

18   for the equitable relief.

19         Your Honor, in addition, we have set forth they

20   didn't -- even if you look at that March 7th interaction, they

21   didn't make a counter-offer.  The evidence is undisputed their

22   negotiator had no authority to do anything, and they claim

23   they had no duty to negotiate.

24         Your Honor, if this is a RAND and they come to that

25   discussion and say we don't like the number and they don't

1    want to negotiate and they don't have anybody there with any

2    power to negotiate, both in equity and otherwise, whether it

3    is unclean hands or it is simply the terms of the contract,

4    summary judgment gets granted on that ground as well.

5            What does RAND mean in this particular situation?

6    We have set forth through the law and the analysis, that

7    "reasonable" means reasonable.  We have put forth the facts as

8    to what that means, Your Honor, with respect to that their

9    argument is, well, "reasonable" means -- and their expert says

10   this.  The are only evidence for Celotex purposes, Your Honor,

11   on that issue.  It an ex ante royalty.  They're saying it is

12   the earlier royalty.  The letter just doesn't say that.

13           The last line of that second paragraph says,

14   including its then current royalty rates.  You take a snapshot

15   of time at the time of the written request.  That is what the

16   letter says.  The fact is, is that if somehow coming to that

17   negotiation and not being able to negotiate somehow they can

18   still come here and argue reasonableness and equity, that is

19   their only evidence through their expert is the number for

20   damages, the number that occurred years earlier with Radiata;

21   and we have got that in our brief.  So it is a delay in making

22   the request and the terms itself, Your Honor.

23           Your Honor, let me say as to the one claim they want

24   to get before the jury, which is their damage claim, that

25   fails under the multiple grounds we have set forth in our

1   papers.  That is, it is not -- first of all, it is not a

2   number of certainty at all.  They told us they might have an

3   obligation.

4          What they really do, Your Honor, and which I think

5   public policy presents, they say Microsoft settled, we have an

6   indemnity agreement that we haven't finalized in any way or

7   know what it is.  Therefore, since Microsoft settled and Your

8   Honor was right in this courtroom when that happened in terms

9   of the case getting over, therefore, there is a double-dipping

10  and they can sue us for damages for Microsoft's settlement.

11         Your Honor, the good-faith aspect of settlements is

12  that it not only cuts it off because Microsoft has settled

13  away any claims so there is no subrogation rights, it not only

14  goes away because public policy says we support settlements

15  and we don't have a settling with Microsoft and then paying

16  Marvell damages for the same number.  That is not how it works

17  in this situation.

18         And lastly on damages, Your Honor, there is, may I

19  suggest -- going back to my first year of law school -- a

20  Hadley v. Baxendale issue that is very clear; that is, that

21  these supposed damages are not foreseeable.  The letter of

22  assurance was not between CSIRO and Marvell.  The damages are

23  based on Microsoft's supposed claim for indemnification, which

24  Marvell has not yet formally confirmed they have agreed to it.

25         The indemnification agreement was entered into after

1   the LOA was signed.  And it is simply not foreseeable at the

2   time of the LOA as required by law, particularly in a

3   third-party beneficiary situation, that this rather

4   around-the-bend theory that because we owe indemnity someone

5   you settle with is going to equal a damage, that particular

6   settlement somehow can continue to go forward in front of a

7   jury in that particular regard.

8        So, Your Honor, for that reason all of the causes of

9   action go away by way of summary judgment, but the simplest

10  one is in that single letter by its very terms, which is

11  exactly what happened in summary judgment all the time.

12       THE COURT:  Okay.

13       MR. CORDELL:  Your Honor, we see a number of fact

14  issues that are raised in CSIRO's motion.  If I can go to the

15  slides and, Your Honor, to Tab 2 of our binder.

16       Beginning with the question of what is the meaning

17  of a reasonable and non-discriminatory RAND offer in the

18  context of 802.11?

19       We just heard discussion about what could or

20  couldn't be reasonable.  That is the quintessential fact issue

21  of -- that is the reason why we have trials.  The reasonable

22  man standard in negligence is a good example.  That is an

23  issue fraught with fact determinations.  Does the letter of

24  assurance apply only to alleged direct infringers?  The facts

25  of this case --

1          THE COURT:  Are you saying that is a fact question?

2          MR. CORDELL:  I do think it is, Your Honor, and for

3    this reason:  The facts of this case -- and CSIRO is

4    well-aware of this -- is that the chips perform everything

5    except for the antenna function.  They have taken the position

6    that that is true; that the chip is everything except for the

7    antenna.  And it is completely foreseeable.

8          Therefore, is it now reasonable to allow CSIRO to

9    retract its RAND commitments to the industry, based on that

10   technicality; and that technicality, I do think, is a fact

11   issue because it is born out if these things are used in any

12   other context, for example, and the degree to which CSIRO

13   could have foreseen and predicted that the chips themselves

14   formed the corpus of the infringement.

15         Was CSIRO's license a RAND offer at all?  I will

16   present a fair amount on this.  But the reality is that it is

17   not just the Radiata license that shows it was unreasonable.

18   It was the fact that CSIRO was demanding in excess of 100

19   percent of the revenue that Marvell makes on these chips.  The

20   jury is entitled to decide whether or not that is a reasonable

21   position for a licensor to take.

22         The fact that -- the issue that the Court asked

23   earlier about whether or not the LOA on 802.11(a) also applies

24   to (g) and (n).  The facts show that the technology is the

25   same; that the backward compatibility requires you to practice

1    exactly what it is that was in 802.11(a); and that there is

2    really nothing outside of that that they accuse as infringing

3    for the (g) and (n) standards.  So what essentially CSIRO is

4    attempting to do is to retract its RAND commitments by

5    suggesting that you added something to the device.

6          But that is not the way patent law works.  You don't

7    affect infringement by adding things to the device.  Whether

8    Marvell's refusal to pay half of its revenues ultimately to

9    CSIRO was appropriate in the exchange that they had; and that

10   whether or not it was reasonably foreseeable that damages

11   would result, I believe is a fact issue.

12         So let me touch on these quickly.  We begin with the

13   letter at Slide 2.  It is, in fact, true that CSIRO made a

14   RAND commitment.  And the RAND commitment -- it is important

15   to note here -- is not we agree to offer a license to a

16   particular technology as long as you are making that

17   particular technology.  That is not what the RAND commitment

18   says.

19         What the RAND commitment says is that they will give

20   us a non-exclusive license under the patent, under the

21   patent.  There is no restrictions to field of use.  There is

22   no discussion of the technology at issue here.  What is being

23   licensed is the patent on a non-discriminatory basis.  That

24   was the RAND commitment they made.  That is the RAND

25   commitment that we expect them to live up to.

1           At Slide 3, does CSIRO's letter apply only to direct

2     infringers?  The IEEE bylaws, which is the operating body that

3     bore out the RAND commitment, makes it clear that the license

4     has to be offered to all applicants.  They are not going to

5     get into whether you are doing 90 percent of the infringement

6     or 95 percent of the infringement or 80 percent of the

7     infringement.

8           If you are an applicant and you want a RAND license,

9     you are entitled to one under the rules governing the 802.11

10    RAND commitment.

11          When we look at this from a legal perspective, a

12    license is just a permission to engage in activity that would

13    otherwise infringe --

14          THE COURT:  I tell you, if you could address the

15    third-party beneficiary aspects of what qualifies Marvell as a

16    third-party beneficiary.

17          MR. CORDELL:  Certainly, Your Honor.  The reason

18    why -- there are really two responses there.  Number one,

19    CSIRO fully understood, fully understood that there would be

20    actors in the chain of distribution for these particular

21    patents.

22          Imagine, for example, that instead of suing the chip

23    makers or the box makers, CSIRO were to sue the users.  That

24    is an act of infringement.  Would there be any dispute about

25    whether or not an infringer if they wanted to, would, in fact,

1  be entitled to claim the benefit of the RAND commitment made

2  to the IEEE?  The IEEE's RAND commitment is not made just to

3  the IEEE's members.  It is made to the public at large.  It is

4  made to anyone --

5          THE COURT:  Why did this not get raised as a breach

6  of contract issue in the other cases?

7          MR. CORDELL:  I think the posture of this particular

8  claim is a little bit unique, because remember Marvell was a

9  chip supplier, and they supplied chips to customers who were

10  then sued, and the demands made of those customers were above

11  RAND rates.  That is really the fundamental contract claim

12  that we are bringing.  Had CSIRO lived up to its contractual

13  commitment to offer a RAND rate, all of these Marvell

14  customers who were sued and were forced to pay monies --

15          THE COURT:  Why couldn't the box defendants have

16  raised a breach of contract?

17          MR. CORDELL:  I think actually each of the

18  defendants could have --

19          THE COURT:  But they didn't.

20          MR. CORDELL:  Well, I think that in fairness, Your

21  Honor, the way it was phrased in the last case is that they

22  breached the RAND commitment and, therefore, their damages

23  should be limited.

24          THE COURT:  Right.  And I mean this whole RAND thing

25  I remember from last time.  It is murky water.  Has the IEEE

1   done anything to clear up and more clearly define what is

2   being created in these RAND letters that they send back and

3   forth?

4          MR. CORDELL:  I think the IEEE is composed of a

5   number of committees that operate on different bodies of

6   technology, and different committees have actually taken

7   different approaches.  But I think everybody recognizes that

8   it is a thorny issue.  And it is a problem.  And it is a

9   fundamental societal problem.  Because what happens in the

10  standard is when the IEEE says we are going to go with path

11  (c) out of the choices that we have, the makers of path (c)

12  now have market power way beyond any patent rights, any other

13  intellectual property rights because they hold the keys to the

14  standard that everyone must now adopt.

15         So that is really what bears out the entire standard

16  setting organization in law is the FTC and Justice looks at

17  this stuff very, very closely because they want to make sure

18  that people don't use this market power.

19         This ex-ante debate that we heard about on the

20  damages issue is germane to this.  The idea that you don't let

21  a patent holder whose patent covers a standard to come in and

22  raise their rates after the standard is adopted.  The germane

23  analysis is, what would the prevailing rates at the time that

24  they were selling these things before the standard was adopted

25  so that we know that they are not creating this so-called

1   patent holdup that the standard setting cases talk about; that

2   they are able to look at after the standard was adopted.

3           Of course, you may find instances where people can

4   demand higher rates, but they are not supposed to.  That is

5   the whole point of the idea.

6           So if I could just move forward --

7           THE COURT:  Why don't you wrap this one up, and we

8   will move on to something else because we have got a few more

9   things to cover here.

10          MR. CORDELL:  Okay.  If I can just address a couple

11  of points that Counsel made.  One was the idea that the offers

12  that were made were, in fact, RAND; and that the only evidence

13  that we have was the Radiata license.

14          It is true at Slide 6 we put up the Radiata license

15  and the royalty rates between .5 percent and 5 percent of the

16  chip price are what was in the Radiata license.  That existed

17  before 802.11 said, okay, we are going to go with this

18  approach.  So that is a very, very forceful piece of evidence

19  that we think creates a significant fact issue because what we

20  find is that when they did finally offer rates to Marvell,

21  they were at substantially higher rates; 200 or 300 times --

22          THE COURT:  Did Marvell ever make any counter-offers

23  to those --

24          MR. CORDELL:  What Marvell --

25          THE COURT:  Was there any negotiation -- after they

1    sent out their letter offering to license, was there ever any

2    negotiation between Marvell and CSIRO?

3              MR. CORDELL:  The negotiation asked that Marvell

4    come -- I'm sorry, that CSIRO come down to a much more

5    reasonable level.  So there was some discussion.  The

6    discussion pointed out the fact that the dollar 40 to dollar

7    90, the four dollar rates that CSIRO were demanding were in

8    excess of Marvell's entire revenue, that four dollar number is

9    more than a hundred percent of CSIRO's entire --

10             THE COURT:  Is this back when the letter was first

11   sent out or was there no response to the letter?

12             MR. CORDELL:  This, I believe, was in the 1997 time

13   frame.  There was some discussion, and the discussion from

14   Marvell's perspective was that if you come down to a

15   particular level, we can have a real discussion.  And CSIRO

16   declined to do that.  But the level that -- again and I don't

17   know how confidential this stuff is or not, but --

18             Can I talk about it?

19             If I could have a moment Your Honor.

20        (Pause in proceedings.)

21             MR. CORDELL:  The response from Marvell was that

22   CSIRO was asked to come down to a reasonable level, something

23   like ten cents a chip, which would have been above the .5 to 5

24   percent number that the Radiata license had in it, so they

25   could have an effective negotiation.  But the gulf between ten

1    cents and a dollar 40 or four dollars was too big, so nothing

2    progressed from there.  But there was a discussion about it.

3             And the question as to why it is that Marvell didn't

4    have this discussion until 1997, is easily explained, Your

5    Honor.

6             If I could have -- if I could have slide --

7             THE COURT:  I tell you what, I need to take about a

8    ten-minute break.  We have been going for a pretty long time.

9    We will be back in about ten minutes.

10            MR. CORDELL:  Thank you

11       (Recess was taken at this time.)

12            THE COURT:  All right.  Please be seated.

13            All right.  What would CSIRO like to hear next?

14            MR. WAGSTAFFE:  Your Honor, could I have the final

15   statement on the motion?

16            THE COURT:  All right.

17            MR. WAGSTAFFE:  Let me just say it this way, Your

18   Honor --

19            MR. CORDELL:  Your Honor, I hate to interrupt, but I

20   was going to make one more point.

21            THE COURT:  All right.  One more point.

22            MR. CORDELL:  The one more point is just this:  The

23   explanation for the delay was very simple.  CSIRO simply told

24   Marvell that it didn't infringe, over and over and over

25   again.

1           If I can have Slide 15.

2           THE COURT:  Wait a minute.  CSIRO simply told

3    Marvell they did not infringe?

4           MR. CORDELL:  Yes.  I'm sorry if I misspoke.  They

5    told us that over and over and over again.  So we have an

6    excerpt from Mr. Colwell's declaration that he submitted

7    earlier in this case.  Mr. Colwell was one of the Townsend

8    lawyers that represents CSIRO.

9           He says:  I told Mr. Anthony that CSIRO had

10   investigated the company's manufacturing and infringing

11   products and that Marvell was not on the list.  I assured him

12   that CSIRO had no plan to assert the patent against Marvell

13   because Marvell's products did not infringe the patent.

14          THE COURT:  Okay.

15          MR. CORDELL:  We have got that excerpt on Slide 15.

16   There is another one on 16.  There is another one on 17.  It

17   is no surprise that we didn't start that negotiation until

18   2007.  When CSIRO decided to sue our customers and not provide

19   them with the RAND commitment, it does damage Marvell.

20   Marvell then has to deal with those indemnity claims.  Marvell

21   has to pay more than they would have paid had CSIRO made its

22   RAND commitment.

23          So they are going back on their word when they said

24   that we didn't infringe.  But more than that, they are costing

25   us money.  That is real damage.  It is cognizable damage.  The

1    simple fact that it is hard to ascertain doesn't mean that it

2    is not legal damage.  Thank you.

3            THE COURT:  Let me ask you on that claim if it is in

4    the case and we try it, what does your damage model look

5    like?

6            MR. CORDELL:  Our damage model has to do with the

7    fact that companies like Microsoft are forced to pay more --

8            THE COURT:  Are you going to be able to quantify it?

9            MR. CORDELL:  It will be difficult, but our expert

10   has taken a shot at that, and we will have testimony about the

11   kind of damage that we have suffered.  It may be, again,

12   difficult to ascertain; but that doesn't defeat the claim of

13   damages.

14           THE COURT:  What kind of damages does your expert

15   opine, what amount?

16           MR. CORDELL:  I confess, I don't know what the full

17   amount is; but I can consult with Mr. Heit.  Could Mr. Heit

18   respond to that one?

19           THE COURT:  Sure.

20           Mr. Heit.

21           MR. HEIT:  Your Honor, an indemnity claim was made

22   by one of Marvell's customers to Marvell as a result of the --

23   one of the settlements in the --

24           THE COURT:  Is that Microsoft?

25           MR. HEIT:  Correct, Your Honor.

1          It is Marvell's position that had CSIRO offered to

2    Marvell a RAND license when requested by letter in 2007,

3    Marvell would have taken that license and that would have

4    stopped the clock of any sort of liability.  In fact, it would

5    have had Marvell paying for --

6          THE COURT:  All right.  I understand that.

7          What amount of damages are you claiming?

8          MR. HEIT:  It is -- two aspects of it.  The

9    indemnity claim had two components to it.  It had an

10   attorneys' fees component to it; and Marvell's damages expert

11   took a look at that and said the attorneys' fees from the date

12   that CSIRO should have given the RAND license forward, would

13   have been avoided.

14          And there is a liability component, settlement

15   component with it and said had CSIRO given to Marvell a RAND

16   license, the exposure -- the settlement associated with the

17   parts that Microsoft paid would have been at a RAND rate.  And

18   anything that Microsoft paid with respect to those parts in

19   excess of that RAND rate, should it be recoverable, are

20   damages associated with CSIRO's breach of RAND claim.

21          THE COURT:  Has Marvell accepted indemnity to

22   Microsoft?

23          MR. HEIT:  What Marvell -- that liability is -- that

24   is a claim against Marvell.  When Marvell is successful on its

25   breach of contract claim, that money will be paid to

```
 1   Microsoft.  Marvell's position is --
 2              THE COURT:  What if it is not successful?
 3              MR. HEIT:  Then the claim -- there is a claim
 4   outstanding by Microsoft against Marvell.
 5              THE COURT:  So no money has changed hands?
 6              MR. HEIT:  At this point no money --
 7              THE COURT:  So parts A and B of your damage model,
 8   what are your amounts that the expert put on both of those
 9   attorneys' fees and potential indemnity to Microsoft.
10              MR. HEIT:  I'm going to do my best at recalling it.
11   I believe it is somewhere between three and six million
12   aggregate.  It is around that number, Your Honor.  I
13   apologize --
14              THE COURT:  Three and six million for parts and A
15   and B?
16              MR. HEIT:  I think in the aggregate, yes, Your
17   Honor.
18              THE COURT:  So it is a relatively small damage claim
19   in the context of -- what is being sought in this case?
20              What is CSIRO's damage model going to look like?
21              MR. WAGSTAFFE:  On this issue, we have no damage
22   model.
23              THE COURT:  No, I mean on the case as a whole.
24              MR. CAPSHAW:  About $130 million, Your Honor.
25              THE COURT:  All right.
```

1          MR. WAGSTAFFE:  Your Honor, very briefly.

2          First -- if you will forgive the pun -- this

3   inventive theory was not raised last time, even though Intel

4   was in the case as a chip maker.

5          Second, when you are analyzing the contract, Your

6   Honor, it is important to remember you construe it against the

7   drafter.  This is an IEEE form draft.

8          Second, Your Honor, since my client is being asked

9   through this process to waive statutory damages and is a

10  waiver, you also construe it against the waiver.

11         Third, Your Honor, so on the third-party beneficiary

12  theory, as Your Honor has outlined, it only applies to those

13  who practice the standard.  The suggestion that everybody, as

14  in their words, who provides component parts, therefore, gets

15  a license through that process, is not how the IEEE applied.

16         Next, Your Honor, is that the LOA letter, as I have

17  indicated, only dealt with (a).  The suggestion that, oh, they

18  are all the same thing is defied --

19         MR. CORDELL:  Your Honor, I didn't get to respond to

20  that point.

21         THE COURT:  Okay.  I will allow you to in a moment.

22         MR. WAGSTAFFE:  Well, your Honor, he will probably

23  respond to this; but I note that the IEEE sent a (g) letter --

24  that is not disputed.  CSIRO -- Marvell knew about that

25  process, and CSIRO didn't agree.  There is no LOA letters.

1   And the IEEE felt it necessary to send one, both of them on

2   (g) and (n) and there is no LOA.  We have no (a)-only chips in

3   this case.  Literal terms.

4           Your Honor, with respect to the negotiations, let me

5   say this:  Not only is the reference they made not in the

6   record and not only is that 1990's record not in the record,

7   it was not a RAND offer.  It did not talk about ten cents.

8   And it didn't have a dollar figure.

9           The only time we have a negotiated point where they

10  are coming in this Court and seeking equity for this process

11  is where they get a number and they reject it.  They do not

12  have a negotiator there in good faith.  They do not have --

13  the testimony in the record is:

14          Question:  Okay.

15          This is to their negotiator.

16          It is fair to say you were never authorized or

17  instructed to make any offer on any terms to license the CSIRO

18  '069 patent; is that correct?

19          Answer:  Yes.

20          They went there with no intent to negotiate.  Your

21  Honor, if this is coming to this Court on a RAND

22  reasonableness argument, to go to that negotiation and say we

23  are rejecting whatever you say and we will see you in court

24  and we will seek damages, it is exactly the opposite purpose

25  of what this process is designed to do.

1          As to damages, Your Honor, I just heard the damage

2     model.  This is a Celotex motion.  We have set forth the

3     damages are indefinite; that there was no meeting of the minds

4     with respect to how much it would be; and they don't have

5     evidence at this time.  That is Celotex.

6          But, Your Honor, it is murky water.  And if it is

7     murky water -- and we have -- you can look at our brief at

8     Pages 17 to 19 for all of the evidence.  And the people from

9     IEEE themselves don't know what it means and Marvell steps

10     into the shoes of the IEEE, we have indefiniteness and no

11     meeting of the minds; therefore, an unenforceable contract in

12     this particular circumstance.

13          Your Honor, Marvell has paid no money in this case.

14     They have just told you their damage model.  Maybe there will

15     be a lawsuit thereafter.  If they were going to come to court

16     and try to beat summary judgment, they have to say not only

17     some model but they had to say they paid some money.  The

18     claim is not ripe.  There are no definite damages.  And if we

19     run the tape -- as they say on the sports broadcasts -- you

20     know what happens here, these equity claims go away, the

21     inventive contract claim that no one else raised goes away,

22     and there are several things we might be doing next time we

23     see each other that won't be necessary, and it will streamline

24     this trial.

25          Thank you, Your Honor.

1          THE COURT:  Final word.

2          MR. CORDELL:  Your Honor, the precise numbers are 2

3    million for the attorneys' fees and 7 million for the

4    liability are the precise demands.

5          THE COURT:  Okay.  Thank you.

6          MR. CORDELL:  On the (a)-only, Your Honor, the fact

7    of the matter is if what CSIRO is suggesting is that if we

8    include 802.11(a) functionality in our chips then they are off

9    the table, then they won't make any accusations about them, we

10   can all go home right now because every one of these chips has

11   (a) functionality in it.  So it is a complete non sequitur

12   to say, well, this is all about (a)-only chips.  No, it is

13   not about (a) chips.  It is about (a) technology, 802.11(a)

14   technology.

15         If I could have Slide 11.

16         The fact of the matter is, the letter of assurance

17   didn't say anything about limiting it to one particular flavor

18   of the standard.  It said that we are going to give you a

19   license under the patent, not the standard, not as to any

20   particular technology; but a license under the patent.  So you

21   get a patent to the '069 -- to the '069 claims themselves.

22         At Slide 12 what we are talking here is -- what we

23   are talking about here is an IEEE working group.  Bruce

24   Kraemer, one of our witnesses who was an instrumental person

25   at the IEEE, explained that everybody understood at the IEEE

1    level that when you progressed forward within a standard, any

2    letter of assurance you have offered remains intact.  You

3    can't then somehow recant your letter of assurance because the

4    technology has moved forward.

5              And then, finally, Your Honor, at Slide 13 we talk

6    about the Bloom case where they specifically recognize that if

7    a new use is foreseeable, reasonably foreseeable, then the

8    grantor bears the risk that that new use would spring into

9    action, and the grantor bears the risk of having to reserve

10   that out of the grant in the initial case.

11             Here it was eminently reasonable that 802.11 would

12   go through different generations, and so CSIRO should have

13   reserved that from their letter of assurance, if that was

14   their intention.

15             Thank you.

16             THE COURT:  Okay.  Thank you.

17             All right.  We have got about ten minutes left.

18   Anything special that CSIRO would like to hear arguments on?

19             MR. MICHAUD:  Your Honor, I assumed from earlier you

20   have decided to take under advisement the realignment motion.

21             THE COURT:  No. I wanted to deal with that,

22   actually.

23             MR. MICHAUD:  Then we would like to address that, if

24   we may.

25             THE COURT:  I can probably save y'all some time.  I

1    think how I normally try patent cases, even when it has been

2    brought as a DJ, is to try to realign and allow the patentee

3    to assume the position of the plaintiff; and I think it is

4    more understandable to the jury that way working through

5    infringement and invalidity and damages.

6            However, in the event -- what did we do in the last

7    case?  Who went first in that case?

8            MR. CORDELL:  CSIRO.

9            MR. CAPSHAW:  CSIRO did, Your Honor.

10           THE COURT:  CSIRO.  So that is sort of my thinking,

11   but I have got a question for Marvell, which might change my

12   mind on the order of the plaintiffs; and that is whether

13   Marvell is going to pursue its non-infringement defense.

14           MR. CORDELL:  Well, at this time the answer is yes,

15   Your Honor.  It depends quite a bit on the Court's claim

16   construction that we discussed.

17           THE COURT:  I will get that to you this week.  What

18   is today -- today's Thursday.  It may be early next week.

19           MR. CORDELL:  Just if I understand, Your Honor, if

20   we decide not to proceed with our non-infringement defenses,

21   does that put us in the posture of the plaintiff then?

22           THE COURT:  I would hear arguments on it, but I

23   would think so.

24           What would be CSIRO's position on that?  If they

25   concede infringement, wouldn't you agree they would have the

1    burden of proof and probably ought to go first?

2              MR. MICHAUD:  Well, Your Honor, there is still the

3    issue of willful infringement and damages.  Damages are in

4    this case, as I understand it, and I wasn't --

5              THE COURT:  If they concede infringement, are you

6    going to pursue willfulness?

7              MR. MICHAUD:  Yes, Your Honor, we are.

8              MR. WAGSTAFFE:  Your Honor, may I add to that just

9    briefly.  The jury confusion issue is a serious issue.

10             THE COURT:  The what?

11             MR. WAGSTAFFE:  The jury confusion issue is serious

12   in this sense, regardless of infringement, although I see

13   where that goes -- we are seeking damages.  This is a damage

14   trial.  And you know how jurors are.  They think the person

15   who is seeking damages -- and at the end they have got to fill

16   out the form as to who is the plaintiff and who is the

17   defendant; and even with the best of explanation, that

18   confusion can exist.

19             If you go first and you put your case forward on

20   liability, you put your damages case on, the other side --

21   like every trial -- puts on its defenses.  If they have a

22   counterclaim, they put it on.  Let's hope it is not in this

23   case.  And then we go forward.  That is -- the jury has to

24   see, if you will, who is -- who gets the dollar sign line, you

25   know.  So I think that is my concern on the confusion, as

1    well.

2              THE COURT:  Okay.

3              MR. CORDELL:  Just to respond, Your Honor, the jury

4    confusion is manifest if, for example, our breach of claims

5    get heard.  The idea there is that we have got affirmative

6    claims that we need to prosecute.  So it is not a panacea

7    simply to say that we realign so that the patentee is in the

8    posture of the plaintiff.  We all have to do our jobs

9    and explain it to the jury.

10             I would like to raise one critical jury confusion

11   issue, which has to do with the settlement agreements, the

12   whole ResQNet debate.

13             THE COURT:  Let me comment on the order of proof.

14   Let me get my claim construction opinion out, and then I would

15   like for Marvell to make a decision on whether it is going to

16   contest infringement or not within a reasonable period of time

17   after you receive that.

18             How long would you need?

19             MR. CORDELL:  Three business days, Your Honor.

20             THE COURT:  Three business days.  How are we doing

21   on time.  Y'all pick a jury on the 6th.  Could you do it in

22   two?

23             MR. CORDELL:  Sure.

24             THE COURT:  Okay.

25             MR. CORDELL:  Thank you.

1          THE COURT:  As soon as I get that to you, you make a

2     decision and file a notice to what your election is, and I

3     will enter an order dealing with the order at trial based on

4     the arguments.

5          MR. CORDELL:  Thank you, Your Honor.

6          THE COURT:  So don't make it just thinking you are

7     going to go first, but you can abandon it if you wish to

8     because you don't think it has any merit and you think the

9     Court might be inclined to go that way.

10          MR. CORDELL:  We will take our chances, Your Honor.

11          THE COURT:  But don't hold my feet to it.  I will

12     think about it.

13          Okay.  What else?

14          MR. MICHAUD:  Well, Your Honor, you mentioned

15     willfulness.  There is a motion by Marvell -- for summary

16     judgment that there is no willfulness in this case.

17          THE COURT:  Okay.  That is denied.

18          What is next?

19          MR. MICHAUD:  Pardon me?

20          THE COURT:  I said that's denied.

21          MR. MICHAUD:  Denied.  The only other one I would

22     like to address if we have a little bit of time is also a

23     Marvell motion for partial summary judgment with respect to

24     the priority date.

25          THE COURT:  Yes.  I think we have got a fact issue

 1    there, too, and I deny that one as well.

 2              What else?  We have got a Marvell Daubert --

 3              MR. MICHAUD:  There's a Daubert --

 4              THE COURT:  -- on Wagner, what about that?

 5              MR. CORDELL:  Yes, Your Honor.  That one does deal

 6    with the settlement issue, so I think -- the settlement

 7    agreement issue.  I think that is probably the most important

 8    one.

 9              THE COURT:  Let's deal with the ResQNet.  Will that

10    resolve this Daubert?

11              MR. CORDELL:  They are related, Your Honor.

12              MR. CAPSHAW:  No, sir.  The Wagner Daubert is a

13    separate issue.  What Mr. Cordell is talking about, I believe,

14    is Mr. Wagner's supplemental report, which under ResQNet puts

15    the settlement agreements in.

16              MR. CORDELL:  Yeah, I don't mean to suggest --

17              THE COURT:  Have y'all briefed that issue yet?

18              MR. CAPSHAW:  The parties have exchanged the briefs.

19    The Court indicated -- or Mr. Cordell indicated he had an

20    argument as to why ResQNet should not apply.  That issue

21    hasn't been briefed.  Both parties in their brief basically --

22    and you can correct me if I am wrong -- assume ResQNet made

23    settlement agreements admissible.

24              MR. CORDELL:  However, we have not heard from the

25    Court as to the application of ResQNet here.  We have heard it

1    in other divisions.

2            THE COURT:  I would like briefing on that issue

3    specifically.  Since you have raised it, why don't you file

4    your brief first.  I don't have a brief on that yet, do I?

5            MR. CORDELL:  Not on the precise issue that Mr.

6    Capshaw outlined.  We talked about it.  Monday morning, would

7    that suffice?

8            THE COURT:  What is today?  Thursday.  Yeah, Monday

9    morning would be fine.  And do you want to have briefing by

10   then, or do you want to file a response?

11           MR. CAPSHAW:  We probably should file a response.

12           THE COURT:  Can you have that by Tuesday morning,

13   say?

14           MR. CAPSHAW:  Yes, Your Honor, we can.

15           THE COURT:  Let's don't have any replies after that.

16           MR. CORDELL:  We'll keep it brief.  We do have a

17   separate motion as to Mr. Wagner, as to his old theories; and

18   Mr. Heit can present those.  It's a Daubert motion.

19           THE COURT:  I tell you what, I think we have covered

20   enough today.  Let's get the thing -- we are starting to get

21   into damages now.  If necessary, I'll schedule another hearing

22   taking up some of these matters or maybe do it after jury

23   selection on the 6th.  Isn't that when we are picking the

24   jury?

25           MR. CORDELL:  Yes, Your Honor.

1          MR. CAPSHAW:  Yes, Your Honor.

2          THE COURT:  Is there anything about these motions to

3     strike and Dauberts and stuff that you really need today?

4          MR. CAPSHAW:  Not from CSIRO, Your Honor.

5          MR. HEIT:  I think we can wait until voir dire.

6     Thank you.

7          THE COURT:  I think we have all got our boats kind

8     of full now.

9          All right.  Where are y'all on settlement?  Who is

10    mediating this?  Judge Faulkner?

11         MR. CORDELL:  Judge Faulkner.

12         THE COURT:  Have y'all had a mediation with him

13    recently?

14         MR. CAPSHAW:  We had one mediation, Your Honor,

15    about a week ago Thursday.

16         THE COURT:  You make any progress?

17         MR. CAPSHAW:  We are far apart, but we progressed

18    from where we were.

19         THE COURT:  Both sides still talking to Judge

20    Faulkner?

21         MR. CAPSHAW:  No, sir.  I think we ought to set up a

22    process for that.  My last conversation we hadn't gotten back

23    in touch with him.

24         THE COURT:  Okay.  What is your reading?

25         MR. CORDELL:  My experience, Your Honor, is that

1    Judge Faulkner doesn't need much prompting, but we are happy

2    to engage with him.  We typically talk with him after

3    mediations for days and days sometimes.  I don't know if

4    anyone has heard from him in the last week.  Our expectation

5    was we would continue to talk.

6            MR. CAPSHAW:  Your Honor, we will do something

7    formal or whatever is the Court's pleasure.

8            THE COURT:  Well, I will leave that up to Judge

9    Faulkner.  But I would appreciate it if both sides would

10   contact him today or tomorrow at the latest and let him know

11   that I have expressed interest in him aggressively pursuing

12   additional mediation with the parties either formal or

13   whatever he believes will be appropriate.

14           Did we have the decision-makers at the last

15   mediation?

16           MR. CAPSHAW:  We did, Your Honor.

17           MR. CORDELL:  Yes.

18           THE COURT:  Very good.

19           Okay.  What else can the Court help you with?

20           MR. CORDELL:  But in the spirit of full disclosure,

21   Your Honor, I wasn't at the last mediation.

22           THE COURT:  Okay.  Good.  Good.  I hope you will

23   be -- I will instruct you to be at the next one.  How's that?

24           MR. CORDELL:  Thank you.

25           THE COURT:  As far as trial times, I will get you an

1   order on that after I find out whether infringement is in the

2   case -- in this case or not.  But I think we are looking at

3   substantially less time than what we did in the earlier CSIRO

4   case.  I think I gave y'all way too much time for that case.

5               MR. MICHAUD:  The parties have actually only asked

6   for five and six days.  They want six and we want five.  So it

7   is a fairly narrow range at this point.  I think if some of

8   these issues fall out, it could be less.

9               THE COURT:  Very good.  All right.  Very well.

10              Y'all a good day and weekend.

11              We are adjourned.

12        (Hearing concluded.)

13

14                    C E R T I F I C A T I O N

15

16   I certify that the foregoing is a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19

20   /s/ Shea Sloan

21   SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
22   STATE OF TEXAS NO. 3081

23

24

25